IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Case no.:  6:13-cr-94-Orl-37GJK

UNITED STATES OF AMERICA,          )     Orlando, Florida
                                   )     September 11, 2013
                Plaintiff,         )     8:57 a.m.
                                   )
                    v.             )
                                   )
JONATHAN DANIEL ADLETA,            )
                                   )
                Defendant.         )
_____   )

Transcript of the jury trial (day two)

before the Honorable Roy B. Dalton, Jr.

United States District Court Judge

Appearances:

Counsel for Plaintiff:  Karen Gable
                        Ilyanis Rivera Miranda

Counsel for Defendant:  Matthews Bark

Court Reporter:         Diane C. Peede, RMR, CRR
                        United States Courthouse
                        401 West Central Blvd., #4600
                        Orlando, Florida  32801
                        (407) 615-0305

Proceedings recorded by mechanical stenography, transcript
produced by computer.

1                          Index of Transcript

2                                                          Page

3    Preliminary matters                                 3

4    Jury selection (continued)                          6

5    Preliminary instructions                            50

6    Opening statements
     By Ms. Gable                                        63
7    By Mr. Bark                                         72

8                          Sarah Adleta
     Direct by Ms. Rivera Miranda                        76
9    Cross by Mr. Bark                                   171
     Redirect by Ms. Rivera Miranda                      176
10

11                       Samantha Bryant
     Direct by Ms. Gable                                 177
12   Cross by Mr. Bark                                   203
     Redirect by Ms. Gable                               206
13

14                         Diane Mathis
     Direct by Ms. Rivera Miranda                        208
15

16                        Sherry Wentz
     Direct by Ms. Gable                                 214
17

18                        Ian Buchanan
     Direct by Ms. Gable                                 218
19   Cross by Mr. Bark                                   234

20

21                        Debra Healy
     Direct by Ms. Gable                                 236
     Cross by Mr. Bark                                   260
22   Redirect by Ms. Gable                               264

23
     Defense's motion for judgment of acquittal          269
24
     Court inquires if defendant wishes to testify       276
25

3

1                      P R O C E E D I N G S

2               (Jury panel not present.)

3               THE COURT:  Good morning.  We're back on the record

4      in United States of America versus Jonathan Adleta, 6:13-

5      criminal-94.

6               Is the government ready to proceed?

7               MS. GABLE:  Yes, Your Honor.

8               THE COURT:  Is the defense ready to proceed?

9               MR. BARK:  Yes, Your Honor.

10              THE COURT:  All right.  We're going to finish our

11     jury selection process this morning.  The jury assembly tells

12     me that they have ten people for us.  I have them outside.

13              Both the government and the defense have exhausted

14     their peremptory challenges.

15              I am going to give you one more challenge for use

16     on alternates only.  I plan to pick two jurors.  The first

17     juror in the box will be our twelfth juror, unless he or she

18     is disqualified for cause for some reason.

19              Then our alternate will be the next juror in the

20     box, unless they are either challenged by one of you

21     peremptorily or excused for cause.  So I want to make sure

22     everybody knows where we stand.

23              Are you with me, Ms. Gable?

24              MS. GABLE:  Yes, Your Honor.

25              THE COURT:  How about you, Mr. Bark?

4

1          MR. BARK:  Your Honor, I would request two

2   additional peremptory challenges based on the denial of the

3   for-cause challenge previously, and I do have a case to cite

4   that the Court may want to look at, which is U.S. versus

5   Vera, 701 F.2d 1349.  It's an Eleventh Circuit case in 1983.

6   The court did find in that case that the challenges for

7   cause, the denial of them was okay, but in that case the

8   court also gave two extra peremptories, and so the Eleventh

9   Circuit did say that by doing so, that avoided any possible

10  error.

11         THE COURT:  I'm going to deny your request for

12  additional peremptory challenges.

13         Are you ready to go right into openings, Ms. Gable,

14  when we finish?

15         MS. GABLE:  Yes, Your Honor.

16         THE COURT:  How about you, Mr. Bark?  I don't know

17  if the defense plans to make an opening, but are you prepared

18  if you do?

19         MR. BARK:  Yes.

20         THE COURT:  All right.

21         Mr. Fiorenza, if you'll bring our jurors in, we'll

22  go ahead and let them get in the box.

23         MR. BARK:  Your Honor, before we do that, I just

24  want to point out to the Court that I ran into a couple of

25  jurors.

1        THE COURT:  Ms. Flick told me.  So when I get them

2   all together, Mr. Bark, I usually do that and I didn't get to

3   it yesterday, for whatever reason, but I will mention to them

4   that you all are not supposed to speak to them or to

5   acknowledge them and for them not to think that you're rude

6   if you don't.  I apologize for not getting to that yesterday,

7   but I'll mention it this morning, but I'll wait until we have

8   our whole panel together.

9        MS. RIVERA MIRANDA:  Your Honor, if I may, there's

10  just a preliminary matter that we wanted to address with the

11  Court.  In this case the defense has not provided any notice

12  that they intend to present any evidence concerning

13  defendant's mental competency or P.T.S.D. issues, and we just

14  want to make sure that with our first witness, that defense

15  will not try to get that evidence in somehow, because we have

16  not been provided notice about that.  We have not been able

17  to rebut any evidence or look at any expert reports on the

18  subject matter.

19        THE COURT:  Okay.  Well, you can make your

20  objection timely and Mr. Bark is on notice that you intend to

21  object to that.

22        So if you intend to get into that, Mr. Bark,

23  perhaps we'll need to have a side bar.  I don't know where

24  you're going with it or if it's going to come up or not, but

25  I appreciate you giving me fair warning.  Thank you.

1          All right, Mr. Fiorenza.

2          THE COURTROOM SECURITY OFFICER:  Please rise for

3   the jury.

4          THE COURT:  You all got the new questionnaires?

5          MR. BARK:  Yes.

6          (Jury panel present.)

7          THE COURT:  Good morning, ladies and gentlemen. We

8   appreciate you all coming in to help us out this morning.  We

9   are in a little bit of a different posture.  We're in the

10  middle of jury selection in connection with a criminal case

11  that we have that we didn't quite get completed yesterday,

12  and we brought you all in to help us finish that process.

13         So I guess the best place for me to start is to

14  tell you this is a criminal case and the style of the case is

15  United States of America versus Jonathan Adleta.  The case

16  number is 6:13-94.  I've established this before you all got

17  here.  The government and the defense are both ready to

18  proceed.

19         My name is Judge Dalton, and I'm going to be the

20  judge presiding over the case.

21         Today we will finish our jury selection process and

22  we'll get right underway with opening statements and the

23  presentation of witnesses.  This is a criminal case in which

24  the government has charged Jonathan Adleta with committing

25  federal crimes.

1          In a criminal case such as this, the defendant is

2    presumed to be innocent of the crimes that are charged and

3    the government has the burden of proving the defendant guilty

4    and the government's burden is to prove that guilt beyond a

5    reasonable doubt.

6          You all are about to participate in one of the most

7    significant responsibilities that you have as citizens of our

8    country.  Sometimes there are criticisms that we all hear of

9    the justice system, and perhaps you've even had occasion to

10   be critical of the system yourself from time to time, but I

11   will remind you that the American system of justice and

12   especially a trial by jury is one that is universally

13   respected throughout the world and considered to be a fair

14   and effective means of administering justice.

15         I know that some people look on jury service as a

16   burden.  I didn't have a chance to talk to you all yesterday

17   with the larger group, but I generally like to take a few

18   minutes and make the point that we all -- and I say "we all,"

19   meaning everybody that's involved in the administration of

20   justice -- appreciate the fact that jury service can be an

21   inconvenience.  It oftentimes comes in the midst of busy

22   lives at work or at home, and we recognize that it is a

23   sacrifice for you all to leave that and come here to

24   discharge your civic responsibility.

25         I do want to take a minute and remind you that from

1    the time that our country was founded, the right of the

2    citizens to preserve the trial by jury is something that has

3    been fiercely fought for.  In fact, the colonists notified

4    King George in the Declaration of Independence it was one of

5    the principal rights that the citizens felt that they were

6    entitled to, that England was depriving them of, and it has

7    been an integral part of our democracy for the last 260 years

8    or plus.

9            So it's a very important thing and you all are

10   doing a very important job this morning, and without you, we

11   could not move forward.  We started yesterday with a large

12   group of people and we had to bring in some more people.  So

13   I'm sure you can appreciate that it takes a lot of folks in

14   order for us to get done what has to be done in order to make

15   sure that we give the parties what they are absolutely

16   entitled to, and that is their Constitutional right to a fair

17   and impartial jury and to a jury trial.

18           I'm going to tell you quickly about the schedule so

19   that you'll know where we stand.  We'll start at 9:00.  This

20   is going to be a relatively short trial, not an unimportant

21   trial, but relatively short in terms of time and the number

22   of witnesses.  We'll start, as we did this morning, at 9:00.

23   We'll take a break at about 90 minutes in the morning.  We'll

24   take an hour-and-fifteen-minute break for lunch, and I will

25   do my best to get you out of here right at 5:00 or very close

9

1    to 5:00 so that you all can make plans for whatever you have

2    to do at the end of the day.

3          I know many of you have to either pick up children

4    or make arrangements at home and have responsibilities,

5    obviously, that are outside the courtroom.  So I will be

6    mindful of that and make sure I get you out of here in time

7    to do that so you can count on your departure time.

8          All of you took an oath downstairs to tell the

9    truth.  I don't feel the need to remind you about that.  I

10   just do feel the need to tell you why it's so important that

11   you listen carefully to my questions and you give me honest

12   and candid responses.

13         As I've mentioned, everybody has a different

14   function here.  My principal function is to -- my overriding

15   job is to make sure that the parties have a fair trial, that

16   the United States has a fair trial, and that Mr. Adleta has a

17   fair trial.  So that's my primary responsibility.

18         In order to do that and to seat a jury that's fair

19   and impartial, I have to ask you some questions that may bear

20   upon your -- not just your qualifications to serve.  All of

21   you are qualified to serve.  That's been determined

22   downstairs; but as you can appreciate, we all come from

23   different walks of life.  There are some cases where people

24   have circumstances in their own background which may make it

25   difficult for them to be fair and impartial.

1           I'll give you a quick example.  If we were -- we're

2    not today trying a case involving a bank robbery, but if we

3    were trying a case involving a bank robbery and a week ago or

4    a month ago or a year ago you had been a teller in a bank and

5    had been victimized by a bank robbery, well, it probably

6    wouldn't be a good case for you to sit on as a juror because

7    you might bring information, thoughts, biases, prejudices

8    into the case, which would be perfectly normal and perfectly

9    understandable, but probably wouldn't be fair.

10          Can all of you appreciate that?

11          (Affirmative responses.)

12          THE COURT:  I didn't mention to you.  This is a

13   participatory exercise and I'm going to ask you a lot of

14   questions and I need you to answer audibly because Ms. Peede

15   down here to my left is the court reporter.  It is part of

16   her job -- her principal job is to make sure that we have a

17   complete record, and she can't write it down if you all don't

18   answer audibly.  So will you help me with that?

19          (Affirmative responses.)

20          THE COURT:  Thank you.

21          So, in order to do what I need to do, I have to ask

22   you some questions that in polite society would be generally

23   referred to as in the none-of-your-business category.  So let

24   me apologize for that before we get to it.

25          I appreciate the fact that these questions are

11

going to be in the none-of-your-business category, at least

some of them will be; but as we go along, I think you'll

understand why they are important.

     All of you were kind enough to fill out some

questionnaires for me downstairs.  The lawyers have copies of

your questionnaires, and that'll be helpful.  It'll save us a

little bit of time, but there's still some things that I need

to cover with you as a group, and then we're going to come

back and ask you some things individually; and then it may be

necessary for me to ask you all to leave the courtroom and

come back in one at a time to ask just a few quick questions

that are a little bit more private than others.

     I know I have you all apprehensive about "What in

the world is he going to be asking me?"  But just don't get

too caught up in that.  I think you'll see where we're going

as the morning unfolds.

     I want to tell you a little bit about why you're

here.  I'm going to give you a brief summary of the case.

The government in this case has charged by way of Indictment

a two-count Indictment, the defendant with committing two

federal offenses.  Count One charges the defendant with

knowingly conspiring to transport minor victim one, an

individual who had not yet attained the age of 18, in

interstate commerce with the intent that minor victim one

engage in sexual activity for which a person could be charged

1    with a criminal offense.

2            Count Two charges that the defendant with knowingly

3    transporting or causing the transportation of minor victim

4    one, an individual who had not yet attained the age of 18, in

5    interstate commerce with the intent that minor victim one

6    engage in sexual activity for which any person can be charged

7    with a criminal offense.  The defendant has entered a plea of

8    not guilty to these charges.

9            Now, the Indictment that I just summarized is not

10   to be considered as evidence against the defendant.  It's

11   merely a charging document which identifies the charges

12   against the defendant.  It is not evidence of the defendant's

13   guilt and you must not be influenced by the fact that an

14   Indictment has been filed.

15           As I've mentioned, I'm going to ask you some

16   general questions first.  I'd like you to listen carefully

17   and given me a clear and audible response to each question,

18   and I am speaking to all of you collectively when I ask you

19   these questions.

20           I've just explained to you the general nature of

21   the case.  I don't know myself whether there's been any news

22   coverage or media coverage about the case, but let me ask you

23   all collectively, have any of you heard anything about the

24   case or know anything about it prior to coming in here this

25   morning?

13

1    (Negative responses.)

2         THE COURT:  Thank you.

3         Now, Mr. Adleta is the defendant in the case, and

4    at this time I'm going to ask his lawyer to introduce himself

5    and to introduce Mr. Adleta, and then I'm going to go to the

6    government's table and ask them to introduce themselves, and

7    I'd like for you to obviously take a look at them, listen to

8    them.

9         I'm going to ask Mr. Bark to tell you a little bit

10   about where he practices.  I'm going to ask the government's

11   lawyers to tell you a little bit about their offices; and as

12   they do that, just pay attention and let me know whether or

13   not you recognize them or have ever had any business

14   connections with them or any other connections, for that

15   matter, professional or social.

16        Mr. Bark.

17        MR. BARK:  Thank you, Your Honor.

18        Good morning, ladies and gentlemen.  My name is

19   Matthews Bark.  I have a small law office in Altamonte

20   Springs.  I practice law across Central Florida.

21        And this is Jonathan Adleta.

22        THE COURT:  Thank you, Mr. Bark.

23        Ms. Gable.

24        MS. GABLE:  Good morning, ladies and gentlemen.  My

25   name is Karen Gable.  I'm an Assistant United States Attorney

14

```
1   at the U.S. Attorney's Office here in the Middle District of
2   Florida.
3         With me is Ilianys Rivera Miranda.  She is my
4   co-counsel on this case and is also an Assistant United
5   States Attorney.
6         The case agent assigned to the case is Agent Rod
7   Hyre, who is with the F.B.I.
8         THE COURT:  Thank you, Ms. Gable.
9         Now, do any of you recognize any of the individuals
10  who just identified themselves?
11        (Negative responses.)
12        THE COURT:  Thank you.
13        I'm going to read to you the names of some of the
14  witnesses that I know or at least may expect may be called,
15  and then I'm going to ask the lawyers to add to that if they
16  are aware of any other witnesses.
17        I'm going to just ask you to listen carefully and
18  if you recognize any of these names or if they sound familiar
19  to you, you just let me know that and then I'll follow up and
20  get some more information about who they are or a little bit
21  about them to help you figure out whether or not it is in
22  fact somebody that you know.
23        Sarah Adleta, Debra Healy, Rodney Hyre, Steve
24  McElyea, Ian Buchanan, Carol Ann Rodriguez, Diane Mathis.
25        And then I think, Ms. Gable, you had some
```

```
 1   additional witnesses.

 2              MS. GABLE:  Yes, Your Honor.  Thank you.

 3              Sherry Wentz, Samantha Bryant.

 4              THE COURT:  Any other witnesses from you, Mr. Bark?

 5              MR. BARK:  No, Your Honor.

 6              THE COURT:  Do any of you recognize the names of

 7   any of those individuals?

 8              (Negative responses.)

 9              THE COURT:  Thank you.  Do any of you know each

10   other?  Sometimes that happens.  I know the --

11              (Negative responses.)

12              THE COURT:  Thanks.

13              The Middle District of Florida is a big district,

14   and I recognize that a lot of you came from a long way away

15   to be here this morning, and I would be remiss if I didn't

16   tell you that I'm aware of that and I appreciate that.  I

17   know that some of you had to get up early and you have a long

18   drive.

19              The Middle District of Florida is a big district.

20   It goes -- actually, the entire district is 350 geographical

21   miles from Jacksonville in the northeast to Fort Myers in the

22   southwest, and the Orlando division of the Middle District of

23   Florida encompasses all of the large counties in Central

24   Florida.  So some of our folks come from a long way away in

25   order to be here and we are grateful for that.
```

1            Sometimes it happens that I end up with folks on

2      the panel that work together.  Yesterday we had a couple of

3      people that went to church together.  So it happens, you

4      know, and I wanted to make sure I asked you about it.

5            Have any of you ever studied law or had any legal

6      training, paralegal training?

7            (Hand raised.)

8            THE COURT:  Are you Ms. Angell?

9            THE PROSPECTIVE JUROR:  Yes, sir.

10           THE COURT:  I need for y'all to use the microphone.

11     The reason is even though I know we can hear each other well,

12     the court reporter only listens through the sound system.  So

13     it's difficult for her to hear if we don't use the mic.

14           THE PROSPECTIVE JUROR:  Yes, Your Honor.  I'm a

15     court reporter.

16           THE COURT:  Where do you work?

17           THE PROSPECTIVE JUROR:  Brevard County.

18           THE COURT:  Okay.  Do you principally work in state

19     court or in all kinds of places?

20           THE PROSPECTIVE JUROR:  State court.

21           THE COURT:  Okay.

22           THE PROSPECTIVE JUROR:  Circuit.

23           THE COURT:  Anything about that training, Ms.

24     Angell, that you think would make it difficult for you to sit

25     as a juror and be fair and impartial if you were seated in

```
 1    this case?

 2             THE PROSPECTIVE JUROR:  No, sir.

 3             THE COURT:  Okay.  Thank you very much.  I

 4    appreciate that.

 5             That's perfect just the way Ms. Angell did that.

 6    As I roll along in these questions, I don't want you to get

 7    the impression that I'm not interested in your answers.  I'm

 8    very interested in your answers, and that's why I'm asking

 9    the questions.

10             So if you have even the slightest inkling that,

11    "Well, if he asked that a little bit differently, maybe I'd

12    raise my hand," err on the side of raising your hand.

13             Yes, sir, Mr. Dockery.

14             THE PROSPECTIVE JUROR:  I was in court in 1980,

15    charged with marijuana possession, and it was dismissed.

16    Well, it was dismissed.  I was found guilty, but I was

17    given a -- I forgot the term, but I was clean for a year.

18    There were no charges filed.

19             THE COURT:  Okay.  Is there anything about that

20    experience that you think would make it difficult for you to

21    be fair and impartial if you were seated as a juror in this

22    case?

23             THE PROSPECTIVE JUROR:  No, sir.

24             THE COURT:  Do you think you could listen to the

25    government's evidence and evaluate their evidence and
```

1    evaluate the charges against Mr. Adleta and reach a decision?

2              THE PROSPECTIVE JUROR:  Yes, sir.

3              THE COURT:  Okay.  While we're on that subject Mr.

4    Dockery raised, is there anybody else that's ever either

5    themselves or had a close family member that's been charged

6    with a criminal offense?

7              (Hand raised.)

8              THE COURT:  Yes, ma'am.  Ms. Angell, keep those

9    hands up.

10             As I mentioned, I recognize these are in the none-

11   of-your-business category, but we need to ask them.

12             THE PROSPECTIVE JUROR:  A family member, Your

13   Honor.

14             THE COURT:  Okay.  Was that a state or a federal

15   offense?

16             THE PROSPECTIVE JUROR:  State.

17             THE COURT:  Okay.  And how long ago?

18             THE PROSPECTIVE JUROR:  One is presently going on.

19             THE COURT:  Okay.  Can you tell me just generally

20   what the category is, the nature of the offense?

21             THE PROSPECTIVE JUROR:  Criminal mischief.

22             THE COURT:  Okay.  Anything about that that you

23   think would color your judgment or make it hard for you to be

24   fair in this case?

25             THE PROSPECTIVE JUROR:  No.  It's not involving me.

| | |
|---|---|
| 1 | THE COURT:  Okay.  All right.  Thank you, ma'am. |
| 2 | We had some other hands up there.  This will give |
| 3 | me a chance to test my seating chart, too. |
| 4 | Is is it Mr. Herman? |
| 5 | THE PROSPECTIVE JUROR:  Yes. |
| 6 | THE COURT:  All right, Mr. Herman. |
| 7 | THE PROSPECTIVE JUROR:  My father-in-law was |
| 8 | convicted of a crime.  I don't even know what the crime was. |
| 9 | It was before he was my father-in-law. |
| 10 | THE COURT:  Okay. |
| 11 | THE PROSPECTIVE JUROR:  But he went to prison for a |
| 12 | couple of years.  It had to do with -- he was a mortgage |
| 13 | broker and wasn't paying the bills he was supposed to be |
| 14 | paying. |
| 15 | THE COURT:  Okay.  Is there anything about that |
| 16 | that you think would color your judgment or make it difficult |
| 17 | for you to be fair and impartial? |
| 18 | THE PROSPECTIVE JUROR:  Most certainly not. |
| 19 | THE COURT:  Thank you, Mr. Herman. |
| 20 | Anybody else? |
| 21 | Yes, ma'am.  Is it Ms. Ramsey? |
| 22 | THE PROSPECTIVE JUROR:  Yes, sir. |
| 23 | THE COURT:  Good morning, Ms. Ramsey. |
| 24 | THE PROSPECTIVE JUROR:  Good morning.  My brother, |
| 25 | driving under the influence. |

1              THE COURT:  Okay.  Again, the same question.  Would

2    your answers be any different?

3              THE PROSPECTIVE JUROR:  No, sir.

4              THE COURT:  Thank you, ma'am.

5              Let me ask you the other side of that coin.  Have

6    any of you been the victim of a crime or a close family

7    member a victim of a crime?

8              Mr. Dockery.

9              THE PROSPECTIVE JUROR:  Yes.  I was robbed inside

10   of -- it was a stick up of a bar that I happened to be in in

11   1974.

12             THE COURT:  Okay.

13             THE PROSPECTIVE JUROR:  I was robbed at that time.

14             THE COURT:  Okay.  Anything about that

15   experience -- I know that was not pleasant, I'm sure.

16   Anything about that experience that would make it difficult

17   for you to be fair?

18             THE PROSPECTIVE JUROR:  No, sir.  No problem.

19             THE COURT:  All right.

20             Anybody else?

21             Yes, ma'am.  Is it Mozingo?  Are you Ms. Mozingo?

22             THE PROSPECTIVE JUROR:  Yes.

23             THE COURT:  Good morning.

24             THE PROSPECTIVE JUROR:  Good morning.

25             THE COURT:  How are you this morning?

1          THE PROSPECTIVE JUROR:  Fine.  Thank you.  Back in

2     the early '90s, late '80s, my purchases was snatched; and on

3     another occasion simple assault, and that's it.

4          THE COURT:  Okay.  Do you think you would be able

5     to fairly evaluate the evidence in this case in a fair and

6     impartial manner notwithstanding the fact that that

7     circumstance occurred to you?

8          THE PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Do you recognize that they are

10     different?

11          THE PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Could you evaluate the case that's

13     before you on the evidence and my instructions on the law and

14     leave everything else outside?

15          THE PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Thank you, Ms. Mozingo.

17          Now, do all of you understand that one of your

18     responsibilities as jurors will be to keep an open mind and

19     not to form or express any opinions about testimony and

20     evidence until you have heard all of the evidence, the

21     lawyers' arguments and my instructions on the law?  Do all of

22     you think you can do that?

23          (Affirmative responses.)

24          THE COURT:  Is there anybody on the panel that does

25     not believe in the jury system, just doesn't think it's a

1    proper way for us to resolve complaints or doesn't feel like

2    that they should under any circumstances sit in judgment of

3    somebody else?

4            (Negative responses.)

5            THE COURT:  Do all of you understand that

6    defendants in our system are presumed to be innocent of the

7    crimes that they're charged with and that a defendant is not

8    required to prove his innocence?

9            (Affirmative responses.)

10           THE COURT:  Will any of you have any difficulty

11   following that rule?

12           (Negative responses.)

13           THE COURT:  Do all of you understand that a

14   defendant cannot be found guilty unless the government proves

15   him guilty beyond a reasonable doubt?

16           (Affirmative responses.)

17           THE COURT:  Will any of you have any difficulty

18   following that rule?

19           (Negative responses.)

20           THE COURT:  Do all of you understand that a

21   defendant has the right to remain silent and that if he

22   chooses not to testify, that you should not consider that in

23   reaching your decision?

24           (Affirmative responses.)

25           THE COURT:  Will any of you have any difficulty

1    following that rule?

2              (Negative responses.)

3              THE COURT:  Now, have any of you yourselves or a

4    close family member ever been employed by law enforcement,

5    whether federal, state or local?

6              (Affirmative response.)

7              THE COURT:  Mr. Dockery.

8              THE PROSPECTIVE JUROR:  My father was a federal

9    officer for N.S.A.  He was in charge of security in N.S.A.

10   before he retired.

11             THE COURT:  Okay.  Do you think you would be able

12   to evaluate the testimony in this case in a fair and

13   impartial way notwithstanding that?

14             THE PROSPECTIVE JUROR:  Yes.

15             THE COURT:  You don't think you would be inclined

16   to be more favorable to the government's witnesses in view of

17   the fact that your father worked in law enforcement?

18             THE PROSPECTIVE JUROR:  No, sir.

19             THE COURT:  Do you understand why I might ask that

20   question?

21             THE PROSPECTIVE JUROR:  Yes, sir.

22             THE COURT:  Okay.

23             Anybody else other than Mr. Dockery?

24             Yes, ma'am, Ms. Ramsey.

25             THE PROSPECTIVE JUROR:  My stepfather is a citizen

```
 1   on patrol, not necessarily employed, but currently for Orange
 2   County Sheriff's Office.
 3               THE COURT:  Okay.  Is there anything about that
 4   relationship that you think would color your judgment or make
 5   it difficult for you to be fair and impartial in evaluating
 6   the testimony of the witnesses?
 7               THE PROSPECTIVE JUROR:  No, sir.
 8               THE COURT:  Have any of you ever had any close
 9   dealings with or contacts with the United States Attorney's
10   Office, whether in this district or somewhere else?
11               (Hand raised.)
12               THE COURT:  Ms. Angell.
13               THE PROSPECTIVE JUROR:  Just a client, Your Honor,
14   asking my company to cover hearings.
15               THE COURT:  Okay.
16               THE PROSPECTIVE JUROR:  Nothing personal.
17               THE COURT:  You've done some court reporting work
18   for the United States Attorney's Office?
19               THE PROSPECTIVE JUROR:  Yes, sir.
20               THE COURT:  Is there anything about that that you
21   think would make it difficult for you to be fair and
22   impartial?
23               THE PROSPECTIVE JUROR:  No, sir.
24               THE COURT:  Are you currently doing any work for or
25   have any financial relationship with the United States
```

1    Attorney's Office of any kind?

2              THE PROSPECTIVE JUROR:  I don't think so.  I'd have

3    to check my calendar to see if anything is scheduled, but,

4    no, not that I know of.

5              THE COURT:  Okay.

6              THE PROSPECTIVE JUROR:  And no financial

7    relationship other than the court reporting services we

8    provide.

9              THE COURT:  If your company took a deposition or an

10   appearance or a hearing with the United States Attorney's

11   Office, obviously, your company would be paid.  But my

12   question is whether or not do you personally have any -- do

13   you know of anything that you have on the books presently for

14   the United States Attorney's Office?

15             THE PROSPECTIVE JUROR:  No, sir.

16             THE COURT:  Okay.

17             Have any of you ever been sued by the United States

18   government for anything?

19             (Negative responses.)

20             THE COURT:  Have any of you ever brought a suit

21   against the United States government for anything?

22             (Hand raised.)

23             THE COURT:  Yes, sir, Mr. Dockery.

24             THE PROSPECTIVE JUROR:  My late mother is currently

25   in a class action suit with the government for contaminated

1    water at Camp Lejeune, North Carolina, for cancer-causing

2    agents in the water.

3              THE COURT:  All right.  That's an ongoing claim

4    against the United States?

5              THE PROSPECTIVE JUROR:  Yes, sir.

6              THE COURT:  Is there anything about the fact that

7    your mother has that claim against the United States that you

8    think might prejudice you or make you -- color your judgment

9    or make you biased against the government in connection with

10   the evidence --

11             THE PROSPECTIVE JUROR: No, sir.

12             THE COURT:  -- that they might present in this

13   case?

14             THE PROSPECTIVE JUROR:  No, sir.

15             THE COURT:  Kind of let me finish before you start.

16   I'm sorry.

17             THE PROSPECTIVE JUROR: I'm sorry, sir.

18             THE COURT:  She's very good, but it's hard for her

19   to write down two people at one time.  I'm sorry.

20             Now, anything about that that you think would make

21   it difficult for you to be fair and impartial in this case?

22             THE PROSPECTIVE JUROR:  No, sir.

23             THE COURT:  One of the responsibilities of jurors

24   is to consider the testimony of various witnesses and to

25   determine their credibility, that is, their believability,

1   the believability of each witness, and so oftentimes it's not

2   just what someone says, but how they say it.  I'm going to

3   give you some further instructions about things to consider

4   in terms of evaluating the credibility of witnesses; but in

5   view of the fact that this is a criminal case, I expect that

6   there will be a large number of law enforcement officer

7   testifying.

8           With respect to law enforcement witnesses, I want

9   to ask you whether or not any of you have a past experience

10   of any sort or any reason that would cause you to either

11   believe or disbelieve a law enforcement witness over any

12   other witness simply because he or she happens to work for

13   law enforcement?

14           (Negative responses.)

15           THE COURT:  Do any of you have any medical or

16   physical condition or impairment that would make it difficult

17   for you to serve as jurors?  I know you were screened

18   downstairs by the folks down there, who do a wonderful job.

19   But does anybody have any sort of hearing problems or vision

20   problems that they are experiencing that it's making it

21   difficult for them to hear me or understand me this morning?

22           (Negative responses.)

23           THE COURT:  Now, again, because of the nature of

24   the case, it's possible that you'll hear testimony from one

25   or more witnesses who have been involved in criminal activity

1    themselves and who may be testifying in return for leniency

2    or favorable treatment from the government.  If that

3    occurs -- I don't know that it will, but it may occur -- will

4    you all be able to evaluate that testimony in accordance with

5    the instructions that I give you?

6              (Affirmative responses.)

7              THE COURT:  Have any of you ever had an unpleasant

8    or a bad experience with law enforcement, either an officer

9    or an agency, such that you hold a grudge or that you are

10   biased or prejudiced against law enforcement?

11             (Negative responses.)

12             THE COURT:  How about the other side of that coin?

13             I'm sorry.  I had a hand there.  Mr. Salib?

14             THE PROSPECTIVE JUROR:  Yes, sir.

15             THE COURT:  All right.  Yes, sir.

16             THE PROSPECTIVE JUROR:  I wouldn't say I would be

17   prejudiced against all law enforcement, but I did have an

18   incident where I was pulled over for speeding when I was not

19   speeding, and I did take that to small -- you know, the

20   speeding court or whatever and it was dismissed.

21             THE COURT:  Okay.  Would you be able to evaluate

22   the government's witnesses in this case in a fair and

23   objective way, do you think?

24             THE PROSPECTIVE JUROR:  I believe so.

25             THE COURT:  Okay.  Thank you, Mr. Salib.  I

1    appreciate you bringing that to my attention.

2             Anybody else?

3             (No response.)

4             THE COURT:  I was about to ask the flip side of

5    that.  Does anybody have such a close relationship or

6    affinity with or for law enforcement or any law enforcement

7    officers that you don't think that you would be able to be

8    fair with respect to Mr. Adleta, that you might tend to give

9    law enforcement witnesses a leg up because you happen to be

10   close to them or have a close family member that's involved

11   with law enforcement?

12            (Negative responses.)

13            THE COURT:  How many of you have a computer, either

14   at home or at work, that you use on a regular basis?  Just

15   raise your hand.

16            (Hands raised.)

17            THE COURT:  It looks like everybody does.

18            Is there anybody on the panel that does not

19   routinely send and receive e-mails?

20            (No response.)

21            THE COURT:  I don't see any hands there.

22            How many of you have a cell phone that's capable of

23   sending and receiving text messages?  If you could, just

24   raise your hand.

25            (Hands raised.)

```
 1            THE COURT:  That's everybody on the panel.

 2            How many of you have periodically gotten access to

 3    the Internet, have used the Internet for one reason or

 4    another?

 5            (Hands raised.)

 6            THE COURT:  Everybody has raised their hand.  Thank

 7    you.

 8            How many of you are familiar with programs such as

 9    Skype or FaceTime that allow you to actually have a live

10    video chat with another individual?  If you're familiar with

11    that, if you could raise your hand.

12            (Hands raised.)

13            THE COURT:  That's everybody except Ms. Angell.

14            Ms. Angell, no?

15            THE PROSPECTIVE JUROR:  No, sir.

16            THE COURT:  Okay.

17            THE PROSPECTIVE JUROR:  I don't have time to do

18    that.

19            THE COURT:  Okay.  Are you generally familiar that

20    that technology exists?

21            THE PROSPECTIVE JUROR:  I understand it exists.  I

22    understand why, but personally have never experienced it.

23            THE COURT:  Okay.  Thank you very much.

24            How many of you have cell phones or Smartphones

25    that are capable of taking photographs?  If you could, raise
```

1    your hand.

2              (Hands raised.)

3              THE COURT:  Everybody has their hand up.

4              How many of you are capable of or at least

5    understand that cell phones that are capable of taking

6    photographs can also transmit those photographs?

7              (Hands raised.)

8              THE COURT:  Everybody has their hand up.  Thank you

9    very much.

10             Now, as I've mentioned at the outset when I gave

11   you the summary of this case, you probably gleaned from my

12   summary that in this case the United States has charged Mr.

13   Adleta with certain crimes of a sexual nature involving

14   minors.  Mr. Adleta has entered a plea of not guilty and is

15   presumed to be innocent of those offenses; but in view of the

16   nature of the charges, I need to ask you some questions

17   which, as I've mentioned before we started off, are in the

18   none-of-your-business category, but because of the nature of

19   the case, I need to ask you.

20             You all are likely to hear explicit language or to

21   see photographs that depict young people or young children in

22   sexual activities.  Will you be able to set aside any

23   personal feelings that you might have about the material that

24   you see and render a fair and impartial verdict in the case?

25             (Affirmative responses.)

1      THE COURT:  Is there anybody on the panel who feels

2  that they would not be able to do that?

3      (No response.)

4      THE COURT:  Thank you.

5      Again, some of these questions that I'm asking you

6  that are in the none-of-your-business category, if you want

7  to talk to me about it privately, we can do that.  I'll talk

8  to you over here at side bar.  I want to make sure you get

9  that opportunity, because it's really important that even

10  though I know these questions have the potential to put you

11  in a spot where you might be embarrassed or be made

12  uncomfortable, as I know you can appreciate, it's really

13  important that I get a candid response; and the parties are

14  entitled to that, even though nobody likes to talk about the

15  fact that they may have been arrested or pulled over.  Nobody

16  likes to talk about the fact that they may have had an

17  instance of sexual abuse in their family or to a close family

18  member or somebody that they know.

19      I understand that that's a painful thing to talk

20  about, but we have to talk about it this morning.  Can all of

21  you appreciate that?

22      (Affirmative responses.)

23      THE COURT:  So if you want to talk to me privately,

24  let me know and I'll talk to you over here at side bar, with

25  the caveat being that "private" is not really private.  It

1    means it's a little less public than what we're doing now.

2    It would still involve the lawyers and the court reporter.

3              In light of that, have any of you or close family

4    members or close friends ever been the victim of sexual

5    molestation of any kind or any form of unwarranted sexual

6    contact?

7              Mr. Dockery, are you comfortable talking about

8    that?

9              THE PROSPECTIVE JUROR:   Sure.

10             THE COURT:   Okay.

11             THE PROSPECTIVE JUROR:   I was probably eight years

12   old.   A neighbor boy, a teenager.

13             THE COURT:   Okay.   In light of that experience that

14   you've had in your own life, Mr. Dockery, do you think you

15   would be able to sit as a juror and fairly and impartially

16   decide this case in which the United States has charged Mr.

17   Adleta with having committed offenses that are sexual in

18   nature involving minors?

19             THE PROSPECTIVE JUROR:   Yes.

20             THE COURT:   All right.   Do you think you would be

21   able to give a fair shake to the government as well as a fair

22   shake to Mr. Adleta?

23             THE PROSPECTIVE JUROR:   Yes.

24             THE COURT:   Could you keep an open mind and

25   evaluate the totality of the evidence, even if you felt that

1   some of the evidence that you had seen was disturbing?

2           THE PROSPECTIVE JUROR:  Yes.

3           THE COURT:  How about the rest of you?  Let me ask

4   the panel that question as a whole.  It is likely that some

5   of the information, testimony that you will hear, as I've

6   mentioned, because it's of a sexual nature involving minors,

7   will be disturbing to you.

8           I want to ask you whether or not you think you

9   would be able no keep an open mind and consider all of the

10   evidence in total and reach a conclusion as to whether or not

11   the government has carried its burden of proving Mr. Adleta's

12   guilt beyond a reasonable doubt?

13           (Affirmative responses.)

14           THE COURT:  If at the end of the case any of you

15   were persuaded that the government had not met its burden of

16   proof and that it had not established beyond a reasonable

17   doubt that Mr. Adleta was guilty of the offenses with which

18   he's been charged, would you be able to render a verdict of

19   not guilty even though you found some of the evidence to be

20   disturbing?

21           (Affirmative responses.)

22           THE COURT:  Ladies and gentlemen, if you will bear

23   with me for a few minutes, I'm going to talk to the lawyers

24   here briefly at side bar.  We're going to do what you've

25   always been taught not to do.  We're going to whisper in your

 1    presence.  We're going to do that in order to try to keep

 2    things moving.

 3              You all are free to stand and stretch, if you want

 4    to, but I'd ask you to not talk, because we're going to take

 5    a few minutes here and then I'll be right back with you.

 6              (Bench conference as follows.)

 7              MS. GABLE:  Good morning.

 8              THE COURT:  Good morning.

 9              MS. RIVERA MIRANDA:  Good morning.

10              THE COURT:  Good morning.

11              Good morning, Mr. Bark.

12              MR. BARK:  Good morning.

13              THE COURT:  I'm going to ask these folks,

14    obviously, to go through their personal information; but

15    before I leave the general questions, I want to ask you

16    whether or not you think I've covered everything adequately?

17              MS. GABLE:  Yes.

18              THE COURT:  Okay.

19              Mr. Bark?

20              MR. BARK:  Yes.

21              THE COURT:  In that case, what I'll plan to do then

22    is just have them stand up and tell us who they are, what

23    they do, what their husband does, and move through this

24    group, okay?

25              MS. GABLE:  Thank you, Your Honor.

```
1              MR. BARK:  Thank you.

2              THE COURT:  All right.

3              (In open court.)

4              THE COURT:  Ms. Angell, you're going to be our

5    guinea pig because you're the first in line.  If you would do

6    us a favor -- I know you filled out a questionnaire for us,

7    but if you would just stand and tell us who you are, what you

8    do, if you're married, what does your husband do for a

9    living, and if you have children, tell us a little bit about

10   them, and if they're grown children and are employed, if you

11   could tell us what they do for a living.

12             THE PROSPECTIVE JUROR:  You might have to remind me

13   of all of that.

14             THE COURT:  Don't worry.

15             THE PROSPECTIVE JUROR:  My name is Cynthia Angell.

16   I'm a court reporter.  I've been a court reporter for 32

17   years now.  I belong to three professional organizations.  I

18   own my own court reporting agency.

19             I have two children that are both grown, 26 -- a

20   son that's 26, a daughter that's 35.  My daughter is a

21   stay-at-home mom, taking a break from her college.  She

22   almost has her bachelor's degree.  She's going into the R.N.

23   field.

24             My son is still trying to find his way.  He's going

25   back to college, and I think he may follow in my footsteps.
```

1          I'm sorry.  What were some of the other?

2          THE COURT:  That's all right.  That's pretty

3    comprehensive.  That's good.  I appreciate that.

4          I may have been distracted getting Mr. Dockery some

5    water.  Did you tell us what -- if you're married, what your

6    spouse does?

7          THE PROSPECTIVE JUROR:  I'm divorced twelve years.

8    So I'm married to my Harley Davidson.

9          THE COURT:  Okay.  Thank you, ma'am.  If you will,

10   pass the microphone to Ms. Ramsey.

11         THE PROSPECTIVE JUROR:  Thank you, Your Honor.

12         THE COURT:  Good morning Ms. Ramsey.

13         THE PROSPECTIVE JUROR:  Good morning again.  Jackie

14   Ramsey.  I am an assistant principal for an Orange County

15   Public School high school and have been for eight years.

16   I've been in the education field since 1995 with Orange

17   County Public Schools.

18         I have two children:  A son that's 23, who is

19   currently an assistant for a plumber; and a daughter, who's

20   eight.

21         I am divorced in 1995, several years, and I'm not

22   sure what his current employment is.

23         THE COURT:  Thank you, Ms. Ramsey.  Pass the

24   microphone.

25         Mr. Salib, before you start, one of the general

```
 1   questions I forgot to ask you, I know it's on your form, but
 2   if you would put your hand up if you've ever had any prior
 3   jury experience.  Ever served on a jury before?
 4              THE PROSPECTIVE JUROR:  I wasn't selected for the
 5   jury, but I was doing this.
 6              THE COURT:  I can't hear you.
 7              THE PROSPECTIVE JUROR:  I was not selected for the
 8   jury, but I was doing this before.
 9              THE COURT:  You went through the voir dire process.
10              How about you, Ms. Ramsey, did you serve?
11              THE PROSPECTIVE JUROR:  Yes, sir.
12              THE COURT:  Would you pass that back for a minute.
13              How long ago was that?
14              THE PROSPECTIVE JUROR:  Late '90s.
15              THE COURT:  Was it a civil case or a criminal case;
16   do you remember?
17              THE PROSPECTIVE JUROR:  A criminal case.
18              THE COURT:  Okay.  Were you able to reach a
19   verdict?  You don't need to tell me what it was.
20              THE PROSPECTIVE JUROR:  Yes, sir.
21              THE COURT:  Was that generally a positive
22   experience for you?
23              THE PROSPECTIVE JUROR:  Yes, sir.
24              THE COURT:  Thank you, ma'am.
25              Back to you now, Mr. Salib.  I'm sorry for the
```

```
 1    interruption.
 2              THE PROSPECTIVE JUROR:  I'm Tim Salib.  I'm a
 3    dentist.  I'm unmarried and no children.
 4              THE COURT:  How long have you lived in the
 5    district, Mr. Salib?
 6              THE PROSPECTIVE JUROR:  Five years.
 7              THE COURT:  Okay.  And no prior jury experience for
 8    you?
 9              THE PROSPECTIVE JUROR:  No.
10              THE COURT:  Other than what you've told me?
11              THE PROSPECTIVE JUROR:  Yes.
12              THE COURT:  Thank you very much.  You can pass the
13    mic to Ms. Mozingo, please.
14              THE PROSPECTIVE JUROR:  I'm Amy Mozingo.  I'm
15    currently a research and information specialist for a dietary
16    supplement company based out of Fort Lauderdale.  I'm
17    married.  My husband is senior director of total quality for
18    food for a restaurant company.
19              I don't have any children, but I do have two
20    stepdaughters, my husband's children.  The oldest one is 20.
21    The youngest one is 19.
22              THE COURT:  Okay.  Thank you, ma'am.  Pass the
23    microphone.  We'll say hello to Mr. Mehta.
24              Good morning, Mr. Mehta.
25              THE PROSPECTIVE JUROR:  Good morning.  My name is
```

Vineet Mehta.  I am a software analyst for one of the local companies here in Orlando and I've been doing this kind of work for 16, 17 years now.  I've lived in Orange County for four years.

I'm married.  My wife is a research scientist at one of the research institutes here.  I have two children: One boy, who is 15; and a daughter, who is ten.

THE COURT:  All right.  Thank you, sir.

Good morning, Mr. Herman.

THE PROSPECTIVE JUROR:  Good morning.  My name is Marcus Herman.  I've lived in Brevard County for -- since 1966.  I have a business, automotive repair and tire.

I am married with three children:  17, 15, and my son is eleven.

THE COURT:  All right.  Thank you, sir.

Good morning, Ms. Miller.

THE PROSPECTIVE JUROR:  Good morning.  My name is Rebecca Miller.  I'm a nurse with a substance abuse treatment program in Cocoa.  I've been a nurse for three years.  Before that, I was a health educator in the schools in Brevard County.  I worked for Department of Children and Families for about four years and Department of Juvenile Justice for a couple of years.

I have three grown children.  One is a nurse, one is an accountant at Sea World, and my son is a supervisor in

1    a medical equipment company.

2              THE COURT:  All right.  Thank you, Ms. Miller.

3              Good morning.  Is it Sa-von?

4              THE PROSPECTIVE JUROR:  Sa-vo-na.

5              THE COURT:  Good morning, Ms. Savona.

6              THE PROSPECTIVE JUROR:  Good morning.  My name is

7    Mona Savona, and I currently work for Brevard County at the

8    Melbourne Beach Public Library, and I'm the administrative

9    assistant there.

10             I have a son from my first marriage and a stepson.

11   Currently, my son works for an engineering firm and is

12   finishing his degree; and my stepson is a doctor of

13   chiropractic and he has our two grandchildren.

14             THE COURT:  Thank you, ma'am.

15             And, Mr. Dockery.

16             THE PROSPECTIVE JUROR:  I'm Thomas Dockery.  I've

17   lived in Volusia County for 23 years.  I'm married to my

18   present wife for four years.  My late wife died in 2005.  I

19   had a daughter that is deceased.  She died at 19 of a brain

20   tumor.

21             I currently have a stepdaughter with my present

22   wife.  She's 37.  She lives in Alabama.  We have three

23   grandchildren with that daughter.  One is 18, one's 15, and

24   one is seven -- eight.

25             My wife is disabled, retired also.  We both have

42

```
 1    brain injuries and other physical injuries along with it, and
 2    we both work with traumatic brain-injured people throughout
 3    the counties, and in Central Florida we have a program that
 4    we deal with disabled people.  We're both advocates.
 5              THE COURT:  Thank you, Mr. Dockery.
 6              Counsel, if I could see you back here at side bar,
 7    please.
 8              (Bench conference as follows.)
 9              THE COURT:  Mr. Bark, do you have any challenges
10    for cause on juror number 37, Cynthia Angell?
11              MR. BARK:  No.
12              THE COURT:  How about the United States?
13              MS. GABLE:  No.
14              THE COURT:  All right.  Ms. Angell then will be our
15    twelfth juror.
16              You'll each have one strike on alternates.  What
17    says the defense to juror number 39 Jacqueline Ramsey?
18              MR. BARK:  I would use a strike on Ms. Ramsey.
19              MS. GABLE:  I thought we were doing Mr. Dockery.
20    He's number 38.
21              I'm sorry.  I thought Mr. Dockery was number 38.
22              THE COURT:  You're right, because Mr. Dockery is
23    disabled.  So I'm sorry.  So Mr. Dockery would be the next in
24    line.
25              What says the defense to Mr. Dockery?
```

43

1            MR. BARK:  I would not use a strike on him.

2            THE COURT:  You do?

3            MR. BARK:  No, I do not.

4            THE COURT:  Okay.

5            What says the government to Mr. Dockery, juror

6    number 38?

7            MS. GABLE:  Can I have one moment, please?

8            THE COURT:  Yes, you can.

9            MR. BARK:  While they're doing that, can I ask who

10   this gentleman is?

11           Nice to meet you.

12           MS. GABLE:  We pass, Your Honor.

13           THE COURT:  Okay.  So Mr. Dockery will be our

14   alternate.

15           Okay.  Let's just review and make sure we're all on

16   the same page.  Do you have your notes?

17           MR. BARK:  Are we only going with one alternate?

18           THE COURT:  Yes.  I think in view of the length of

19   the case, one alternate would be sufficient.

20           MR. BARK:  Can I go grab my other chart?

21           THE COURT:  Sure.

22           THE COURT:  I'm not opposed to seating two, if you

23   want to have another person, for some insurance.

24           Next up would be Ms. Ramsey.

25           MS. GABLE:  That's fine with me, Your Honor.

1          THE COURT:  I mean, I think 13 is plenty, in light

2     of the length of the case.

3          MS. GABLE:  I really anticipate we'll be finished

4     tomorrow.

5          THE COURT:  Yes.

6          MR. BARK:  Okay.

7          THE COURT:  So that's going to leave us with --

8     this is where we are now.  We have juror number seven, Sherry

9     Schmitt; juror number 14, Deborah McLaughlin; juror number

10    15, Karen Pizette; juror number 18, Donald Rapovich; juror

11    number 24, Shauna Wadsworth; juror number 26, Ward Sparks;

12    juror number 27, Jean Warriner; juror number 30, Patricia

13    Windorf; juror number 31, Gary Baugh; juror numer 35, Paul

14    Jaynes; juror number 36, Kamaal Hutchinson; juror number 37,

15    Cynthia Angell; and juror number 38, Thomas Dockery, is our

16    alternate.

17          Does that square with everybody's notes?

18          MS. GABLE:  Yes, Your Honor.

19          MR. BARK:  Yes, Your Honor.

20          THE COURT:  Okay.  All right.

21          MS. GABLE:  Your Honor, while at side bar, there is

22    one thing I wanted to address with the Court.  During the

23    openings, I do intend to refer to the children in this case

24    by their first names.  I do not feel that that will identify

25    them.  I still -- I'm very, very cognizant of the United

1    States' responsibility to protect the identities of the kids

2    in this case.

3            They are all under the age of five years.  They are

4    not in school.  Two of the children -- I will not mention the

5    last names of any of the children.  Two of the children have

6    last names that are different from each other, not even the

7    last name of the testifying parent.

8            In many of the documents that the government will

9    be presenting, the children are identified by their first

10   name.  The defendant and Ms. Adleta talk about them by their

11   first names, and Mr. Adleta does in his diary, he does in his

12   text communications and Skype communications; and it would

13   confuse the jury more for me not to at least refer to their

14   first names, given that the evidence, the documentary

15   evidence, will refer to that than for me not to refer to

16   their first names.

17           So I wanted to raise that with the Court before I

18   did this.

19           THE COURT:  I appreciate that.

20           Mr. Bark, do you have a view on it?

21           MR. BARK:  I just think it's in the Court's

22   discretion.

23           THE COURT:  Okay.  I'm going to allow you to use

24   the first names, but, obviously, be vigilant, as I'm sure you

25   will, to make sure that we don't do anything that's going

1  to -- I'm concerned not just about the jurors, obviously, but

2  other folks that are present in the courtroom.  I don't know

3  whether media is going to be in here or not, but I certainly

4  want to do everything I can do to make sure that we protect

5  the privacy interest of those victims.

6          MS. GABLE:  Yes.  The government's interest as

7  well, Your Honor.  Thank you.

8          THE COURT:  Thank you.

9          (In open court.)

10          THE COURT:  Ladies and gentlemen, my apologies for

11  whispering in your presence, but it helps us move along a

12  little bit more efficiently.  If I call your name, that means

13  that you have been selected to serve and you will be joined

14  up with those that we selected yesterday.  Ms. Angell,

15  Cynthia Angell, and Mr. Dockery, Thomas Dockery, you all will

16  be joining the group that we selected yesterday.

17          The rest of you are excused.  I do need to ask you

18  to stop off at the jury assembly room downstairs before you

19  leave the building.  It may be that they don't need you

20  anymore.

21          I want to reiterate that I very much appreciate the

22  efforts that you all expended to get down here this morning.

23  I know to some of you, especially those of you that were not

24  chosen, maybe you're happy that you weren't chosen.

25          My experience in talking with jurors after they

1   serve is that while almost everyone is a little bit reluctant

2   when they get started, almost every juror I have talked to,

3   once they completed their service, found it to be satisfying

4   and rewarding and felt like that they had done some

5   significant work and they were happy that they had done it.

6         I know it can be frustrating to come down here and

7   to go through the selection process -- Mr. Salib at least has

8   done this once before -- and to not be selected.  I want to

9   make sure that you understand that it's not because you were

10  found to be wanting in any respect, but in order for us to

11  get the number of jurors that we have, we have to start off

12  with a large pool of folks, and as evidenced by what happened

13  yesterday, as we went through a very large group of people

14  and we did not have enough people to seat our jury.

15        So those of you that were not selected, please

16  don't feel like it was a waste of time.  It was very

17  important for you in terms of our ability to continue with

18  the administration of justice.  I want you to know that you

19  have my thanks personally and I know the thanks of the rest

20  of my colleagues here in the Middle District for your

21  willingness to come down and serve as jurors.

22        You never know when you show up whether or not

23  you're going to be here for a day, a week or sometimes

24  months.  And jury service can be challenging and

25  inconvenient, but it's vital to our democracy and I want to

48

 1    tell you how much I appreciate your being down here this

 2    morning.

 3              So you all whose names I did not call are excused;

 4    and if you'll stop off at the jury assembly room on your way

 5    out, I'd appreciate it.

 6              Mr. Dockery, you might want to move out, if you

 7    can, and then we'll let these folks file out.  Thank you.

 8              (Jury panel members who were not selected are no

 9    longer present at 9:50 a.m.)

10              THE COURT:  Mr. Dockery and Ms. Angell, what I'm

11    going to do is I'm going to ask Mr. Fiorenza to show you the

12    jury room back here and he's going to deposit you there.

13    Then he's going to do down and collect up the rest of your

14    number, bring them back up here, and we'll get you all

15    gathered there.

16              While you all are doing that, I'll take up a few

17    preliminary things with the lawyers; and when your group gets

18    fully constituted, we'll bring you back in and get underway.

19              (Jury members not present.)

20              THE COURT:  Is there anything else we're going to

21    need to take up before we bring our jurors in and get ready

22    with the opening?

23              Do you know if you plan to make an opening, Mr.

24    Bark?

25              MR. BARK:  I do intend to.

1    THE COURT:  Okay.  I'll leave the bench for a few

2  minutes while we get everybody collected and then we'll come

3  back.  I'll give the jurors -- we'll get them sworn.  I'll

4  give them their preliminary instructions and then we'll go

5  directly into opening.

6    We'll be in recess.

7    (Recess taken from 9:54 until 10:07 a.m.)

8    THE COURT:  Mr. Fiorenza, bring our jury in,

9  please.

10    (Jury present.)

11    THE COURT:  Good morning, ladies and gentlemen.

12  Thank you for your patience this morning.  Those of you that

13  came that I told you that you would have to cool your heels

14  for a little while downstairs, but we've gotten a quorum, as

15  we like to say, and we're fully constituted here this morning

16  and we're ready to get underway.

17    In a moment I'm going to ask you to stand, with the

18  exception of Mr. Dockery, and be sworn, but I'll give you a

19  little overview of how the day will proceed.  I'm going to

20  give you some preliminary instructions that will tell you a

21  little bit about what to expect.  The lawyers will have an

22  opportunity to make opening statements.  We're going do get

23  right into the presentation of evidence this morning, and I

24  think you'll find we'll move along fairly efficiently and

25  quickly now that we've gotten through the jury selection

```
 1   process.   So thank you all for bearing with me and for your
 2   patience.
 3            Will you all stand, with the exception of Mr.
 4   Dockery, and raise your right hand, please.
 5            Mr. Dockery, raise your right hand, please, and be
 6   sworn.
 7            (Jury sworn.)
 8            THE COURT:  Y'all can be seated.   Thank you.
 9            One of the things I forgot to mention to you
10   yesterday is that the lawyers, of course, are trained to do
11   everything that they can to try to make sure there's no even
12   appearance of impropriety.  So oftentimes -- this is a public
13   building -- you'll get into an elevator or you'll be looking
14   for the restroom and you may come into contact one with of
15   the lawyers or the case agent or somebody that's involved in
16   the case.
17            The lawyers particularly are trained to avoid that
18   situation.  So they may stop and not get on the elevator with
19   you or they may turn and go in the other direction or they
20   may not acknowledge you if you said "Good morning" or "Good
21   afternoon."
22            So I don't want you to think that they're being
23   rude.  They're doing what they're trained to do, and I'm sure
24   you can understand why that would be important.
25            So if that happens or if it has happened, don't
```

hold it against them.  They're doing what they're supposed to be doing.

Ladies and gentlemen, now that you've been sworn, I've got some basic principles to explain to you about a criminal trial and about your duties and responsibilities as jurors.  These are your preliminary instructions, and at the end of the case I will give you more detailed instructions.

You've met a lot of these folks already, but I want to take a minute and introduce you to the court personnel. As I've mentioned earlier, my name is Dalton and I'm a United States District Judge here in the Middle District of Florida and I will be presiding over this case.

My courtroom deputy sits down here in front of me to my right.  Her name is Ginny Flick, and Ms. Flick is in charge of everything that happens in the courtroom and she's responsible for the exhibits.  She does a lot of working with the lawyers during the times that you and I are not in the courtroom getting the exhibits in order and making sure that all the paperwork flows the way that it's supposed to work, to flow.

You've met Mr. Fiorenza, my court security officer. Mr. Fiorenza will take care of any needs that you might have that would come up during the course of your service or if it's something that he can't take care of, he'll bring it to my attention and I'll make sure that I handle it if he can't.

1          Sitting down here in front of me is to my left is

2     Diane Peede.  Diane is our court reporter.  She's responsible

3     for taking down everything that happens and for making an

4     accurate record of the proceedings.

5          And as I've already mentioned to you, I'll be

6     fairly vigilant about making the lawyers ask questions from

7     the podium and making sure the witnesses use the microphone

8     that's in front of them, because she doesn't listen to the

9     ambient sound.  She listens to the sound only through the

10    sound system.

11         So if I seem to be a little focused on that, the

12    reason is I want to make sure that I help her get the record

13    as clean and neat as it can be.

14         Seated over here to my left, a little bit out of

15    your view, is my law clerk.  He assists me as needed in all

16    aspects of the trial.  I have, as you might imagine, quite a

17    number of other matters that are my responsibility, and I may

18    from time to time ask my clerk to leave and go see about

19    something else that's unrelated to this case.  If I ask him

20    to come or go, he'll try to do that as quietly as he can.

21         This door is a little bit loud, but they get pretty

22    good at slipping in and out unnoticed; but if he leaves for

23    any reason, it's because I've asked him to go see about

24    something else.

25         Back in the jury room, you had a chance to be in

there briefly, I think it's everything you need to be

comfortable for the short period of time that you'll be with

us.  There are restrooms back there, coffee, water; but if

you need anything that's not back there, let Mr. Fiorenza

know and we'll that care of it, if we can.

        The room is secure.  So if you have a purse or

anything that you want -- that you are worried about, you can

leave it in there with the comfort of knowing that's a very

secure area.  Nobody will get in there except for -- nobody

can get in there except for Mr. Fiorenza, myself and you

guys.

        Now, it will be your duty to determine what

happened so that you can decide whether the defendant is

guilty or not guilty of the crimes that are charged in the

Indictment.  At the end of the trial I will explain to you

the law that you must follow in reaching your verdict and you

must follow the law as I explain it to you, even if you do

not agree with the law.

        You must decide the case solely on the evidence

presented here in the courtroom.  Evidence can come in many

forms.  It can be testimony about what someone saw or heard

or smelled.  It can be an exhibit that's admitted into

evidence.  It can also be someone's opinion.

        Now, some evidence proves a fact indirectly, such

as a witness who saw wet grass outside and people walking

1    into the courthouse carrying a wet umbrella.

2            "Indirect evidence" is sometimes called

3    circumstantial evidence and it's simply a chain of

4    circumstances that prove a fact.

5            Now, as far as the law is concerned, it makes no

6    difference whether evidence is direct or indirect.  You may

7    choose to believe or disbelieve either kind, and you should

8    give every piece of evidence whatever weight that you think

9    it deserves.

10           Certain things are not evidence and must not be

11   considered.  I'll list them you now:  Statements and

12   arguments of the lawyers.  In their opening statements and in

13   their closing arguments, the lawyers will discuss the case

14   with you, but their remarks are not evidence and they're not

15   to be considered by you as evidence, neither are the

16   questions asked by the lawyers or the objections made by the

17   lawyers.  Those are not evidence.  Only the witnesses'

18   answers are evidence.

19           You should not think that something is true just

20   because a lawyer's question suggests that it is.  For

21   instance, if a lawyer were to ask a witness, "You saw the

22   defendant hit his sister, didn't you," well, that question is

23   not evidence whatsoever of what the witness saw or what the

24   witness did unless the witness agrees with it.

25           There are rules of evidence that control what comes

1   into evidence.  When a lawyer asks a question or offers an

2   exhibit and the lawyer on the other side thinks that it is

3   not permitted under the rules of evidence, that lawyer may

4   object.

5       If I overrule the objection, then the question may

6   be answered or the exhibit may be received.  If I sustain the

7   objection, then the question cannot be answered and the

8   exhibit cannot be received.  Whenever I sustain an objection

9   to a question, you must ignore the question and not try to

10  guess what the answer might have been.

11      Now, sometimes I may order that evidence that's

12  already been received be stricken, for whatever reason, and

13  instruct you that you should disregard or ignore the

14  evidence.  What that means is that when you're deciding the

15  case, you must not consider any evidence that I have told you

16  to ignore or to disregard.

17      Some evidence is from time to time admitted for a

18  limited purpose.  When I instruct you that an item has been

19  admitted for a limited purpose, you must consider it only for

20  the limited purpose that I describe and not for any other.

21      I've touched already on credibility of witnesses.

22  In reaching your verdict, you may have to decide what

23  testimony to believe and what testimony not to believe.  You

24  may believe everything a witness says or part of it or none

25  of it.

1          In considering the testimony of any witness, you

2    may take into account the opportunity and ability of the

3    witness to see or hear or know the things testified to, the

4    witness's memory, the witness's manner while testifying, the

5    witness's interest in the outcome of the case and any bias or

6    prejudice that the witness may have, whether other evidence

7    contradicts the witness's testimony, and the reasonableness

8    of the witness's testimony in light of all of the evidence

9    and any other factors that bear on believability.

10          I'll give you additional guidelines for determining

11   credibility of witnesses at the end of the case and remind

12   you of some of these as well.

13          Now, as I have told you, this is a criminal case.

14   There is one defendant in this case.  There are three basic

15   rules about a criminal case that you must keep in mind.

16          First, the defendant is presumed to be innocent

17   until proven guilty.  The Indictment against the defendant

18   brought by the government is only an accusation, nothing

19   more.  It is not proof of guilt or anything else.  The

20   defendant therefore starts out with a clean slate.

21          Second, the burden of proof is on the government

22   until the very end of the case.  The defendant has no burden

23   to prove his innocence or to present any evidence or to

24   testify.  Since the defendant has the right to remain silent

25   and may choose whether to testify, you cannot legally put any

1    weight on a defendant's choice not to testify.  It is not

2    evidence.

3           Third, the government must prove the defendant's

4    guilt beyond a reasonable doubt.  I will give you further

5    instructions on this point later, but bear in mind that the

6    level of proof required is high.

7           Now, our law requires jurors to follow certain

8    instructions regarding their personal conduct in order to

9    ensure that the trial is just and fair.  I'll give you these

10   instructions now.

11          You are not to talk, either amongst yourselves or

12   with anyone else, about anything related to the case.  You

13   may tell people with whom you live and your employer or

14   others that may inquire that you are a juror and give them

15   information about when you will be required to be in court,

16   but you may not discuss with them or anyone else anything

17   related to the case.

18          Do not at any time during the trial request,

19   accept, agree to accept or discuss with any person any type

20   of payment or benefit in return for supplying any information

21   about the trial.

22          You must promptly tell me about any incident that

23   you know of or become aware of that involves an attempt by

24   any person to improperly influence you or any member of the

25   jury.

1          You are not to visit or view the premises or any

2    place where the charged crime was allegedly committed or any

3    other premises involved in the case.  You must not use

4    Internet maps or Google Earth or any other program or device

5    to search for a view of any location that may be discussed in

6    the testimony.

7          You are not to read, watch or listen to any

8    accounts or discussions related to the case that may be

9    reported by newspapers, television, radio, the Internet or

10   any other news media.

11         You are not to attempt to research any fact, issue

12   or law related to the case, whether through discussions with

13   others, by the library or Internet research or any other

14   means or source.  It's important that you understand why

15   these rules exist and why they are so important.

16         We've spent a lot of time, as you know, in the

17   course of jury selection; and you, as jurors, must decide

18   this case based solely on the evidence presented here within

19   the four walls of this courtroom.  This means that during the

20   trial, you must not conduct any independent research about

21   the case, the matters in the case, any individuals that may

22   be involved in the case.

23         In other words, you should not consult dictionaries

24   or reference materials.  You should not search the Internet,

25   websites, blogs or use any other electronic tools to obtain

1   information about this case or to help you decide this case.

2   Please do not try to find out any information from any source

3   outside the confines of this courtroom.

4         Now, the law requires that you not read or listen

5   to any news accounts of the case.  The law often uses words

6   or phrases in special ways.  So it's important that any

7   definitions that you might hear come from me only and not

8   from any other source.  It would not be fair to the parties

9   for you to base your decision upon any reporter's view or

10  opinion or some other information that you might acquire from

11  outside the courtroom.

12        Our law does not require -- or does not permit

13  jurors to talk with anyone else about the case or to permit

14  anyone to talk with them about the case because only jurors

15  are authorized to render a verdict.  Only you have been

16  examined and found to be fair and only you have promised to

17  be fair.  No one else is so qualified.

18        Our law does not permit jurors to talk amongst

19  themselves about the case until the Court tells them to begin

20  deliberations, because premature discussions can lead to

21  premature final decisions.

22        Now, I know that many of you use cell phones,

23  iPhones, Blackberries, the Internet and other tools of

24  technology.  You also must not talk to anyone at any time

25  about this case or use these tools to communicate

electronically with anyone about the case.  This includes --
and I want to stress this -- it does include your family and
your friends.  You may not communicate with anyone about the
case using your cell phone, e-mail, BlackBerry, iPhone, text
messaging, Twitter, any blog or website, including FaceBook,
Google+, MySpace, LinkedIn, YouTube, or as I often say,
anything that might have been invented between the time we
started this morning and now.

         You may not use any similar technology or social
media even if I didn't specifically mention it here, and I
expect you to inform me if you were to become aware of any of
your fellow jurors violating these instructions.

         Our law also does not permit you to visit a place
that's discussed in the testimony.  There are several reasons
for that.  First, you can't be sure that the place would be
in the same condition as it was on the day in question; and,
second, even if it were in the same condition, once you go to
a place that's discussed in the testimony in order to
evaluate the evidence in light of what you see, you become a
witness, not a juror, and as a witness, you may now have a
mistaken view of the scene that neither party would have an
opportunity to correct.  That would not be fair.

         Now, these rules are designed to help guarantee a
fair trial, and our law accordingly sets forth serious
consequences if the rules are not followed.  I trust that you

1  understand and appreciate the importance of following these

2  rules, and in accordance with your oath and your promise, I

3  have every confidence that you will do so.

4          Now, y'all have notepads that were distributed to

5  you.  If you want to take notes, you can do that in order to

6  help yourself remember what witnesses said.  I do want to

7  stress, however, that if you take notes, keep them to

8  yourself until you and your fellow jurors go to the jury room

9  to begin your deliberations.

10         The other thing that I want to stress is don't let

11 notetaking distract you from paying attention to what's

12 happening in the courtroom.  We have a court reporter who

13 will record the proceedings.  I don't want you to become so

14 distracted with taking notes that you don't pay attention to

15 the manner in which the witness testifies, that you miss some

16 of the non-verbal clues, that you don't perhaps hear the next

17 question and answer because you're busy taking notes.

18         I mention that because I see it happen from time to

19 time, especially in long, complex cases, where jurors are

20 naturally focused on trying to make notes to remember what's

21 happening, but use the notes to jot down a date or to make

22 yourself a note or a reminder about something that you saw or

23 heard that might refresh your memory or help fill it in later

24 on, but don't get consumed in notetaking if you decide to

25 take notes.

1          Now, whether or not you take notes, it's important

2     that you rely upon your own memory of what was said.  Notes

3     are intended to assist your memory only and they're not

4     entitled to any greater weight than your memory or impression

5     about the testimony, and that certainly goes for your

6     neighbor's notes as well when you retire to deliberate.  So

7     rely upon your memories and impression about the testimony.

8     That's what's controlling.

9          In just a few moments we'll begin with the trial

10    itself.  The government will have an opportunity to make an

11    opening statement.  An opening statement is simply an outline

12    to help you understand the evidence as it comes in.

13         After the government's opening, the defendant may,

14    if they choose, but they're not required to, make an opening

15    statement.

16         I'll remind you that opening statements are neither

17    evidence nor argument.

18         Following opening statements, the government will

19    then present its witnesses and counsel for the defendant may

20    cross-examine them.

21         Following the government's case, the defendant may,

22    if he wishes, present witnesses whom the government may

23    cross-examine.

24         After all of the evidence is in, the lawyers will

25    then be given an opportunity to make their closing arguments

1    to you to summarize and to help interpret the evidence for

2    you, and then I'll give you your instructions on the law.

3    After that, you'll go to the jury room to deliberate and

4    decide upon your verdict.

5            So, with all that said, I'm going to turn to Ms.

6    Gable in just a minute and invite her to come to the podium

7    and to start and make her opening statement.

8            As I've mentioned to you this morning, we've gotten

9    a little bit off of our ordinary schedule because we had to

10   do the jury selection process this morning.  I know I told

11   you that I wouldn't keep you for longer than 90 minutes.

12   We've had a little bit of break while we've been putting you

13   all together.  So I assume that everybody is okay and we're

14   going to get underway; but if anybody on the panel is not

15   okay, just raise your hand, somehow get Mr. Fiorenza's

16   attention or mine and we'll make sure that we take a break

17   and keep you all comfortable.

18           Ms. Gable, is the government ready to proceed?

19           MS. GABLE:  Yes, Your Honor.

20           THE COURT:  Thank you, Mr. Fiorenza.

21           MS. GABLE:  Good afternoon, ladies and gentlemen.

22   Actually, it's morning.  Good morning, ladies and gentlemen.

23   This case is about a father, the defendant, Jonathan Adleta,

24   who had a sexual appetite for his three-year-old daughter,

25   and it's about a mother who fed that appetite by agreeing to

 1    transport their little girl across state lines, from Florida

 2    to Oklahoma, so that that man could sexually molest his

 3    little girl.

 4            The evidence in this case will show that the

 5    defendant, Jonathan Adleta, began and planned to molest his

 6    little girl before she was even born; that after she was

 7    born, for the short time that he lived with her, he did

 8    molest her and that the abuse continued even after he and the

 9    child's mother had divorced and had moved from California,

10    where they were living, to Florida.  Even thousands of miles

11    apart, the abuse continued.

12            In this case you will hear and you will see the

13    words of Jon Adleta, the words that he wrote, the words that

14    he wrote in a diary, in his text communications with the

15    mother of the child, Sarah Adleta, and in his Skype

16    communications with her, his words of his plans to sexually

17    abuse this child, of his intent to sexually abuse this child.

18            You will hear from two mothers, the mother of the

19    little girl, K., the victim in this case, and of the mother

20    of another child, both women who were involved with him,

21    mothers who both had small children, mothers who both had

22    daughters who were under the age of five, and both of those

23    women will recount for you and testify about the defendant's

24    deviant desire for daddy-daughter sex and they will recount

25    for you their eyewitness accounts of his sexual abuse of both

1  of their daughters.

2           The evidence of Jon Adleta's words and his conduct

3  will show that his intent was to molest K. when he caused her

4  mother, Sarah, to transport her from Florida to Oklahoma in

5  December of 2012 during the winter holidays.

6           In March of 2009, K. was born to Jon and Sarah

7  Adleta.  From the time that she was born, the defendant began

8  to lay the groundwork for the life that he wanted to live

9  with K.  He began to lay the groundwork for his family

10  values, values that included the sexual abuse of K.

11           He told Sarah that he was into daddy-daughter sex.

12  He involved Sarah in a deviant sexual lifestyle.  He told

13  Sarah that he was into young.  He showed her stories on his

14  computer, stories that he had downloaded from the Internet,

15  stories that were about fathers, fathers having sex with

16  their little girls.

17           In May of 2010 the defendant, who was in the Marine

18  Corps, was deployed to Afghanistan.  At this time Sarah was

19  pregnant with their second child, J., and they were

20  contemplating marriage.  While in Afghanistan, the defendant

21  kept a paper trail of his intent to molest little K. and J.

22  It was a paper trail that he kept in the form of a diary, a

23  diary that law enforcement seized three years later during

24  the execution of a search warrant at his home, and in this

25  diary the defendant laid out his plans to sexually abuse his

children and his requirement that Sarah live by his family
rules, because, as you will see in this diary, according to
his rules, he wanted the family to live as nudists.  He
wanted to teach the children how to have sex.  He wanted to
have sex in front of the children.  He wanted there to be no
boundaries.

In his words, in his words, he said that he wanted
to feel up K.  This child was two years old at this time.  He
said that he wanted to teach her how to give him a blow job
and that he wanted to teach her how to give him a hand job
and that he wanted to give her a "facial," a term that he
used for ejaculating on the child.

According to his rules, he wanted to teach his son,
who was not even born yet, techniques, sexual techniques; and
he wanted Sarah to give him, the little boy that was not even
born, a blow job.

You will see in this diary that he wrote when he
was in Afghanistan that he negotiated with Sarah, because
they were contemplating marriage, and he was negotiating with
her about this and wanting to make sure that she knew what he
was all about, and that eventually she relented and she
agreed.  She agreed to live by the defendant's rules and to
live a lifestyle where child sexual abuse was part of their
parenting plan.

In November of 2010 the defendant returned to the

1   United States and lived with Sarah and the kids in

2   California.   During this time he did exactly what he said he

3   was going to do in that diary that he kept in Afghanistan.

4   The family lived as nudists.   He was naked in front of the

5   children.   Sarah was naked in front of the children, and he

6   began to teach K. how to have sex.   While he was naked with

7   her, he had her place her little hand on his penis and he was

8   erect and he masturbate in front of the child as if to get

9   her used to what that looked like.

10          Later, the defendant and Sarah divorced in 2012 and

11   she moved back to Oviedo, Florida, with her two young

12   children; but despite being thousands of miles apart, the

13   defendant and Sarah continued to parent their children as

14   they had agreed to at the time of their marriage.   They

15   continued to sexually abuse their children.

16          The defendant, who was in Texas at this time, asked

17   Sarah to Skype with him and they Skyped frequently and during

18   these Skype communications where they could see each other, a

19   video application where they could talk to each other through

20   their computers and over their computer monitors they could

21   see each other, it was realtime, he asked Sarah to display

22   their little girl naked, and while she was naked, he

23   masturbated in front of the child.   This was part of his

24   family values, part of the way he wanted to raise his

25   children.

1          Sarah, who was completely warped by this time, also

2     began to molest her little girl and her little boy; and the

3     defendant asked her to take pictures, and she did and she

4     sent those pictures to him.

5          When law enforcement recovered his computer from

6     his home during the execution of the search warrant in 2013,

7     they found one of those pictures; and I apologize, but you

8     will see that picture and it's a picture of Sarah molesting

9     her little boy, one that he received in November of 2012, a

10    picture that he kept on his computer in his saved folders.

11         During this same month, in November of 2012, the

12    defendant found another woman.  Her name is Samantha and you

13    will hear her testify.  And, like Sarah, she had a little

14    girl, who was four years old, and a little boy, who was

15    three, and the two of them dated and they were contemplating

16    marriage; and, again, the defendant began to set down what

17    his rules were for their family.  He told Samantha that he

18    was into daddy-daughter sex.

19         As he had done with Sarah, he Skyped with Samantha

20    because they did not live in the same area; and while he

21    Skyped with her, he, too, asked her to display her little

22    girl naked, which she did, and he masturbated while he saw

23    her.  He told Samantha again about his daddy-daughter

24    fantasies and he told her that he was sexually interested in

25    young girls.

1          In November of 2012 the defendant visited Samantha

2    just weeks before he was expecting K.'s arrival to visit with

3    him in Oklahoma; and while he was at Samantha's home, he went

4    into M.'s room, who was Samantha's little girl, and with

5    Samantha present, he laid in bed with M. and he placed his

6    penis, which was erect, against M.'s back side, pulled down

7    her underwear and placed it inside of her underwear and had

8    Samantha take pictures of it with his digital camera, which

9    she did, and Samantha sent those pictures to him through her

10   e-mail account on November 19th of 2012.

11         Law enforcement recovered one of those pictures off

12   of the defendant Jonathan Adleta's computer media, a picture

13   of him molesting little M.

14         In December of 2012, just two weeks before K.

15   arrived in Oklahoma, Samantha moved in with Jon and her

16   children came to visit.  During that time the defendant had

17   K. (sic) in the living room.  He masturbated on K. -- I'm

18   sorry -- on M., Samantha's child, and he had Samantha video

19   record it.

20         During their conversations in November of 2012, the

21   conversations between the defendant and Sarah Adleta about

22   the trip to Oklahoma, they talked about what they both

23   expected.  In November of 2012, the early part of November of

24   2012, Jon Adleta told Sarah that he wanted both her and her

25   daughter and her son to visit him during the winter holidays

and he told her that he would pay for the ticket because
Sarah didn't have any money.  She couldn't pay for it.

During their conversation he told her that he
wanted to molest their daughter, K., and he specifically told
Sarah that he planned to give K. a "facial," Jonathan
Adleta's words, and that he planned to have her give him a
blow job, and he asked Sarah, "Are you okay with this?  Is
this good?"  And she said, "Yes."  He told Sarah that he
planned to video record it.

So in December of 2012, on December 23rd, Sarah and
the children flew out to Oklahoma.  Jon picked them up.  The
defendant picked them up from the airport, took them back to
the house; and not less than two days after their arrival,
Jonathan Adleta called Sarah into his bedroom and he had K.
on the bed.  He was standing up.  He was naked and he was
erect and he began to masturbate in front of little K., and
then he lied on his bed and he put K. on top of him and he
continued to masturbate and then he ejaculated on her.  As he
had done with M. just two weeks earlier, he had done the same
thing to K., exactly what he said that he intended to do.

He told Sarah later during that trip that he had
had K. in the shower with him and that he had put his penis
in her mouth.

When on January 2nd Sarah flew back to Florida with
her children and she and the defendant began to talk about

1    and make arrangements for transporting K. back and forth so

2    that K. could spend time with the defendant in Oklahoma, they

3    talked about him having her every two weeks and him having

4    her every three weeks and they talked about in their

5    communications the sexual abuse of K.

6            You'll see five text and Skype communications that

7    occurred after Jonathan -- after Sarah Adleta returned to

8    Florida, between Jonathan Adleta and Sarah Adleta, and they

9    talk about the sexual abuse of K.  In one of the

10   communications Jonathan Adleta asked Sarah whether she

11   enjoyed seeing him come on K.

12           In another communication he told Sarah, after Sarah

13   remarked that K. freaked out when the defendant ejaculated on

14   her in Oklahoma, the defendant's solution was to find other

15   men to ejaculate on her so that she would get used to the

16   idea of being in that situation.

17           In their last communication, in March of 2013,

18   Sarah told the defendant, Jonathan Adleta, that she was in

19   communication with another man, another pedophile, who was

20   molesting his daughter and that she was planning to take K.

21   up to him for that purpose, and Jonathan Adleta's reaction

22   was, "Well, if you do, you've got to record it."

23           As far as conduct, the defendant has been charged

24   with conspiracy, conspiring with Sarah Adleta, to transport a

25   minor in interstate commerce, K., three-year-old K., with the

```
 1   intent of engaging the child in sexual activity; and he's

 2   also been charged with joining with Sarah to transport that

 3   child in interstate commerce with intent to engage her in

 4   sexual activity.

 5           At the end of the day this case will be about the

 6   defendant's intent.  When he had Sarah bring K. to him, did

 7   he intend to sexually molest her?

 8           How do we discern somebody's intent?  It's by their

 9   words and by their actions, what they say and what they do.

10           In this case we will present to you ample evidence

11   of the defendant's words and his actions, which will prove to

12   you beyond a reasonable doubt that his intent was to molest

13   K. when he caused her travel in 2012, and that he in fact

14   committed these terrible crimes.  Thank you.

15           THE COURT:  Mr. Bark, do you wish to make an

16   opening?

17           MR. BARK:  Please, Your Honor.

18           THE COURT:  All right.  You may proceed.

19           MR. BARK:  Thank you.

20           Good afternoon -- good morning, ladies and

21   gentlemen.  I don't even want to make light of that.  What

22   you're about to see and observe and hear are some of the most

23   disturbing things you'll probably hear and see in your life,

24   and that's part of why we went through great lengths during

25   jury selection to make sure you could overcome that and look
```

1    at all the evidence to see if the government proved the

2    allegations against Mr. Adleta.

3            Now, you're in one of the most difficult positions

4    I believe anybody could be in, in an effort to come to a

5    decision as to someone's guilt or not.  The reason I say that

6    is you have not been instructed on what the law is that you

7    are to apply to the evidence, that you will hear and that you

8    will see.

9            There are certainly going to be moments where you

10   are full of emotion or you may be assured to yourself of

11   guilt or perhaps even not guilt, but I ask you to please

12   reserve on that to the best of your ability, because it is

13   not until you hear everything, see everything and then you're

14   instructed on the law that you can come to a fair verdict.

15   This is going to be a very challenging exercise and one that

16   you are not often asked to do in life.

17           I don't have a terrible amount to say at this

18   point, but there is something else I'd like to point out to

19   you, which is you're going to hear about a virtual reality,

20   you're going to hear about fantasies, and you will hear about

21   actual acts, and you're going to have to make a determination

22   at some point which is which and at what point which occurs.

23   It's going to be very difficult to do that through the

24   discernment of the evidence, but as you go through it, you're

25   going to be asked to do that and have to do that.  So I'm

1    going to ask you to look closely for what is fantasy and what

2    has actually occurred.

3              Also, you may come to conclusions based on what you

4    believe certain words mean, and the Judge, I believe, will

5    instruct you on what those words mean.  So that those are how

6    you are going to apply it to the case.

7              It's not an easy thing to do.  It's a very

8    difficult case to listen to and to see; but as we stand

9    before you, Mr. Adleta has entered a plea of not guilty to

10   the charges here today, and it is only those charges which he

11   is being tried with today.  So I ask you to keep that in mind

12   as you go through this process.  I believe when you do that,

13   you will actually find him not guilty of these two counts.

14   Thank you.

15             THE COURT:  Thank you, Mr. Bark.

16             Ladies and gentlemen, we're going to take our

17   morning break this morning, give the lawyers a chance to get

18   organized, and so when you come back from your break, then

19   we'll move right into the government's case and the

20   presentation of the witnesses.

21             It's ten minutes till.  So we'll come back at five

22   minutes after the hour and we'll get underway.

23             (Jury not present at 10:49 a.m.)

24             THE COURT:  We'll be in recess until five minutes

25   after the hour.

```
 1              (Recess taken from 10:50 until 11:05 a.m.)

 2              (Jury not present.)

 3              THE COURT:  Are you ready to proceed, Ms. Gable,

 4   Mr. Bark?

 5              MS. GABLE:  Yes, Your Honor.

 6              MR. BARK:  Yes, sir.

 7              THE COURT:  All right.  Bring the jury back,

 8   please, Mr. Fiorenza.

 9              (Jury present.)

10              THE COURT:  Welcome back, ladies and gentlemen.

11   Were all of you able to abide by my instructions not to

12   discuss the case?

13              (Affirmative responses.)

14              THE COURT:  The government may call its first

15   witness.

16              MS. RIVERA MIRANDA:  Yes, Your Honor.  The United

17   States calls Ms. Sarah Adleta.

18              THE COURT:  Ms. Adleta, if you will, stand there,

19   please, and be sworn.

20                        SARAH ADLETA,

21   having been first duly sworn, was examined and testified as

22   follows:

23              THE COURT:  Have a seat, ma'am.  If you will, pull

24   that microphone up close to you and speak directly into it,

25   please.
```

```
1          THE COURTROOM DEPUTY:  Please state your name and

2    spell your last name.

3          THE WITNESS:  It's Sarah Adleta, A-d-l-e-t-a.

4          THE COURT:  You may inquire, Ms. Miranda.

5          MS. RIVERA MIRANDA:  Good morning, ladies and

6    gentlemen, the Honorable Court, and everybody present.

7                    DIRECT EXAMINATION

8    BY MS. RIVERA MIRANDA:

9    Q.    Good morning, Ms. Adleta.

10   A.    Good morning.

11   Q.    I have an accent.  If you don't understand any question,

12   just ask me to repeat it or rephrase it, okay?

13   A.    Okay.

14         THE COURT:  Ms. Miranda, will you pull that

15   microphone towards you a little bit.

16         MS. RIVERA MIRANDA:  There (complies).

17   BY MS. RIVERA MIRANDA:

18   Q.    All right.  How old are you?

19   A.    Twenty-nine.

20   Q.    Okay.  And where are you currently residing?

21   A.    In the Orange County Jail facility.

22   Q.    Okay.  Why are you currently in prison?

23   A.    Because I'm being detained for my charges.

24   Q.    Okay.  Can you please explain to the members of the jury

25   what charges are you detained for?
```

1    A.    My charges are for distributing and producing child

2    pornography.

3    Q.    Okay.  When were you arrested; do you remember?

4    A.    March 15th.

5    Q.    And that would be of 2013?

6    A.    Yes, ma'am.

7    Q.    Okay.  And you said production of child pornography.

8    Let me ask you, did that involve your children?

9    A.    Yes, it did.

10   Q.    Okay.  Can you please describe to the members of the

11   jury exactly what you did, what were you charged with?

12   A.    I was charged with two counts and both of them are for

13   distributing and producing child pornography.

14   Q.    Okay.

15   A.    My -- I don't know if you want me to go into what

16   happened, but. . .

17   Q.    What did you do with your children?

18   A.    I performed in sexual activities and I posted it on

19   Skype for people to see, and I performed sexual activities

20   with both of my children.

21   Q.    Okay.  Can you please tell the members of the jury how

22   many children do you have?

23   A.    I have two children.

24   Q.    And what are their first names?

25   A.    K. and J.

78

1    Q.    When was K. born?

2    A.    March 8th of 2009.

3    Q.    What about J.?

4    A.    October 15th of 2010.

5    Q.    Okay.  Let me ask you, in relation to the charges that

6    were filed against you, who were you producing those images

7    for mainly?

8    A.    Aaron Dixon.

9    Q.    And who is this person?

10   A.    He was a friend of mine.

11   Q.    Okay.  When did you meet him?

12   A.    I met him approximately in the 2005 area.  I'm not -- I

13   can't tell you --

14   Q.    Is this a person --

15   A.    -- exactly --

16   Q.    -- that you had a romantic involvement with?

17   A.    Yes, I did.

18   Q.    Okay.  Now, let me ask you, who is the father of your

19   children?

20   A.    Jonathan Adleta.

21   Q.    And if you see Jonathan Adleta here in court today can

22   you please tell the members of the jury where is he sitting

23   at?  What is he wearing?

24   A.    He's wearing a suit, it looks like it's gray in color,

25   and he's on the left-hand side of me.

1          MS. RIVERA MIRANDA:  Your Honor, let the record

2    reflect that the witness has identified the defendant,

3    Jonathan Adleta.

4          THE COURT:  Yes, the record will so reflect.

5    BY MS. RIVERA MIRANDA:

6    Q.   Okay.  Now, what happened with the charges that were

7    filed against you for production of child pornography?

8    A.   I got charged and I've already pleaded guilty to the

9    charges.

10   Q.   Okay.  And you pled guilty pursuant to a Plea Agreement?

11   A.   Yes, ma'am, I did.

12   Q.   And in that Plea Agreement, is there a cooperation

13   provision?

14   A.   Yes, I do have to cooperate.

15   Q.   Okay.  Now, let me ask you, when did you meet the

16   defendant?

17   A.   I met him approximately August of 2008.

18   Q.   And how old were you when you met the defendant, if you

19   recall?

20   A.   Around 22 or 23.

21   Q.   Okay.  How old was he?

22   A.   He would have been 20.

23   Q.   Okay.  Where did you meet him?

24   A.   Where?  I met him at -- I believe at someone's house, a

25   friend of mine.

80

1    Q.    Okay.  And did you start dating right away or did it

2    take some time?  When did you start actually dating the

3    defendant?

4    A.    It took a little bit of time, but we pretty much had

5    feelings for each other right away, you know, started dating,

6    I guess you could say.

7    Q.    Where did you live at the time when you started dating

8    the defendant?

9    A.    I was residing at my parents' home in Oviedo.

10   Q.    That's Florida?

11   A.    Yes.

12   Q.    Okay.  Where was the defendant residing when you started

13   dating him?

14   A.    He was living in an apartment off of Goldenrod in the

15   Orlando area.

16   Q.    Okay.  Now, let me ask you, did it come a point early in

17   your relation when the defendant expressed a sexual interest

18   in children?

19   A.    Can you repeat the question.

20   Q.    Sure.  If there came a point in your relation with the

21   defendant, early in your relation with the defendant where he

22   expressed an interest, a sexual interest in children?

23   A.    Yes, he did.

24   Q.    In young kids?

25   A.    Uh-huh.

1   Q.   And how did he do that?  How do you know that?

2   A.   Because he would show me these stories online of

3   father-daughter fantasies, sexual fantasies.

4   Q.   This was when you were dating?

5   A.   Uh-huh.

6   Q.   What exactly was he showing you?

7   A.   They were stories that -- you know, you can Google and

8   they are sexual fantasies based on a father and daughter

9   performing in sexual activity.

10  Q.   Do you recall what kind of sexual activities?

11  A.   No, I do not.

12  Q.   Okay.  Now, did he also express an interest in doing

13  things with children?

14  A.   At what point in time are you asking?

15  Q.   Early in your relation.

16  A.   Early?  I wouldn't say right away.

17  Q.   At what point do you remember that he started expressing

18  this interest in children?

19  A.   More towards when my daughter was about two.

20  Q.   Okay.  Now, did you marry the defendant?

21  A.   Yes, I did.

22  Q.   Okay.  And when did that happen?

23  A.   June 24th of 2010.

24  Q.   And where were you residing when you married the

25  defendant?

1   A.    I was residing at my parents' home in Oviedo, Florida.

2   Q.    And where was he at when you married him?

3   A.    He was in Afghanistan.

4   Q.    Okay.  If he was in Afghanistan and you were in Florida,

5   how did that take place?

6   A.    We -- I flew to Texas and you can get married there with

7   a proxy marriage, and his parents stood in his place and we

8   legally got married.

9   Q.    Okay.  You said that he was deployed in Afghanistan at

10  the time that you married him.  Was he in the military?

11  A.    Yes, he was.

12  Q.    Which branch?

13  A.    The Marine Corps.

14  Q.    Do you recall if he was an officer in the Marine Corps?

15  A.    Yes, he was.

16  Q.    Okay.  And do you recall when was it exactly that he was

17  deployed?

18  A.    When?

19  Q.    When?  Uh-huh.

20  A.    May of 2010.

21  Q.    Okay.  So basically before you married, he had already

22  been deployed to Afghanistan, according to your testimony.

23  And let me ask you, when he was deployed, how old was K.?

24  A.    About two and a half.

25  Q.    Okay.  And what about your second son (sic)?  Were you

1    pregnant with your second son when the defendant deployed?

2    A.    Yes, I was.

3    Q.    Okay.  And let me ask you, how did you communicate with

4    the defendant when he was deployed?

5    A.    He would call me from a satellite phone and he also

6    communicated through e-mail service that the Marine Corps

7    had.  You go on a website and you can e-mail each other.

8    It's a form of e-mail.

9    Q.    Okay.  And prior to marrying the defendant, let me ask

10   you, were there any discussions concerning the type of

11   lifestyle that he wanted your family to have?

12   A.    Yes.

13   Q.    Okay.  Can you please tell the members of the jury what

14   exactly were these communications?

15   A.    He had a conversation with me and he basically expressed

16   that he wanted to take pictures of our children as they grew

17   up, especially my daughter, and he wanted to hide them in a

18   safe box.  He also wanted to -- he was curious about doing

19   sexual activity with my daughter, and he also said that he

20   wanted us to be nudists; and he also wanted me to engage in

21   sexual activity with my son, when he was older.

22   Q.    Okay.  Now, can you please tell the members of the jury

23   exactly what terms did he use?  When he said having sexual

24   activity with your daughter and having you perform sexual

25   acts on your son, what were his words?  What did he want to

1   do?

2   A.    He wanted me to have sex with my son when he was, like,

3   high school age and he kind of made the point of maybe, you

4   know, fuck his friends as well.

5   Q.    And what about your daughter?  What interest did he

6   express in your daughter as to the kind of things he wanted

7   you to do with your daughter?

8   A.    He was curious about her giving him a blow job.

9   Q.    Okay.  What do you mean by that?  Oral sex?

10  A.    Yes, ma'am.

11  Q.    Having K. perform oral sex on him?

12  A.    Yes, ma'am.

13  Q.    Okay.  And did he also express an interest in doing

14  anything to her as far as other sexual activities?

15  A.    He was also interested in "facials."

16  Q.    Can you explain to the members of the jury what is that?

17  What did he mean by giving K. a "facial"?

18  A.    Ejaculating either on her face or somewhere on her body.

19  Q.    Did he express exactly when he intended to do this?

20  A.    No.

21  Q.    Okay.  Now, you said these conversations started before

22  your marriage.  Can you estimate when -- when was it that he

23  started talking about these sexual activities, these

24  interests that he had in sexual activities with the children?

25  A.    About a week or -- a week and a half to two weeks before

1   we got legally married.

2   Q.   Okay.  And was this something that you would talk about

3   often?  I mean, was it on one-time occasion?

4   A.   We had several discussions over the satellite phone and

5   he made it very clear that these were -- if I -- I had to be

6   okay with it in order to get married.  So there was

7   conditions placed on it.

8   Q.   So you had to be okay with certain things?

9   A.   And if I wasn't, then he was going to leave me.

10  Q.   Okay.  So basically are you telling us that he made that

11  a condition to your marriage, to have sex with the children,

12  an open sex life and nudism --

13  A.   Yes.

14  Q.   -- as a condition to your marriage?

15  A.   Yes.

16  Q.   Okay.  Were you okay with that initially?

17  A.   Not initially.  I struggled with it and I knew that it

18  was wrong and I -- I -- I really struggled for a while, and

19  then I just kept thinking, well, maybe he'll be

20  disinterested, you know, after a period of time.

21  Q.   Did you agree then at some point to have this kind of

22  lifestyle with your children, open sex life, nudism?

23  A.   Yes, I did.

24  Q.   Okay.  Why did you agree to that?

25  A.   Because I loved him and I had a financial security with

1    him.  I didn't know how I was going to raise two kids by

2    myself, and I basically wanted to do whatever it took to keep

3    him.

4    Q.    Okay.  Even if it included sexually abusing the

5    children?

6    A.    Yes.

7    Q.    And you said financially.  What did you mean by that?

8    Were you working at the time?

9    A.    No.

10   Q.    Did you have other sources --

11   A.    No, I wasn't working.  I was taking care of the kids

12   full time.

13   Q.    Okay.  So who was providing for you, financial support?

14   A.    He was, Jonathan Adleta.

15   Q.    Okay.  Now, let me ask you, at any point while you were

16   involved with the defendant, did you get involved in

17   downloading and saving child pornography?

18   A.    Yes, I did.

19   Q.    Okay.  And how did that happen?  Why did you do that?

20   A.    When?

21   Q.    How and why?

22   A.    How was he explained to me that there was a website that

23   I could go to and he already had a membership on it, and he

24   told me where to find the images that he was looking for.

25   And why?  Because he wanted them.  He wanted the actual

87

1    pictures and videos.

2    Q.    So what did you do then upon receiving these

3    instructions about downloading these images?

4    A.    I did -- I did what he said and I put it on a memory

5    stick and then I actually sent it to him to Afghanistan

6    through a care package.

7    Q.    You saved these images into what?

8    A.    On the computer.

9    Q.    Okay.  Did you send them into -- save --

10    A.    The memory stick.

11    Q.    Okay.  And that's what you sent to him to Afghanistan?

12    A.    Yes, ma'am.

13    Q.    Okay.  Did you actually look at some of these images

14    that you were saving?

15    A.    Yes, I did.

16    Q.    Okay.  What did they depict?

17    A.    They depicted -- there was a few pictures of young girls

18    that were masturbating with a shower head and making out.

19    Q.    When you say, "young girls," what are you referring to?

20    Prepubescent girls?  How young were they?

21    A.    From my memory, they were approximately 13 or a little

22    younger.

23    Q.    And how often did you do that for him?

24    A.    Not very often.  I only sent him two sticks, two memory

25    sticks.

1  Q.   Okay.  Now, what happened when defendant got back from

2  Afghanistan?  Did he actually return to live with you?

3  A.   Yes.  I moved back to California where he was stationed

4  and we had an apartment there and he returned home that

5  Thanksgiving weekend.

6  Q.   When was that?

7  A.   2010.

8  Q.   Let me ask you, upon his return from Afghanistan, what

9  was his demeanor around the children?  What happened, if

10  anything, as relevant to this case?

11  A.   Not anything right away.  He was just kind of very

12  withdrawn when he came back; but after a time, when we moved

13  to a different town home in California, you know, he would be

14  naked around my children and he'd be masturbating in front of

15  them and he would also shower with them.

16  Q.   He would shower with both of them?

17  A.   Yes.

18  Q.   Okay.  And did you observe anything else concerning the

19  defendant's conduct with K. specifically as far as sexual

20  conduct?

21  A.   She -- she touched his penis a few times when he was

22  actually hard.

23  Q.   Okay.  You mean that he had an erect penis and he had

24  her put his -- put her hand, her little hand, on his penis?

25  A.   She just went up to it and did it.

1    Q.    Okay.  Is that something that happened on one occasion,

2    more than one occasion?  How often?

3    A.    More than once.  I can't specify how many times exactly,

4    but it happened more than once.

5    Q.    What about him masturbating in front of the children,

6    how often did that happen?

7    A.    Are you referring to -- which point?

8    Q.    When he came back from Afghanistan to live with you and

9    the children, at the time that you were together.

10   A.    Pretty frequently.  It would -- it would be random,

11   though sometimes.  It wasn't like an everyday thing.

12   Q.    Would he say anything to you about what he was doing and

13   why he was doing it or not?

14   A.    No.

15           MR. BARK:  Your Honor, I have an objection.  May we

16   approach for a moment?

17           THE COURT:  All right.

18           (Bench conference as follows.)

19           MR. BARK:  I'm objecting because --

20           THE COURT:  Make sure you speak into the

21   microphone.

22           MR. BARK:  I'm objecting because we were put on

23   notice under 404(b), 413, 414 as to molestation of M., but

24   not as to this type of conduct towards K.  We filed a motion

25   on all the other stuff, but not as to K. specifically under

90

1    413, 414 and 404(b).  So I'm objecting to this testimony, the

2    last question and response, and move to strike it.

3               THE COURT:  The objection is overruled.

4               (In open court.)

5               THE COURT:  You may inquire, Ms. Miranda.

6    BY MS. RIVERA MIRANDA:

7    Q.   I just want to go back for a moment to the time when you

8    were dating the defendant and you talked about him expressing

9    an interest in child pornography.  You said that you looked

10   at certain type of daddy-daughter types of communications

11   that he had on his computer.  Did he also become involved in

12   showing you child pornography?

13   A.   I mean, there was videos he had shown me and I couldn't

14   tell for sure if they were 18 or not.

15   Q.   Okay.  Did it look like young kids?

16   A.   They were young girls.  I mean, but they were like

17   between, I would say, 15 to 18.

18   Q.   Okay.

19   A.   They looked that.  You know, I didn't know for sure, but

20   they looked very young.

21   Q.   Okay.  Now, going back to what you were saying about

22   living with the defendant when he came back from deployment,

23   he lived with you for a short amount of time; would that be

24   correct?

25   A.   Yes.

1   Q.   Okay.  And then was there a point when he filed for

2   divorce?

3   A.   Yes.

4   Q.   When did that happen?

5   A.   He filed somewhere in the last week in September or the

6   first week in October, somewhere in that time period.

7   Q.   Of which year?

8   A.   Of 2011.

9   Q.   Okay.  Were you expecting that, that he would file for

10  divorce?

11  A.   I mean, we had had some contention, but I thought that

12  we would work it out; and because we had children together, I

13  assumed that he wanted to make things work.

14  Q.   Okay.  Now, when were you divorced finally?

15  A.   December 22nd of 2011.

16  Q.   Okay.  And what did you do after the divorce?

17  A.   I resided in California with my dad in a town home and

18  he moved to Texas.

19  Q.   Okay.  Let me ask you, after the divorce, did you stay

20  in touch with him?

21  A.   Yes, I did.

22  Q.   And how would you stay in touch with him?

23  A.   Skyping, texting, phone conversations and occasionally

24  e-mail.

25  Q.   Skyping, you mentioned.  Can you describe to the members

1    of the jury how would you do that?  What is Skype?

2    A.    Skyping is an app you can download on your computer

3    and -- you go to a website that says Skype and you download

4    the application and it enables you to have a video conference

5    with the other party.  So you're able to see each other on

6    the webcam and talk to each other.

7    Q.    Can you also --

8    A.    And you can also type messages as well.

9    Q.    Okay.  Is this a live video chat?

10   A.    Yes.  Yes, ma'am.

11   Q.    Okay.  So you used to do this with him.  How often?

12   A.    Pretty often.

13   Q.    After your divorce?

14   A.    Yes, ma'am.

15   Q.    Okay.  And then you also said that you communicated with

16   him through text messaging.  How would you do that?

17   A.    I had him programmed in my phone and I would text him

18   pictures as well as just, you know, us talking.  Usually it

19   was about the kids.

20   Q.    Okay.  Which phone did you own at the time?

21   A.    I'm sorry?

22   Q.    Which phone did you own at the time?

23   A.    It would have been a Windows phone.

24   Q.    Okay.  You had a Windows phone.  Do you own an iPhone

25   also at some point?

1    A.    Yes, ma'am, I do.

2    Q.    Okay.  And you said you had him on your phone.  You mean

3    he was in your contact list on your phone?

4    A.    Yes, ma'am.

5    Q.    Under what name?

6    A.    Jon Adleta.

7    Q.    Do you know what his phone number was at the time?  Do

8    you recall that number?

9    A.    It's XXX-XXX-6155.

10   Q.    What about e-mails?  Did you communicate with the

11   defendant through e-mails?

12   A.    Yes.

13   Q.    How would you do that?

14   A.    He had a couple different e-mails.  Mainly I e-mailed

15   him sorryforhaha@Yahoo.com, and he also had another one that

16   was JAdleta@Yahoo.com.

17   Q.    For this Skype, did he have a contact name that you used

18   when you were Skyping?

19   A.    Yes, he did.

20   Q.    What was his contact name?

21   A.    JAdleta87.

22   Q.    Okay.  What about yours?

23   A.    Just SAdleta.

24   Q.    Okay.  Now, concerning your e-mails did you own a laptop

25   or a computer at that time?

```
 1    A.    Yes, I did.

 2    Q.    Can you describe it for the members of the jury?

 3    A.    I had a lap -- a Mac laptop, an Apple Mac.

 4    Q.    Okay.  Now, I'm going to ask you to please take a look

 5    at Government Exhibit for identification number 20.  Do you

 6    recognize it?

 7    A.    Yes, I do.  That's my phone and I can tell by the

 8    scratches because I actually dropped my phone within a few

 9    days of buying it.

10    Q.    Okay.  Is this a phone that you used to communicate with

11    the defendant?

12    A.    Yes, it was.

13    Q.    Okay.  Does it appear to be in substantially the same

14    condition as when you last saw it?

15    A.    Yes, it is.

16    Q.    Okay.

17          MS. RIVERA MIRANDA:  Your Honor, I would now move

18    Government Exhibit 20 for identification that would be

19    admitted into evidence.

20          THE COURT:  Any objection?

21          MR. BARK:  No, Your Honor.

22          THE COURT:  Twenty will be received.

23    BY MS. RIVERA MIRANDA:

24    Q.    Now, concerning Government Exhibit 19 for

25    identification, can you please take a look at that.  I think
```

```
 1   it's open on the side.  Do you recognize that?

 2   A.    Yes, I do.

 3   Q.    How do you recognize it?

 4   A.    Because I used to borrow this.  I actually borrowed it

 5   from a friend of mine.

 6   Q.    To do what?

 7   A.    To Skype.

 8   Q.    With whom?

 9   A.    Aaron Dixon and Jonathan Adleta.

10         MS. RIVERA MIRANDA:  Your Honor, we now move

11   Government Exhibit 19, that it be admitted into evidence.

12         THE COURT:  Mr. Bark?

13         MR. BARK:  No objection.

14         THE COURT:  It'll be received.

15   BY MS. RIVERA MIRANDA:

16   Q.    Now, I'm going to ask you to take a look at Government

17   Exhibit 25 for identification.  Do you recognize it?

18   A.    Yes, I do.

19   Q.    How do you recognize it?

20   A.    This camera used to belong to Jonathan.

21   Q.    Okay.  Did you use that camera to take pictures, family

22   pictures?

23   A.    Yes, ma'am.

24   Q.    Does it appear to be in substantially the same condition

25   as when you last saw it?
```

96

1   A.   Yes, it is.

2            MS. RIVERA MIRANDA:   Your Honor, I would now move

3   Government Exhibit 25 for identification into evidence.

4            THE COURT:   Mr. Bark.

5            MR. BARK:   No objection.

6            THE COURT:   It'll be received.

7            MS. RIVERA MIRANDA:   Your Honor, may we publish

8   these three exhibits.

9            THE COURT:   Yes.

10           MS. RIVERA MIRANDA:   May we approach the witness,

11  Your Honor.

12           THE COURT:   Yes.

13  BY MS. RIVERA MIRANDA:

14  Q.   Now, this is Government Exhibit 20.   Can you please tell

15  the members of the jury what is this?

16  A.   That is my phone, my iPhone.

17  Q.   Okay.   Is this the phone that you were referring in your

18  testimony that you were using to communicate with the

19  defendant?

20  A.   Yes, ma'am.

21  Q.   Okay.   Now, what happened with the Windows phone?   You

22  said you had a Windows phone also?

23  A.   It -- the battery got swollen, so I couldn't actually

24  cover the back of the phone.   So I had to buy this phone so I

25  could have one that worked.

1    Q.    So that one stopped working, the Windows phone?

2    A.    Yes, ma'am.

3    Q.    Okay.  I'm showing you Government Exhibit 25.  What is

4    this?

5    A.    Jonathan's camera.

6    Q.    Okay.  A Casio camera?

7    A.    Yes.

8    Q.    And what is this?

9    A.    This is my laptop or the one I borrowed.  It was in my

10   possession.

11   Q.    The one you used to communicate with the defendant?

12   A.    Uh-huh.

13   Q.    Okay.  Let me go back to your testimony about when the

14   defendant was deployed.  You testified that K. was two and a

15   half years old, but can you go back and maybe think about

16   that.  You said she was born in March of 2009, right?

17   A.    Uh-huh.

18   Q.    And he was deployed in May of 2010?

19   A.    Uh-huh.

20   Q.    So how old was she when he was deployed?

21   A.    She was a year and a half.  I'm sorry.

22   Q.    Okay.  Now, you explained that you communicated with the

23   defendant through these means, media devices.  Can you please

24   tell the members of the jury about the substance of these

25   communications with the defendant about after your divorce as

1    they pertain to this case?

2    A.    Well, we would -- we would text back and forth and we

3    would Skype a lot and he would talk about his interest in

4    child pornography.  He obviously didn't state it like that,

5    but he showed me pictures and videos.

6    Q.    Of what?

7    A.    Of child pornography.

8    Q.    Okay.  And did he express -- I'm talking this is now the

9    year 2012, right, when you're communicating with the

10   defendant through Skype and text messaging and e-mails.  Did

11   you at any point start having communications about K. and

12   about his sexual interest in K.?

13   A.    Yes, we did.  We did discuss it through text as well as

14   on the phone, and he had expressed his curiosity with my

15   daughter.

16   Q.    Curiosity about what?

17   A.    Her engaging in sexual activity with him, such as giving

18   him a blow job or touching his penis.

19   Q.    Okay.  And did you talk at some point how was this going

20   to happen if he was going to see the children eventually at

21   some point?

22   A.    Yes, we did.  We spoke and he wanted to spend time with

23   the kids at Christmastime.

24   Q.    Okay.  Now, let me -- before then, did there come a

25   point in time during your communications with the defendant

1   that you told him about you performing sexual acts on K. and

2   taking pictures and videotaping this?

3   A.   Yes.

4   Q.   Okay.  So please describe to the members of the jury

5   what did you tell him and what was his response?

6   A.   I told him that -- that I had been making out with my

7   daughter and that I had my tongue in her mouth and that I had

8   partially entered -- inserted my finger into her vaginal

9   area, and I also gave her oral sex in her vaginal area.

10  Q.   Why did you do that?

11  A.   Because Aaron Dixon wanted me to.

12  Q.   This is the other person you were talking about?

13  A.   Uh-huh.

14  Q.   Okay.  And were you photographing or videotaping these

15  acts?

16  A.   Yes.

17  Q.   What was defendant's response when you told him about

18  these things that you were doing with your children?

19  A.   He seemed interested in it.

20  Q.   Okay.  Did he ask you for pictures of the sexual abuse

21  on your children, on K. specifically?

22  A.   Yes.

23  Q.   Okay.  And did you actually send him those pictures?

24  A.   Yes, I did.

25  Q.   Okay.  How do you do that?

1   A.    Through text message.

2   Q.    Okay.  And you said that you had oral sex with K., that

3   you performed oral sex on her.  How often -- how many times

4   did you do that?

5   A.    Less than six times.

6   Q.    Did you tell the defendant about that?

7   A.    Yes, I did.

8   Q.    And what was his response to that?

9   A.    He actually seemed to like the idea of it.

10  Q.    Okay.  Now, you said that at some point he indicated

11  that he would want to have the kids travel for Christmastime.

12  At the time when he mentioned this, can you tell the members

13  of the jury when exactly -- about what time was it?  Was this

14  October, November?  When was it in the year that he mentioned

15  that?

16  A.    More towards the end of November, in the December area.

17  Q.    Okay.  That he wanted to have K. travel?

18  A.    As well as my son.

19  Q.    Okay.  Where?

20  A.    To his home in Glenpool, Oklahoma.

21  Q.    And where were you living at the time?

22  A.    I was residing in Oviedo, Florida.

23  Q.    Okay.  Now, when you talked about the possibility of the

24  kids traveling, did the defendant mention what exactly he

25  wanted to do with K. when she visited?

1  A.    And he said he was curious of performing -- well, he was

2  curious of doing some things with her sexually and he wanted

3  to video it.

4  Q.    Okay.  What things did he want to do with K.?

5  A.    He wanted to give her a "facial" and then he also wanted

6  her to touch him and suck on his penis.

7  Q.    Did he use the word "suck" on his penis?

8  A.    It was something along that nature.

9  Q.    Okay.  So he wanted oral sex from K. and also to

10  masturbate on her?

11  A.    Yes.

12  Q.    Okay.  And did he ask you if you were okay with this?

13  A.    Yes.

14  Q.    And what did you say?

15  A.    I said yes.

16  Q.    So you agreed to have the defendant have K. travel from

17  Oviedo, Florida, to Oklahoma so that he could perform these

18  sex acts on her?

19  A.    Yes.

20          MR. BARK:  Objection to leading.

21          THE COURT:  Sustained.

22  BY MS. RIVERA MIRANDA:

23  Q.    Okay.  Now, at some point after this conversation about

24  the possibility of having K. travel to Oklahoma, is there any

25  coordination of this travel?

1    A.    Yes.  He -- he gave me his credit card information and I

2    went and booked the flights.

3    Q.    Okay.  Now, you said he gave you his credit card

4    information.  Do you recall which credit card?

5    A.    It was a MasterCard.

6    Q.    Okay.  With which bank, if you remember?

7    A.    It was the military banking.  I believe it's U.S.S.A.

8    (sic) I believe.

9    Q.    Something to that effect?

10    A.    Something to that nature.

11    Q.    And at the time did you have financial means to buy

12    those tickets?

13    A.    Absolutely not.

14    Q.    Okay.  So how did you go about making this reservation?

15    A.    I -- he text messaged his credit card information and

16    then I went online and I purchased the tickets.

17    Q.    For when did he make the reservation?

18    A.    I think it was approximately a week and a half before

19    the departure.

20    Q.    Okay.  And do you recall which airline did you use?

21    A.    No, I do not.

22    Q.    Okay.  Now, regarding the sex acts that he indicated he

23    wanted to perform on K., is there anything else he said as to

24    what he wanted to do or whether he wanted to record those

25    acts?

1    A.    He had said that he wanted to video some of the things

2    and he said to remind him to charge his battery for it.

3    Q.    He wanted to video record the sexual activities with K.?

4    A.    Yes.

5    Q.    Okay.  Now, the reservation -- you made the reservation

6    for which dates?

7    A.    I believe it was either the 22nd or the 23rd.

8    Q.    Of which month?

9    A.    December.

10   Q.    Of the year 2012?

11   A.    That was when I flew out.

12   Q.    Okay.  Was there a return trip that was also reserved

13   with this?

14   A.    Yes, it was a roundtrip ticket.

15   Q.    It was a roundtrip ticket.  Okay.  So did you, in fact,

16   travel on December 23rd?

17   A.    Yes, I did.

18   Q.    Okay.  And who traveled with you?

19   A.    My son and my daughter with me.

20   Q.    Okay.  And let me ask you, who picked you up at the

21   airport?

22   A.    Jonathan.

23   Q.    Okay.  Where did you stay during that time?

24   A.    At his house.

25   Q.    Okay.  Where was he living at the time?

```
 1    A.    He was living in Glenpool, Oklahoma.

 2    Q.    Okay.  Now, let me ask you, around this time did the

 3    defendant have a girlfriend?

 4    A.    Yes.

 5    Q.    You know her name?

 6    A.    Samantha Bryant.

 7    Q.    Did you meet her at some point?

 8    A.    Yes, I did.

 9    Q.    Are you aware whether she has any children?

10    A.    Yes.

11    Q.    Okay.  How old are they, if you know?

12    A.    Approximately three and I think the other child was

13    about four or four and a half, somewhere in that age.

14    Q.    Are you aware whether the defendant had access to the

15    children?

16    A.    Yes.

17    Q.    How so?

18    A.    Because when I would Skype, I could hear the children in

19    the background.

20    Q.    Okay.  Now, during your conversations with the

21    defendant, did anything come about concerning Bryant's little

22    daughter?

23    A.    Yes.

24    Q.    Please explain to the jury.

25    A.    He had made a comment to me, explaining that M. or her
```

1    daughter's ass was cuter than my daughter's, that she had a

2    hot body.

3    Q.    He told you that?

4    A.    Yes, ma'am.

5    Q.    Okay.  Now, when you arrived to Oklahoma on December

6    23rd, 2012, was Bryant staying with the defendant?  Was she

7    at the house?

8    A.    She was not at the house when we first arrived.

9    Q.    She arrived later then?

10   A.    Yes, ma'am.

11   Q.    Do you recall more or less when was it that she arrived

12   to the house in Oklahoma?

13   A.    It was approximately the 25th or the 26th.

14   Q.    Okay.  Did she arrive alone or was she accompanied by

15   others?

16   A.    She had her children with her.

17   Q.    Okay.  Now, did you all stay together at the house for

18   that period of time since she arrived until your departure?

19   A.    Yes.

20   Q.    Okay.  Now, let me ask you, what happened during your

21   stay at the defendant's house in Oklahoma as it pertains to

22   K.?

23   A.    Within the first day and a half or so I was in his

24   bathroom area, master bathroom, and he was in his bedroom and

25   my daughter was in there as well, and he said, "Sarah, come

1   here," and I came into his room and he was laying on the bed

2   and he didn't have a shirt on and he had been playing with

3   himself, and my daughter was in the same vicinity, very close

4   to him on the bed.

5   Q.   What do you mean that he was "playing with himself"?

6   A.   Meaning he was rubbing his penis.

7   Q.   Was he masturbating?

8   A.   Yes, ma'am.

9   Q.   Okay.  And you said your daughter was where?

10  A.   On the bed with him.

11  Q.   Okay.  Was she awake or asleep?

12  A.   She was awake.

13  Q.   Okay.  And how was she dressed at the time or was she

14  dressed, if she was dressed at all?

15  A.   She wasn't wearing a shirt.

16  Q.   Okay.  So what was she wearing?

17  A.   I believe she was wearing just her panties and a pullup.

18  Q.   And then what happened?

19  A.   She -- she -- he had her lay down and he ejaculated on

20  her chest.

21  Q.   Okay.  Can you describe the events that led to that, to

22  him ejaculating on her chest, on K.'s chest?

23  A.   Yes.  She had sat down -- when he was laying down, she

24  was right on top of him and she was sitting there, and then

25  that's when he had her lay down next to him and she freaked

1    out.

2    Q.    Where was she sitting exactly when he had her on top of

3    him?

4    A.    She was laying on the bed and he -- he was -- he was

5    kind of like -- her body was laying this way and then he was

6    on the side.  So he could actually ejaculate on her chest

7    area.

8    Q.    You said he had her sit on him?

9    A.    Yes.  That was in the beginning.

10   Q.    Okay.  What was he doing in the beginning with her?

11   A.    She -- he was just cuddling with her.

12   Q.    How was he cuddling her?

13   A.    Meaning that he had his hands on her, you know, just on

14   her back area.

15   Q.    Where on her back area?

16   A.    Like here (demonstrating), right above her ass.

17   Q.    And as he was touching her, what was he doing?

18   A.    Well, his penis was already hard at that point.  So he

19   was just -- she was just sitting there, you know, and then it

20   happened really fast.

21   Q.    And from there, what happened?  He had her sitting on

22   him, and then what happened?

23   A.    Then he had her lay down on the bed and then she -- she

24   didn't -- she seemed very resistant, but he just kept doing

25   it and --

1    Q.    What did he keep doing?

2    A.    He was about to come on her, on her chest area,

3    ejaculate, and she was really upset.

4    Q.    And when you said she was really upset, how was she

5    acting?

6    A.    She was just frightened.

7    Q.    Okay.  What happened when he ejaculated on her chest?

8    A.    She just -- she whined and she just didn't like it.

9    Q.    And what were you doing as this was happening?

10   A.    Watching it all and doing nothing about it.

11   Q.    After he ejaculated on her chest, what happened with K.?

12   A.    They just -- he went and cleaned himself up and then

13   she -- she -- he cleaned her off, I believe, and then just

14   went on with the day.

15   Q.    Okay.  Now, did you videotape this?

16   A.    No, I did not.

17   Q.    Okay.  Or take pictures or anything like that?

18   A.    No.

19   Q.    Okay.  Now, let me ask you, after this incident, was

20   there anything else that happened in that house while you

21   were staying there in Oklahoma?

22   A.    There is another occasion where one of the nights I was

23   there, his girlfriend and him had an argument and so they

24   were not seeing eye to eye.  So she was out in the living

25   room with me and we were drinking some Smirnoffs and we were

1    staying out pretty late, but my daughter wanted to snuggle

2    with Jonathan and so he -- he brought her into his room and

3    she was laying there with, you know, her blanket and so forth

4    and --

5    Q.   Where was she lying?

6    A.   Next to him.

7    Q.   Okay.  On the bed?

8    A.   On the bed with him.

9    Q.   Okay.

10   A.   And they ended up making out that night and I was

11   watching more of the TV that was on, and somewhere between

12   1:30 and 2:00 in the morning I'm turning off the TV to go lay

13   down in the other bedroom and I hear her moaning.

14   Q.   Who's moaning?

15   A.   Samantha.

16   Q.   So this is when Samantha Bryant is at the house?

17   A.   Yes, ma'am.

18   Q.   With her kids?

19   A.   Yes, ma'am.

20   Q.   Okay.  You hear her moaning and that's coming from

21   where?

22   A.   His bedroom.

23   Q.   Okay.  And what do you understand by that?  What's going

24   on?

25   A.   They were having sexual intercourse.

1    Q.    And where's K.?

2    A.    I thought she was in the bedroom.

3    Q.    And what about the other kids that were in the house,

4    where are they?  Your son, J.?

5    A.    My son was in the other bedroom, the kids' room.

6    Q.    Okay.  And what about Bryant's kids?

7    A.    They were laying on the floor on a mattress.

8    Q.    On the floor where, which bedroom?

9    A.    In the master bedroom where he was at.

10   Q.    Where he was at with Bryant?

11   A.    Yes.

12   Q.    And your daughter?

13   A.    Uh-huh.

14   Q.    So, upon listening to this, and you heard this moaning,

15   what did you do, if anything?

16   A.    I got very angry and I came to his door and banged on it

17   and I said, "Get your ass out of here.  We need to talk."

18   And, of course, he was really upset with me.

19           I said, "You're not going to do that in front of

20   my daughter."

21   Q.    You told him that?

22   A.    Uh-huh.  And so they had gotten dressed, both of them,

23   and I had talked to Samantha in the kitchen and she said, you

24   know, "That shouldn't have taken place."  She said by the

25   time --

1          MR. BARK:  Objection; non-responsive to the

2     question.

3          THE COURT:  Sustained.

4     BY MS. RIVERA MIRANDA:

5     Q.   Okay.  Where was K. when this happened, at the time that

6     you intervened, that you said that "This shouldn't happen"?

7     A.   She was still on the bed laying down.

8     Q.   Was she asleep?  Was she awake?

9     A.   She was half in and half out.

10    Q.   Okay.  And you spoke with the defendant about the

11    incident?

12    A.   Uh-huh.

13    Q.   And what was his reaction to that?

14    A.   He was angry at me because I invaded his privacy by

15    opening the door.  I didn't see anything.  I just opened it a

16    crack.

17    Q.   Okay.  And what happened with K.?

18    A.   I picked her up and I brought her to the kids' room and

19    laid her on the bed and was just, you know, trying to get her

20    to go back to sleep.

21    Q.   What was she wearing at that time when you brought her

22    out of the room?

23    A.   She was wearing PJs.

24    Q.   Okay.  Now, let me ask you if there were any other

25    incidents at this house in Oklahoma?

1    A.    The only other incident is one of the afternoons when I

2    was there, the kids were all playing in the living room and

3    he was sitting on the couch and I was across from him sitting

4    in a chair and he had a blanket on top of him and I could

5    tell he was masturbating slash rubbing his dick, and he was

6    watching the kids play.

7    Q.    He was masturbating under the blanket?

8    A.    Yes, ma'am.

9    Q.    And how could you tell?

10   A.    It was very obvious.   I had seen him do it before, not

11   at that particular house but before.

12   Q.    And where were the kids?

13   A.    They were just out playing.

14   Q.    And what was he looking at as he was masturbating?

15   A.    Them.

16   Q.    At the kids?

17   A.    Yes, ma'am.

18   Q.    Okay.   Now, regarding your conversations with the

19   defendant when you were there in Oklahoma, is there anything

20   else that he mentioned regarding K., any other incident?

21   A.    No.

22   Q.    What about any incidents concerning the shower?

23   A.    Oh, he did tell me after that occasion happened with the

24   "facial," that he had told me that he had taken a shower with

25   her and while they were in the shower together, she had given

1   him -- was giving him head.

2   Q.   He told you this when?

3   A.   Right after the incident happened, within that -- of him

4   ejaculating on my daughter.

5   Q.   So he told you he had taken a shower with your daughter?

6   A.   Yes.

7   Q.   And while they were in the shower --

8          MR. BARK:  Objection; leading.

9   BY MS. RIVERA MIRANDA:

10   Q.   -- what happened?

11          THE COURT:  Sustained.

12          Don't recast or restate the witness's testimony.

13   Just ask questions, Ms. Miranda.

14          MS. RIVERA MIRANDA:  Yes, Your Honor.

15   BY MS. RIVERA MIRANDA:

16   Q.   What happened while they were in the shower?  Did he

17   describe it in more detail?

18   A.   He just said that she had his (sic) mouth on his penis.

19   Q.   You used the term "giving him head."  What do you mean

20   by that?

21   A.   I'm meaning that the mouth is on the actual penis.

22   Q.   K.'s mouth?

23   A.   Yes, ma'am.

24   Q.   Did he tell you what was her reaction to that, what was

25   he doing, whether he ejaculated?

114

1    A.    He didn't tell me very much at all.

2    Q.    Okay.  Now, when exactly was it that you returned to

3    Florida?

4    A.    Approximately January 2nd.

5    Q.    Okay.  And when you returned to Florida, did you come

6    back with an understanding that you would continue to molest

7    the children?

8    A.    Yes.

9    Q.    For what purpose?

10   A.    For -- well, Aaron wanted to continue Skyping and

11   pictures, and Jonathan wanted to still -- he was still

12   curious of doing things with my daughter.

13   Q.    Okay.  So, after your return, you said he was curious of

14   doing things with your daughter, meaning what?  Let me just

15   clarify that.  Curious of doing what?

16   A.    Performing in sexual activity, such as her giving him

17   head.

18   Q.    Okay.  Do you mean oral sex?

19   A.    Yes, ma'am.

20   Q.    Okay.  Now, let me ask you, after your return from

21   Oklahoma, you continued communicating with the defendant and

22   you said yes.  Was there any discussion about when he was

23   going to see the children again?

24   A.    Yes.  We had talked about the summertime of this year.

25   Q.    What was going to happen in the summertime?

1    A.    He was going to spend time with the kids.

2    Q.    Okay.  Was there any conversation about having the kids

3    for longer periods of time?

4    A.    Yes, ma'am.

5    Q.    What were the conversations about?

6    A.    He wanted to have the kids for two to three weeks at a

7    time and I was completely against it and I said, "You're

8    not -- you're not going to have it," and even though we

9    shared 50/50 custody.

10   Q.    So there was some conversation about having the kids

11   travel back to Oklahoma and staying with him for some time?

12   A.    Yes, ma'am.

13   Q.    And what was it that you were not comfortable with?

14   A.    I wasn't comfortable with my children being alone with

15   him and I didn't know how he could take care of them with him

16   working full time.

17   Q.    Okay.  But were you expecting the kids to go back at

18   some point, still stay with him?

19   A.    Yes, ma'am.

20   Q.    Okay.  Now, after your return from Florida, were there

21   any other additional conversations regarding what happened --

22   A.    Yes, ma'am.

23   Q.    -- in December --

24   A.    Uh-huh.

25   Q.    -- 2012 --

```
1    A.    Yes, ma'am.

2    Q.    -- in Oklahoma?

3          Can you please describe those to the members of

4    the jury?

5    A.    We -- we were Skyping and we were exchanging a

6    conversation through typing back and forth about the

7    incident.  I had asked him why he hadn't taken videos of it

8    and why he didn't do more.

9    Q.    Why did you ask that?

10   A.    Because Aaron Dixon wanted me to get the videos for him.

11   Q.    Videos of what?

12   A.    Of Jonathan with my daughter performing in sexual

13   activities.

14   Q.    Okay.  And what was his response to that?

15   A.    He -- he liked the idea of it and he supported it.

16   Q.    Okay.  When you asked him that, why he had not done more

17   things or videotaped what happened with K. at the house in

18   Oklahoma, what was his response to that?

19   A.    Can you re. . .

20   Q.    When you asked him about why he had not done more things

21   with K. in Oklahoma, what was his response to that?

22   A.    "I don't know."

23   Q.    He said, "I don't know"?

24   A.    Uh-huh.

25   Q.    Okay.  And then regarding K.'s reaction to what happened
```

1    in the room when he ejaculated on her chest, were there any

2    conversations about that?

3    A.    Yes, ma'am.

4    Q.    Okay.  Can you please tell the members of the jury.

5    A.    Him and I were talking back and forth, typing on the

6    Skype, and we were -- I was commenting on -- he talked about

7    her freaking out, and I said, "Well, if she's anything like

8    me, then, you know, over time she'll -- she'll like it."

9    Q.    That's what you said?

10   A.    Yes, ma'am.

11   Q.    Okay.  And did he suggest you do anything at all to make

12   her not freak out --

13   A.    Yes.

14   Q.    -- the next time?  What did he say?

15   A.    He wanted someone or anyone, really, to actually

16   ejaculate on her.

17   Q.    He wanted someone to ejaculate on her?

18   A.    Yes, ma'am.

19   Q.    For what purpose?

20   A.    To get pictures of it or videos.

21   Q.    Someone ejaculating on K.?

22   A.    Uh-huh.

23   Q.    And did he suggest anyone to do this to K.?

24   A.    Yes.

25   Q.    Who did he suggest?

1    A.    There was a gentleman that I was dating.  His name was

2    Matt, and I had sent a picture of him to him so he actually

3    had an idea of what he looked like, and he -- he really

4    wanted him to do things with my daughter.

5    Q.    And what was the purpose behind having other men

6    ejaculate on your daughter, do things to your daughter?

7    A.    So she would get more comfortable with it and she would

8    like it.

9              MS. RIVERA MIRANDA:  Your Honor, if I can have a

10   moment.

11             THE COURT:  Yes.

12   BY MS. RIVERA MIRANDA:

13   Q.    You said that defendant would -- you would Skype with

14   defendant and defendant would masturbate over Skype?

15   A.    Yes, ma'am.

16   Q.    Okay.  When this happened, would he ask you to do

17   something specifically as he was doing this?

18   A.    No.

19   Q.    What about your children?

20   A.    He -- most of the intentions of the Skyping were for him

21   to talk to the kids and, of course, he would -- he would call

22   on my daughter or my son to come look and there were some

23   occasions where he was already masturbating in front of my

24   child, K., my daughter.

25   Q.    That was through Skype?

1    A.    Yes, ma'am.

2    Q.    And when did that happen?

3    A.    It happened even before the trip, but after the trip as

4    well through -- you know, it wasn't really frequent, but

5    it -- every so often.

6    Q.    So do you mean during the year 2012 and then after your

7    return from the trip on January 2nd, 2013?

8    A.    Yes, ma'am.

9    Q.    And you also mentioned that you saw him masturbating

10   under the covers while you were at his house in Oklahoma in

11   December of 2012.  You said that you had seen him do this

12   before.  When was that?

13   A.    Of 2011, the year 2011.

14   Q.    And where were you at when this happened?

15   A.    It would be at our house that we were staying at.

16   Q.    He was masturbating under the covers when you guys were

17   living together --

18   A.    Yes.

19   Q.    -- is that what you're saying?  Can you please describe

20   to the members of the jury what happened?

21   A.    There would be different occasions where, you know, the

22   TV would be on and the kids would be playing and he would

23   just start masturbating underneath the blanket.

24   Q.    Okay.  So you could tell that this was happening?

25   A.    Yes.

1    Q.    And what was he look at as he was doing this?

2    A.    At the children or at the TV area.

3    Q.    Now, concerning these communications with the defendant

4    about the abuse that you were doing and taking pictures for

5    Aaron Dixon, did he ask for pictures of that abuse?

6    A.    Yes, he did.

7    Q.    And did you -- and what did you do about that when he

8    asked for them?

9    A.    Can you. . .

10   Q.    If he asked for pictures of the abuse, did you actually

11   send him pictures of the abuse?

12   A.    Yes.

13   Q.    Okay.  How many occasions did you do that?

14   A.    Only a few.

15   Q.    A few occasions?

16   A.    Uh-huh.

17   Q.    Okay.  Now, once you got back and you had certain

18   conversations with the defendant about having the kids for

19   longer periods of time, was that just a matter of

20   coordinating the -- how long those periods were going to be,

21   when was -- when was he going to have the kids back in

22   Oklahoma?

23   A.    Can you -- can you ask the question again?

24   Q.    Okay.  Were you okay with the kids going back to

25   Oklahoma and seeing him and visit with him after the trip in

```
 1    December and you understood the kids were going to return to
 2    Oklahoma at some point and see their father?
 3    A.    I mean, I -- I was somewhat okay with it because I knew
 4    that he had custody.  So I couldn't do much about that.
 5    Q.    So you were discussing that?
 6    A.    Yes, ma'am.
 7    Q.    Okay.  Now, regarding your communications through Skype,
 8    you already describe how they took -- can you please take a
 9    look at Exhibit for Identification Number 2.
10    A.    Uh-huh.
11    Q.    Do you recognize it?
12    A.    Yes, I do.
13    Q.    How do you recognize it?
14    A.    It's my conversation that I had with Jonathan through
15    Skype.
16    Q.    Do you recognize your user name and his user name in
17    these conversations?
18    A.    Yes, ma'am.
19    Q.    Okay.
20          MS. RIVERA MIRANDA:  Your Honor, we're now moving
21    Government Exhibit Number 2 for identification be admitted
22    into evidence.
23          THE COURT:  Mr. Bark.
24          MR. BARK:  May I have one moment, Your Honor?
25          THE COURT:  Yes.
```

 1               (Discussion off the record between Mr. Bark and the

 2    defendant.)

 3               MR. BARK:  No objection, Your Honor.

 4               THE COURT:  All right.  It'll be received.

 5               MS. RIVERA MIRANDA:  Your Honor, may we publish the

 6    exhibit.

 7               THE COURT:  Yes.

 8               MS. RIVERA MIRANDA:  That would be Bates stamp 170.

 9    Okay.  Can we just zoom on the top half.

10    BY MS. RIVERA MIRANDA:

11    Q.    Now, what did you say was defendant's user name?

12    A.    JDAdleta87.

13    Q.    And what was your user name?

14    A.    SAdleta.

15    Q.    Okay.  Now, going to that first line, 383, it says, "I

16    like hearing them in the background," okay.  Who wrote that?

17    A.    Jonathan.

18    Q.    Okay.  And who is he referring to here?

19    A.    Our children.

20    Q.    Okay.  And your response was that "They are cute"?

21    A.    Yes, ma'am.

22    Q.    Okay.  And what did he say next?

23    A.    He said, "I'm still scared, but I do want to try

24    things."

25    Q.    What was the defendant referring to when he said, "I do

1    want to try things"?

2    A.    He was referring to sexual activity with children.

3    Q.    And this was on October 1st, 2012; would that be

4    correct?

5    A.    Yes, ma'am.

6    Q.    Okay.  And then if you go to line 388, what was your

7    response to that?

8    A.    I'm sorry.  What line?

9    Q.    Three eight eight.

10   A.    I said, "I would be extremely careful."

11   Q.    Okay.  And what was his response in line 389?

12   A.    "Well, I'm not doing anything unless it's talking to you

13   about it."

14   Q.    Is this how you guys operated, that you would

15   communicate about doing these kind of things with the

16   children?

17   A.    Yes, ma'am.

18   Q.    Okay.  Now, going to line 392, that would be the bottom

19   half, what did the defendant say?

20   A.    On 392?

21   Q.    On 392.

22   A.    "I'm not going and trying to talk to anyone I don't

23   know."

24   Q.    Okay.  And then in line 394 what did he say?

25   A.    "Have you done anything with them?"

1    Q.    What was he referring to by that?

2    A.    He was referring to if I --

3              MR. BARK:  Your Honor, I object as speculation.

4              MS. RIVERA MIRANDA:  Your Honor, may we approach.

5              THE COURT:  If you can establish how she knows.

6    The objection is sustained at the moment.

7    BY MS. RIVERA MIRANDA:

8    Q.    Okay.  When -- in that line, 394, "Have you done

9    anything with them," do you know what he was referring to?

10   A.    Yes, ma'am.  Yes, I do.

11   Q.    How do you know?

12   A.    Because this is how we talked back and forth.

13   Q.    Now, what was he referring to?

14             MR. BARK:  I have the same objection, Your Honor.

15             THE COURT:  Overruled.

16   BY MS. RIVERA MIRANDA:

17   Q.    What was he referring to?  What was he referring to when

18   he said, "Have you done anything with them"?

19   A.    Meaning if I had any sexual activity with either one of

20   the kids.

21   Q.    Okay.  And your response in line 395 was what?

22   A.    "Nope."

23   Q.    Okay.  And then you said -- in line 396, what did you

24   say then?

25   A.    "Because of my stupid rash."

*Diane Peede, RMR, CRR (407) 615-0305*

1    Q.    Okay.  Then in line 399, it says, "Does she know about

2    it?"  What is that about when you say, "Does she know about

3    it"?

4    A.    Samantha Bryant.

5    Q.    What did she know about?

6    A.    About his -- his interest in child pornography.

7    Q.    Okay.  In line 400, what was his response?

8    A.    "My girlfriend?"

9    Q.    Okay.  And then in line 402, what was his response?

10   A.    "No."

11   Q.    Okay.  In line 403, when you say, "No, I haven't.  Most

12   I do is make out with her," what were you referring to there?

13   A.    I was referring to making out with my daughter.

14   Q.    So basically are you answering that question in line

15   394, "Have you done anything with them," and I see on line

16   403 you say, "No, I haven't.  Most I do is make out with

17   her"?

18   A.    Yes, ma'am.

19   Q.    Okay.  And his response to that was?

20   A.    "Do you really?"

21   Q.    Okay.  And in line 405 you said, "Yeah.  She loves it."

22            In line 406 it says, "She wants it."  Who are you

23   referring to here?

24   A.    My daughter.

25   Q.    How old was she at this time?

1    A.    She would have been three and a half or so.

2    Q.    And what was his response to that when you said, "She

3    wants it," in line 407?

4    A.    His response was, "Ha, ha.  Let me see."

5    Q.    And this was over Skype?

6    A.    Yes, ma'am.

7    Q.    And let me ask you then what did he say in line 409?

8    A.    "What happens if you kiss her chest?"

9    Q.    Okay.  And what was her response to that in 410?

10   A.    "She isn't into it at the moment," -- or, "moment."

11   Q.    Why did you say that?

12   A.    Because she was watching a movie or she was playing.

13   Q.    And in line 412, you said, "But she wants to kiss me,

14   like, at least six times a day," and what was his response to

15   that in line 413?

16   A.    He says, "Ha, ha.  Kiss for long or is it just real

17   quick?"

18   Q.    Okay.  And your response in line 414?

19   A.    "Varies."

20   Q.    In line 415, what did you say?

21   A.    "She usually wants long ones."

22   Q.    What did you mean by "long ones," that "She usually

23   wants long ones"?

24   A.    A long kiss.

25   Q.    And what is that?  What did you used to do with K.?

1    A.    I used to kiss her for -- on her lips for some length of

2    time on occasions.

3    Q.    Did you actually put your tongue in her mouth?

4    A.    Yes.

5    Q.    And this happened on more than one occasion?

6    A.    Yes.

7    Q.    Okay.  In line 418, you said, "Maybe she will be bi."

8    What did you mean by that?

9    A.    Meaning that my daughter would be bisexual.

10   Q.    Okay.  And in line 421, he said, "She looks great."

11   When the defendant said, "She looks great," who is he

12   referring to?

13   A.    My daughter.

14   Q.    Then in line 423, he asks you, "Have you looked at

15   anything?"  What does he mean by that?

16   A.    Any pictures of child pornography.

17   Q.    Okay.  In line 425, you say, "I'm waiting to talk to

18   that guy."  Who are you referring to?

19   A.    Aaron Dixon.

20   Q.    So you were waiting to talk to Aaron Dixon about what?

21   A.    Pictures and videos of child pornography.

22   Q.    Okay.  That's why you said in 426, "He has a lot,"

23   meaning what?

24   A.    He had a lot of videos and a lot of pictures.

25   Q.    Okay.  And in 428 what was the defendant's response?

```
1    A.    "Just pictures?  Or videos, too?  Is it good stuff?"

2    Q.    And your response in 429 was, "Everything."

3          Okay.  On line 430, what else do you say?  "I

4    have seen a lot of videos"?

5    A.    Yes.

6    Q.    What do you mean by that?  Videos of what?

7    A.    Of fathers molesting their children or their daughters.

8    Q.    Who was showing you those videos?

9    A.    I'm sorry?

10   Q.    Who was showing you those videos?

11   A.    Aaron Dixon.

12   Q.    Okay.  And in 432 you said, "On mirror."  What do you

13   mean by, "On mirror"?

14   A.    He had a mirror on his wall, and I told him I wasn't

15   comfortable with looking at the website.  So he would play

16   the actual video and then put the mirror where I could

17   actually see the video.

18   Q.    So when you say, "he," are you referring to Aaron Dixon?

19   A.    Yes, ma'am.

20   Q.    And then in 435 what was the defendant's statement?

21   A.    "I'm sorry, but I'm really curious and I wish I could

22   see."

23   Q.    Okay.  And then you said in line 436, "I should text you

24   that."  Why do you say that?

25   A.    Because I knew it was illegal.
```

1    Q.    So would you rather text than Skype?  I mean, is there a

2    particular reason why you say this?

3    A.    It was just easier, too, for me just to text it.

4    Q.    Okay.  And then in line 438 it states, "Can't delete

5    conversations on Skype really well."  Is that why you -- what

6    you were referring to?

7    A.    Yes, ma'am.

8    Q.    Okay.  And on line 443 it states that, "Wish I could

9    see."  What is he referring to?

10   A.    Child pornography.

11   Q.    Okay.  Now, can you please take a look at Exhibit 26 for

12   identification.

13   A.    I don't see it.

14          MS. RIVERA MIRANDA:  Your Honor, if I can approach

15   the witness?

16          THE COURT:  You can approach.

17   BY MS. RIVERA MIRANDA:

18   Q.    Please take a look at this.  Do you recognize that?

19   A.    Yes, I do.

20   Q.    How do you recognize it?

21   A.    It's text messages Jon and I exchanged back and forth.

22   Q.    Okay.  Before, you said that you had him on your contact

23   list on your phone?

24   A.    Yes.

25   Q.    Under what name?

130

1    A.    Jon Adleta or Jonathan.

2    Q.    Now, do you recognize his phone number on this Exhibit

3    26 for identification?

4    A.    Yes, I do.

5    Q.    Okay.

6          MS. RIVERA MIRANDA:  Now, Your Honor, we're

7    offering Exhibit 26 for identification into evidence.

8          THE COURT:  Mr. Bark?

9          MR. BARK:  No objection.

10          THE COURT:  It'll be received.

11          MS. RIVERA MIRANDA:  May we publish it, Your Honor.

12          THE COURT:  Yes.

13          MS. RIVERA MIRANDA:  May we retrieve the document?

14          THE COURT:  Yes.

15   BY MS. RIVERA MIRANDA:

16   Q.    Now, on that first line, where it says, "Outgoing:  J.

17   Is using potty again," who writes that?

18   A.    That is me.

19   Q.    Okay.  And what does it say on the next line?

20   A.    "I did get a new phone.  So if you want to Skype, let me

21   know."

22   Q.    Then in line 33 what do you say?

23   A.    "I don't want to fight, Jon.  I don't want the kids to

24   be put in the middle.  How would two weeks of every month

25   work?"

131

1    Q.    Okay.  What are you talking about here?

2    A.    The kids flying out to Oklahoma and staying with him.

3    Q.    And then what was his response to that?

4    A.    "I wouldn't be able to afford that."

5    Q.    And what was your response?

6    A.    "Well, what's another solution?"

7    Q.    And what did the defendant say to that?

8    A.    He said, "How about three weeks every other month?"

9    Q.    Okay.  And in line 38 what did he say?

10   A.    "So it be five weeks there, three weeks here."

11   Q.    And what was your response to that?

12   A.    "What about when she starts school?"

13   Q.    And what did he say to that in line 40?

14   A.    "I don't know about that yet.  This stuff is going to

15   keep needing adjustments."

16   Q.    Meaning what?

17   A.    The amount of time that they would spend with him.

18   Q.    So this is something you were discussing?

19   A.    Yes, ma'am.

20   Q.    Okay.  So in line 43, I believe, what was your response?

21   A.    "Yeah.  So when were you wanting to start?  And who

22   would be watching them while you work?"

23   Q.    And what did he say to that?

24   A.    "Mid-February or beginning of March.  If someone in my

25   family or Samantha can't, then there are plenty of child care

1    places around here."

2    Q.    So if this happened -- let's look at the date.  Would it

3    be fair to say January --

4    A.    January 5th.

5    Q.    2013?

6    A.    Yes, ma'am.

7    Q.    Okay.  That was right after you returned from Oklahoma?

8    A.    Yes, ma'am.

9    Q.    Okay.  Now, please --

10         MS. RIVERA MIRANDA:  Your Honor, if I may approach,

11   I believe she doesn't have this with her.  This is Government

12   Exhibit for Identification 27.

13         THE COURT:  Yes.

14   BY MS. RIVERA MIRANDA:

15   Q.    If you could take a look at that, do you recognize it?

16   A.    Yes, I do.

17   Q.    How do you recognize it?

18   A.    It's the text messages him and I exchanged back and

19   forth.

20   Q.    With whom?

21   A.    With Jonathan.

22   Q.    Okay.  Do you recognize his contact name in this

23   government identification?

24   A.    Yes.  It's Jon Adleta.

25         MS. RIVERA MIRANDA:  Your Honor, we're moving this

1    government identification into evidence as Government Exhibit

2    27.

3              THE COURT:  Mr. Bark.

4              MR. BARK:  No objection, Your Honor.

5              THE COURT:  27 will be received.

6              MS. RIVERA MIRANDA:  May we retrieve the document,

7    Your Honor.

8              THE COURT:  Yes, you may.

9    BY MS. RIVERA MIRANDA:

10   Q.    There's an incoming message, the first line, 399.  What

11   does it say?

12   A.    It says, "You ever figure out me having kids?"

13   Q.    And what was your response?

14   A.    "I still haven't gotten the child support."

15   Q.    What about line 401, what do you say?

16   A.    "Yes.  Between me and you, yes, I did figure it out

17   somewhat.  When will you trying to see them again?"

18   Q.    Is that a question?

19   A.    Yes.

20   Q.    Okay.  "When were you trying to see them again?"

21   A.    Yes.

22   Q.    And then what else do you say on line 402?

23   A.    "I think first time should only be two weeks, since they

24   have never been away from me.  As for now, she needs her

25   speech a whole lot during the next few months."

1    Q.    Okay.  So you were in agreement that the kids were going

2    to go back at some point?

3    A.    Yes, ma'am.

4    Q.    Okay.  Then in line 403, what did he say?

5    A.    End of February, beginning of March.

6    Q.    Is that when he wanted the kids back?

7    A.    Yes, ma'am.

8    Q.    Okay.  And what was your response to that?

9    A.    "What about her birthday?  I wanted to do something

10   special for her."

11   Q.    And what did he say to that in line 405?

12   A.    "I was thinking I could drop her off right before her

13   birthday or pick her up right after."

14   Q.    What else did he say on line 406?

15   A.    "That way I had her close to her birthday."

16   Q.    And what was your response in line 407?

17   A.    I said, "Okay."

18   Q.    Meaning okay with what?

19   A.    Meaning I was in agreement.

20   Q.    With what?

21   A.    With letting her travel to Oklahoma with him.

22   Q.    Right before her birthday?

23   A.    Yes, ma'am.

24   Q.    Okay.  And what did he say to that in line 408?

25   A.    "So let me know when you want."

1    Q.    And what was your response?

2    A.    "Okay.  Sounds good."

3    Q.    And what else did you say on line 410?

4    A.    "Are you fine with two weeks?"

5    Q.    Why are you asking that question?

6    A.    I was just re -- sorry.  I was just trying to verify

7    with him.

8    Q.    Okay.  And what did he say after that in line 411?

9    A.    "I was trying to think travels.  Maybe you could fly up

10   with them, then leave next day.  Then I do that on way back."

11   Q.    What is he referring to here in 411?

12   A.    He was referring to me flying out with our kids and then

13   dropping them off, and then he would actually bring them back

14   to me.

15   Q.    You would fly to Oklahoma and then he would bring them

16   back?

17   A.    Yes, ma'am.

18   Q.    Okay.  And then in line 412, what did he say?

19   A.    "For this first time, yes; but after, I want at least

20   three."

21   Q.    What is he referring to with that?

22   A.    He's saying he's fine for the first time with the kids

23   being there for two weeks, but then after that, he would want

24   them for at least three weeks at a time.

25   Q.    Okay.  Now, please take a look at Government Exhibit 3

```
 1    for identification.
 2             MR. BARK:  I'm sorry.  What number?
 3    A.   Did you say 3?
 4    Q.   Three.  Do you recognize it?
 5    A.   Yes, I do.
 6    Q.   How do you recognize it?
 7    A.   It's text messages exchanged between Jonathan and I.
 8    Q.   Okay.  And do you recognize his contact name in this
 9    Government Exhibit for identification?
10    A.   Yes, it's Jon Adleta.
11    Q.   Okay.  And his phone number?
12    A.   XXX-XXX-6155.
13             MS. RIVERA MIRANDA:  Your Honor, at this point we
14    offer Government Exhibit 3 for identification, that it be
15    admitted into evidence as Government Exhibit 3.
16             THE COURT:  Mr. Bark?
17             MR. BARK:  No objection.
18             THE COURT:  All right.  3 will be received.
19             MS. RIVERA MIRANDA:  May we publish it, Your Honor.
20             THE COURT:  Yes.
21             MS. RIVERA MIRANDA:  That would be Bates stamp 208.
22    BY MS. RIVERA MIRANDA:
23    Q.   The first line, where it says, "Really?" that would be
24    line 1027, do you see that?
25    A.   Yes, ma'am.
```

137

1    Q.    Who says that?  It's from the context of the

2    conversation?

3    A.    It sounds like that Jon asked me that question.

4    Q.    Okay.  And what was your response to that?

5    A.    "Yeah, and J. just waved."

6    Q.    Okay.  And line 1029, what was his response to that?

7    A.    "Ha, ha, ha.  He's funny."

8    Q.    Okay.  And what did you say after that?

9          THE COURT:  Ms. Miranda, pick and choose the

10   portions that you want to discuss, but we don't need to read

11   each and every exchange unless you think there's some

12   particular relevance to it.

13         MS. RIVERA MIRANDA:  Yes, Your Honor.

14         THE COURT:  I don't want to short-circuit you, but

15   I also don't want to spend time doing things that are not --

16         MS. RIVERA MIRANDA:  Yes, Your Honor, and these

17   ones that we are going to read are relevant.

18   BY MS. RIVERA MIRANDA:

19   Q.    Line 1030, there's a line that indicates, "I think he is

20   going to be popular in school by how he already acts.  He's

21   quite a character."  Who are you referring to?

22   A.    My son.

23   Q.    Okay.  And then in line 1034, there's some -- there's a

24   message from defendant, "Ha, I could see him losing his

25   cherry very young."  What is the defendant referring to when

138

1    he says, "his cherry"?

2    A.   He's referring to virginity being taken, or whatever, at

3    a young age.

4    Q.   Okay.  And he's talking about whom?

5    A.   I'm sorry?

6    Q.   He's referring to whom?

7    A.   My son.

8    Q.   Okay.  And how old was he at the time?

9    A.   He would have been two.

10   Q.   Okay.  And what was your statement in line 1037?

11   A.   "That's so true.  I bet he will have sex by 14."

12   Q.   Okay.  And what was his response to that in line 1038?

13   A.   "Earlier."

14   Q.   Going to Bates stamp 209, line 1045, you said, "Will he

15   lose virginity, and what about K.?"  What are you saying

16   here?

17   A.   He's also talking about when my daughter would lose her

18   virginity as well.

19   Q.   Okay.  And what did he say to that in line 1046?

20   A.   "Maybe twelve.  Ha, ha.  Don't know about her.  Ha.

21   When is she gonna sit on me" with a --

22   Q.   What was the defendant referring to when he said, "When

23   she gonna sit on me"?

24   A.   Meaning her sitting on top of his lap, on his penis.

25   Q.   Do you mean vaginal intercourse?  What do you understand

```
 1   by that --
 2            MR. BARK:  I'm going to object.
 3   BY MS. RIVERA MIRANDA:
 4   Q.   -- "sit on me"?
 5            THE COURT:  Hang on a minute.
 6            MR. BARK:  I object as to speculation as to what
 7   these terms mean that someone else wrote.
 8            THE COURT:  Your response?
 9            MS. RIVERA MIRANDA:  Well, Your Honor, she was part
10   of this conversation.  She knows what they were talking
11   about.
12            THE COURT:  It's overruled on the grounds of
13   speculation.
14            Do you remember the question, ma'am?
15            THE WITNESS:  Yes, ma'am -- I mean, yes, sir.
16            THE COURT:  Okay.  You can answer it.
17   A.   He's referring to her being on top of his penis.
18   Q.   And this conversation was on January 24, 2013, and your
19   response to that in line 1047 was what?
20   A.   "Ha.  Well, if she's anything like how I am about sex, I
21   think it'll be earlier than normal.  Ha.  Whenever you see
22   them again."
23   Q.   And his response to that in line 1048 was?
24   A.   "I meant when is she gonna to stick mine in her when I
25   said 'sit'?  You like seeing me come on her?"
```

1   Q.   Okay.  What did he mean by "come on her," if you know?

2   A.   He was referring to him ejaculating on her, like at

3   Christmastime.

4   Q.   Okay.  And in line 1050 he says, "Yeah, I want her to

5   have lots of pictures taken."  Lots of pictures of what, if

6   you know the context?

7   A.   The context was sexual pictures of her.  In other words,

8   her nude, pose nude and so forth.

9   Q.   Okay.  Now, in line 1057 it says, "I'm sure you'd like

10  to see money shots of her."  Who said that?

11  A.   Jonathan.

12  Q.   Okay.  And in line 1059, what is that?

13  A.   It's a smily face or a wink.

14  Q.   Okay.  And what was his response to that in line 1060?

15  A.   It's a symbol for, like, the tongue hanging out.

16  Q.   A tongue hanging out?

17  A.   Like, happy.

18  Q.   Okay.  And then in line 1061, there's a question there,

19  "Money shots?" that you ask.  Why did you ask that question?

20  A.   Because I was trying to verify what he was talking

21  about.

22  Q.   Okay.  Now, going to Bates stamp 210 of Exhibit 3, what

23  was his response to that, as to your question --

24  A.   "Come."

25  Q.   -- in line 1062?  "Come"?

1    A.     "Come."

2    Q.     Okay.  Meaning what?

3    A.     Ejaculation.

4    Q.     Okay.  Ejaculation on whom?  Money shots of whom, if you

5    know the context?

6    A.     My daughter.

7    Q.     Okay.  And your response to that in line 1063 was?

8    A.     "Ha, ha.  Yes."

9    Q.     And to that in line 1064 he said, "There (sic) hot

10   seeing.  I wish saw more," meaning what?  More of what?

11   A.     Of little girls with "facials" or come on them.

12             MR. BARK:  I'm going to object as to the best

13   evidence, Your Honor.  The writing speaks for itself.

14             THE COURT:  The objection is overruled.

15             We're going to take our lunch break here, Ms.

16   Miranda.

17             It's 12:30, ladies and gentlemen.  So we'll take a

18   break.  As I mentioned, we'll take an hour and 15 minutes

19   because we're kind of across the street from the restaurant

20   facilities.  It usually takes a little longer for you all to

21   get there and get something to eat and come back; but if you

22   would do your best to be back in the jury room ready to get

23   right back in your chair at 1:45, then we'll pick up with

24   this examination.  Just remember, we can't start until

25   everybody is back.

```
1              We'll be in recess until 1:45.

2              (Jury not present at 12:30 p.m.)

3              THE COURT:  We'll stand adjourned until 1:45.

4              (Lunch recess taken from 12:30 until 1:45 p.m.)

5              (Jury not present.)

6              THE COURT:  Are you ready to proceed, Ms. Miranda?

7              MS. RIVERA MIRANDA:  Yes, Your Honor.

8              THE COURT:  All right.  Bring our jury back,

9    please, Mr. Fiorenza.

10             (Jury present at 1:46 p.m.)

11             THE COURT:  Welcome back, ladies and gentlemen.

12   Were all of you able to abide by my instructions not to begin

13   discussing the case amongst yourselves or with anyone else?

14             (Affirmative responses.)

15             THE COURT:  All right.  Ms. Miranda, you may

16   inquire.

17             MS. RIVERA MIRANDA:  Good afternoon, ladies and

18   gentlemen and to the Honorable Court and everyone present.

19   BY MS. RIVERA MIRANDA:

20   Q.   Ms. Adleta, can you please take a look at, for

21   identification, Number 4.

22             MS. RIVERA MIRANDA:  That would be Bates stamp 173.

23   BY MS. RIVERA MIRANDA:

24   Q.   Do you recognize it?

25   A.   Yes, ma'am.
```

```
1   Q.    How do you recognize it?

2   A.    It's text messages exchanged between Jonathan and I.

3   Q.    Okay.  Do you see his contact name there?

4   A.    Yes, ma'am.

5   Q.    And his phone number?

6   A.    Yes, ma'am.

7              MS. RIVERA MIRANDA:  Your Honor, at this point we

8   offer Government Exhibit for Identification Number 4 that

9   would be admitted into evidence.

10             MR. BARK:  No objection, Your Honor.

11             THE COURT:  All right.  4 will be received.

12             MS. RIVERA MIRANDA:  May we publish it, Your Honor.

13             THE COURT:  Yes, you may.

14             MS. RIVERA MIRANDA:  Okay.

15  BY MS. RIVERA MIRANDA:

16  Q.    Okay.  Ms. Adleta, going to the top portion, this

17  incoming message indicating, "So you want -- what you want to

18  see K. play?" what do you mean by "play"?  I'm sorry.  What

19  did he mean by "play"?

20  A.    What did he mean?

21  Q.    Uh-huh.  What did the defendant mean by "play"?  If you

22  need a moment to review the text messages, take your time.

23  A.    Okay.

24             He's referring to --

25             MR. BARK:  Your Honor, I'm sorry.  I have an
```

```
 1   objection, for lack of predicate as to how she would know

 2   this.

 3            THE COURT:  The objection is sustained.  You can

 4   lay a predicate and you can ask the question again.

 5   BY MS. RIVERA MIRANDA:

 6   Q.   Okay.  You indicated that this was part of a

 7   communication that you had with the defendant?

 8   A.   Yes, ma'am.

 9   Q.   Okay.  And when did that take place?

10   A.   February 12th of 2013.

11   Q.   Okay.  And what were you discussing with the defendant

12   at this time?

13   A.   Our children and specifically my daughter.

14   Q.   As to what topic specifically?

15   A.   Sexual activities.

16   Q.   Okay.  Now, when you -- when you received this message,

17   defendant stated, "So what you want to see K. play," what do

18   you understand by that?  What did he mean by that?  What was

19   your understanding?

20   A.   He wanted to -- he was referring to her being played

21   with sexually.

22   Q.   Okay.  And what about on 1947, when you say, "Your cock

23   and my pussy, ha, ha," what are you referring to?

24   A.   His -- his penis and -- and my pussy.

25   Q.   Your vagina?
```

1    A.   Yes, ma'am.

2    Q.   Okay.  And his response to that in line 1948, "Oh, so

3    you want her to make my cock play with your pussy," what did

4    you understand he meant by that?  What did he mean by that?

5    A.   He was referring to my daughter playing with Jonathan's

6    penis and then as well as my vagina area.

7    Q.   And in line 1950, when he states -- when he states, "Ha,

8    her playing with anything is hot," what did you understand he

9    meant by that?

10   A.   I understood it as my daughter playing with a penis or

11   any kind of sexual thing.

12   Q.   Okay.  In line 1953 you ask, "Have you heard of sounding

13   rods?"  Why did you ask that question?

14   A.   Because Aaron Dixon had wanted me to buy these for her.

15   Q.   Okay.  And in line 1955, when he says, "Her with come

16   anywhere on her would be so, so hot," what is he referring

17   to?

18   A.   My daughter having ejaculation on her body.

19   Q.   Okay.  And did you try to explain to the defendant what

20   sounding rods are?  Did you see that here?

21   A.   Yes, I do.

22   Q.   Okay.  So in line 1956, what do you explain to him?

23   A.   "A metal rod stick in the pee hole (start out small,

24   then big) and supposedly it gives a great orgasm."

25   Q.   Now, after that, in line 1957, you state, "Ha, ha.  Hope

```
 1   she will like that more than she does now."  What were you
 2   referring to at that point?
 3   A.    The come or ejaculation on her.
 4   Q.    Why did you say that; do you remember?
 5   A.    I'm sorry?
 6   Q.    Why did you say that; do you remember?
 7   A.    Because we had discussed it.
 8   Q.    You have discussed what?
 9   A.    What took place at the trip.
10   Q.    Which trip?
11   A.    The Christmas trip.
12   Q.    December 2012?
13   A.    Yes, ma'am.
14   Q.    Okay.  And his response in 1959, "More than she does
15   now?  You having someone come on her?" what did you
16   understand he mean by that?
17   A.    I understood it as my daughter having ejaculation on her
18   from someone else.
19   Q.    He was asking you that question, if you were having
20   someone else ejaculate on her.  Okay.  And what was your
21   response in line 1961?
22   A.    "No.  I was referring to her with you the last time.
23   Remember, she freaked out."
24   Q.    What were you talking about then?
25   A.    I was referring to the incident that took place at his
```

1    house when he came on her, ejaculated on her.

2    Q.    Okay.  And in line 1962, Bates stamp 174, line 1962, it

3    says, "She kinda did.  Maybe you should get someone to come

4    on her."  What did you understand that to mean?

5    A.    I understood it to be that, yeah, she did freak out and

6    that he wanted me to get someone to come on her, ejaculate on

7    her.

8    Q.    And let me ask you, did the defendant actually suggest

9    who should come on her?

10   A.    Yes.

11   Q.    And who did he mention?

12   A.    A guy named Matt that I was dating, as well as my dad.

13   Q.    You said he mentioned your dad.  Now, if we go to Bates

14   stamp 175, line 1983, it says, "Ha.  Well, there is always

15   your dad.  Ha, ha.  I'm sure he hasn't had any in a while and

16   love the release."  Is that what you're referring to when he

17   suggested your dad?

18   A.    Yes, ma'am.

19   Q.    Okay.  Now, going back to Bates stamp 174, the same

20   exhibit, in line 1963 you ask, "What your thoughts of her

21   playing with a small dildo now?"  Why did you ask that

22   question and what is a dildo?

23   A.    I asked him because I was asking his permission, and

24   Aaron had wanted to -- me to buy a sex object for her, such

25   as a dildo, which is an object that's placed in the vagina

1   area.

2   Q.   A sex toy?

3   A.   Yes, ma'am.

4   Q.   So you were consulting the defendant about buying a sex

5   toy for your daughter?

6   A.   Yes.

7   Q.   Okay.  And when you mention Dixon in this, you said

8   Dixon was asking you to do this?

9   A.   Yes, he was.

10  Q.   Okay.  So you were doing these things for both the

11  defendant and Dixon?

12  A.   Yes.

13  Q.   Okay.  Now, his response in line 1965 was, "That's fine.

14  Ha.  Just take pictures."  "Pics," does that mean pictures?

15  A.   Yes, ma'am.

16  Q.   Okay.  And what is that symbol next to it?

17  A.   It's a symbol that's like a tongue sticking out.

18  Q.   Now, going to Bates stamp 175, line 1988, defendant

19  states, "Ha, ha.  Okay.  But the bigger thing is seeing her

20  do anything, which is really hot.  Ha.  I'm sure you could

21  find someone easy, though, if really wanted."  What did you

22  understand he mean by that?

23  A.   I understood it as seeing my daughter do anything

24  sexually would be really hot to him and that he wanted me to

25  find someone to engage in sexual activity with her.

1   Q.    And what was your response to that in line 1989?

2   A.    "You just need to get your ass here.  Laugh out loud."

3   Q.    Okay.  And then on line 1992 the defendant states,

4   "Besides, don't you want to see her explore with other

5   people?  Besides, I'm sure other people have way more come

6   than me."  What did you understand by that?

7   A.    I understood it to mean that he -- he wanted me to see

8   other guys perform sexual acts on her and he was saying that

9   there would be more ejaculation from other men than him.

10  Q.    Okay.  And going to Bates stamp 176, in line 2001, so --

11  there's a message from you:  "So why didn't you do much with

12  her when she was there?"  What are you referring to here?

13  A.    I'm referring to the incident that happened at

14  Christmastime at his house.

15  Q.    Why are you asking this question?

16  A.    Because Aaron had wanted me to get some videos and

17  pictures of her.

18  Q.    And his response in line 2002 is, "I don't know"?

19  A.    Correct.

20  Q.    Okay.  Then in line 2004 you state, "Because you

21  obviously are into it, and just wondered what held you back."

22  Why do you say this?

23  A.    I said it because we had discussed these things before

24  the trip and he just did, obviously, the one incident that I

25  told you about with her, and I was just asking him why he

1    hadn't done more with her.

2    Q.    You were expecting other things to happen?

3    A.    Yes.

4    Q.    Now, let me ask you to go to Exhibit for Identification

5    10 and 11.   Please take a look at Government Exhibit for

6    Identification Number 10.   Do you recognize it?

7    A.    Yes, I do.

8    Q.    How do you recognize it?

9    A.    It is a picture taken at the vacation on the Christmas

10   trip at his house.

11   Q.    Okay.   Do you recognize the persons depicted in this

12   picture?

13   A.    Yes, I do.

14   Q.    Who are they?

15   A.    It is Samantha Bryant's children as well as our children

16   and Jonathan and myself.

17           MS. RIVERA MIRANDA:   Your Honor, I would now offer

18   Government Exhibit 10 for identification into evidence.

19           MR. BARK:   No objection.

20           THE COURT:   It'll be received.

21           MS. RIVERA MIRANDA:   May we publish it, Your Honor.

22           THE COURT:   Yes, you may.

23   BY MS. RIVERA MIRANDA:

24   Q.    Now, please tell the members of the jury who is depicted

25   here; and if you can actually identify them, please mark to

1    identify each one of the persons in this picture.

2    A.   I guess that's how I'm doing it.  Am I doing it

3    correctly?

4    Q.   That's fine.

5    A.   That's Samantha's son.  His name is L.  And then the

6    girl is M., which is Samantha Bryant's daughter.  And that's

7    Jonathan Adleta.  That's K. Adleta, J. Adleta, and myself.

8    Q.   Now, going to Exhibit 11 for identification, do you

9    recognize it?

10   A.   Yes, I do.

11   Q.   How do you recognize it?

12   A.   It was taken one after the other, the picture was.  It's

13   at his house.

14   Q.   Okay.  Do you recognize the persons that are depicted

15   here?

16   A.   Yes, I do.

17   Q.   Who are they?

18   A.   It's Samantha's children as well as our children and

19   Jonathan and his girlfriend, Samantha Bryant.

20          MS. RIVERA MIRANDA:  Your Honor, I request that

21   Government Exhibit 11 for identification be admitted into

22   evidence.

23          MR. BARK:  No objection.

24          THE COURT:  It'll be received.

25          MS. RIVERA MIRANDA:  May we publish it, Your Honor.

152

1        THE COURT:  Yes, you may.

2        MS. RIVERA MIRANDA:  That's Bates stamp 197.  Okay.

3    If we can, clear this.

4        Okay.  Thank you.

5    BY MS. RIVERA MIRANDA:

6    Q.   Now, can you please identify for the jury who are the

7    persons depicted here?

8    A.   It's L., Samantha Bryant's son.  M., Samantha's

9    daughter.  Jonathan Adleta, K. Adleta, J. Adleta, and

10   Samantha Bryant.

11   Q.   Who took this picture?

12   A.   I did.

13   Q.   And when was this picture taken?

14   A.   When I was there at his house in Oklahoma.

15   Q.   In December 2012?

16   A.   Yes, ma'am.

17   Q.   Okay.  What about the previous picture, the Exhibit

18   Number 10?

19   A.   Yes, that was taken in the same time frame.

20   Q.   Who took that picture?

21   A.   Samantha Bryant.

22   Q.   And when was this?

23   A.   This was while I was there at his house that week.

24   Q.   Of December 2012?

25   A.   Yes, ma'am.

```
 1   Q.    Okay.  I'm going to ask you to look at Government

 2   Exhibit for Identification Number 5.  Do you recognize it?

 3   A.    Yes, I do.

 4   Q.    How do you recognize it?

 5   A.    It's the conversation Jonathan and I had through Skype.

 6   Q.    With whom?

 7   A.    It's a conversation I had with Jonathan with Skype.

 8   Q.    Okay.  Do you recognize his user name in this document?

 9   A.    Yes, ma'am.

10   Q.    And what about yours?  Do you recognize yours in this

11   document?

12   A.    Yes, I do.

13   Q.    Okay.  And when did this communication take place?

14   A.    February 13th of 2013.

15             MS. RIVERA MIRANDA:  Your Honor, we now move that

16   Government Exhibit for Identification Number 5 be admitted

17   into evidence.

18             THE COURT:  Mr. Bark?

19             MR. BARK:  No objection, Your Honor.

20             THE COURT:  It'll be received, Number 5, for the

21   government.

22             MS. RIVERA MIRANDA:  May we publish it, Your Honor.

23             THE COURT:  Yes, you may.

24             MS. RIVERA MIRANDA:  The top half.

25   BY MS. RIVERA MIRANDA:
```

1    Q.    Now, in line 701 you ask, "So I guess things are pretty

2    serious with Samantha."   Who is Samantha?

3    A.    Jonathan Adleta's girlfriend.

4    Q.    The one that you identified in the picture in

5    Exhibit 11, I believe?

6    A.    Yes, ma'am.

7    Q.    Now, his response in 702 is, "Yeah"?

8    A.    Correct.

9    Q.    Going to line 708, what did he say?

10   A.    He said, "I'm still into young and dad-daughter stuff.

11   So. . .I don't know."

12   Q.    What did you understand that to mean?

13   A.    I understood that to mean that father and daughters

14   would engage in sexual activity.

15   Q.    That he was still into that?

16   A.    Yes, ma'am.

17   Q.    Okay.   In line 710 what did you ask?

18   A.    Did you say 710?

19   Q.    Yes.

20   A.    "But she doesn't know that, does she?"

21   Q.    What are you referring to?

22   A.    I'm referring to Samantha knowing about him looking at

23   child pornography.

24   Q.    And his response in line 712 was, "She knows"?

25   A.    Yes.

1    Q.    Okay.  Now, going to Bates stamp 212, in line 730 you

2    say, "Should be living somewhere where it is socially

3    acceptable."  What do you mean by that?

4    A.    I was referring to when Aaron Dixon had told me there

5    was different countries, such as, like, Russia, that -- where

6    it's acceptable for -- for girls to engage -- young girls to

7    engage in sexual activity.

8    Q.    So the defendant knew about Aaron Dixon?

9    A.    Yes.

10   Q.    Now, in line 741 defendant states, "He doing stuff?"

11   What do you understand that to mean?

12   A.    I understood it to mean that was he engaging in sexual

13   activity with his daughter.

14   Q.    Who?

15   A.    Aaron Dixon.

16   Q.    The defendant is asking you whether you know if Aaron

17   Dixon is molesting his daughter?

18   A.    Yes.

19   Q.    And what was your response to that in line 742?

20   A.    "Yes."

21   Q.    Okay.  Now, going to Bates stamp 213, in line 749, you

22   state, "He gives oral."  What do you mean by that and who are

23   you talking about?

24   A.    I'm referring to Aaron Dixon and I'm talking about him

25   licking his daughter's vaginal area.

156

1    Q.    Are you talking about Dixon giving oral sex to his

2    daughter?

3    A.    Yes.

4    Q.    And in line 750 you state, "And she likes rubbing

5    against him."  What are you referring to there?

6    A.    I'm referring to his daughter rubbing against his penis.

7    Q.    In line 751 the defendant asks, "She give oral?"  What

8    did you understand that to mean?

9             MR. BARK:  I'm sorry.  We'll ask to rephrase the

10   last statement to clarify who the he's are.

11            MS. RIVERA MIRANDA:  Okay.

12            THE COURT:  Why don't you restate the question, Ms.

13   Miranda, so that it's clear.

14            MS. RIVERA MIRANDA:  Yes.

15   BY MS. RIVERA MIRANDA:

16   Q.    As to line 750, "And she likes rubbing against him," who

17   are you referring to here?

18   A.    Aaron Dixon.

19   Q.    And his daughter?

20   A.    Yes, ma'am.

21   Q.    Okay.  Now, in line 751 defendant states, "She give

22   oral?"  What did you understand that to mean?

23   A.    I understood it to mean was his daughter giving head

24   to -- to Aaron.

25   Q.    And in line 753 he says, "He come?"  What does that

1   mean?  What did you understand that to mean?

2   A.    It meant that, did he ejaculate?

3   Q.    Who?

4   A.    Aaron Dixon.

5   Q.    On his daughter?

6   A.    Yes.

7   Q.    And your response in line 754 was what?

8   A.    "Don't know that."

9   Q.    Okay.  Now, going to Bates stamp 215, line 799, it

10  states, "Was gonna try something with the boy on cam, but

11  mama came out," and that's defendant.  What do you understand

12  that to mean?

13  A.    I understood it to mean that he was going to engage in

14  sexual activity with Samantha's son.

15  Q.    Who was going to engage --

16  A.    Jonathan.

17  Q.    -- in sexual activity?

18  A.    Jonathan Adleta.

19  Q.    And in line 803 you state, "Gonna try something with

20  boy?"  Why are you asking this?

21  A.    I was just asking him if he had done anything with him.

22  Q.    Okay.  And his response in line 804 is, "Have him suck

23  me.  Would you like that?"  What did you understand that to

24  mean?

25  A.    That Samantha's son, L., would suck on Jonathan's penis

1    and would I want to see that.

2    Q.    Okay.  And your response was in line 805, "Humm," and

3    you also said, "It is not necessarily hot to me that much,

4    but it is interesting to watch."  What are you referring to

5    there?

6    A.    I'm referring to it's -- it -- I'm saying it's

7    interesting to watch the boy giving head to Jonathan, but I

8    was saying as well that it wasn't that hot to me.

9    Q.    And by "giving head," you mean what?

10   A.    Him giving oral to Jonathan.

11   Q.    Okay.  Now, going to Exhibit 6 for identification,

12   please review it.  Do you recognize it?

13   A.    Yes, I do.

14   Q.    How do you recognize it?

15   A.    It's a conversation I had with Jonathan through Skype.

16   Q.    Okay.  Do you recognize his user name?

17   A.    Yes, I do.

18   Q.    What about your user name?

19   A.    Yes, I do.

20   Q.    Okay.  And when did this take place?

21   A.    March 5th of 2013.

22            MS. RIVERA MIRANDA:  Now, Your Honor, we're

23   offering that Government Exhibit 6 for identification be

24   admitted into evidence.

25            MR. BARK:  No objection.

```
1         THE COURT:  6 will be received.

2   BY MS. RIVERA MIRANDA:

3   Q.   Okay.  Going to Bates stamp 177 --

4            MS. RIVERA MIRANDA:  The top half.

5   BY MS. RIVERA MIRANDA:

6   Q.   -- in line 937 you state -- or he states -- I'm sorry --

7   "Yeah, I haven't really seen anything."  What do you

8   understand that to mean?

9   A.   I understood it to mean pictures of young girls.

10  Q.   Okay.  And in line 938 -- let me go back.  Pictures of

11  young girls doing what?

12  A.   Playing with themselves or just being naked.

13  Q.   How do you know that?

14  A.   Because these were the conversations I had with him and

15  he had told me he had liked looking at the pictures, and

16  there were times where he would share pictures with me and

17  then I would --

18  Q.   Pictures of what?

19  A.   Of young girls in sexual activity, and I would send them

20  to Aaron Dixon.

21  Q.   Okay.  So, after that, he says in line 938, "I wish I

22  could see stuff, though."  And "stuff," what did he mean by

23  that?

24  A.   Looking at --

25  Q.   What did you understand that to mean?
```

1   A.    I understood it to be that he wishes he could see young

2   girls in sexual activity.

3   Q.    And in line 939 your response was, "I think I still have

4   the link."  What are you referring to?

5   A.    I'm referring to a link on a website that Aaron had

6   given me.

7   Q.    And in line 943 you state, "She still wants me to do

8   stuff with her."  What are you talking about here?

9   A.    I'm referring to sexual activity with my daughter.

10  Q.    With K.?

11  A.    Uh-huh.

12  Q.    And his response in line 946 was, "That's cool"?

13  A.    Correct.

14  Q.    Okay.  Now, in line 947 he's asking, "Do you have it on

15  the computer?"  What is he referring to here, if you know?

16  A.    He's referring to -- I believe he's referring to

17  pictures of young girls.

18  Q.    Did you actually send him a link?

19  A.    Yes, I did.

20  Q.    To child pornography?

21  A.    Yes, I did.

22  Q.    In line 907, and that's Bates stamp 178, you state, "I'm

23  sure I could get more like that from him."  What are you

24  talking about here?

25  A.    More pictures and more videos of young girls in sexual

1  activity.

2  Q.   Okay.  And his response in line 971 is, "Really?"  And

3  your response in line 972 was, "Yeah."

4       Now, going to Bates stamp 179, line 990, you

5  state, "He wants me to do stuff with K."  What are you

6  referring to?  Who are you referring to?

7  A.   Aaron Dixon, and he wanted me to engage in sexual

8  activity with my daughter.

9  Q.   And defendant states in line 992, "On Skype for him?"

10 Your response in line 93 is, "Yes"?

11 A.   Correct.

12 Q.   And in line 996 he asks you, "What have you done?"  What

13 do you understand that to mean?

14 A.   I understood it to be what have I done with my daughter

15 sexually.

16 Q.   And what was your response to that in line 997?

17 A.   "Just given her oral."

18 Q.   And in line 999 what do you say?

19 A.   "She practically begs for it."

20 Q.   What are you referring to in those two lines?  When you

21 say you have given her oral and that she practically begs for

22 it, what are you talking about?

23 A.   I'm referring to my daughter wanting me to give her oral

24 sex or licking her vagina area.

25 Q.   Did you do this while Dixon watched on Skype?

1    A.    Yes.   That's the only time I did it.

2    Q.    I'm sorry.   What did you say?

3    A.    That's the only time I did it, while he was watching on

4    Skype.

5    Q.    While Dixon was watching on Skype.   Okay.   And you said

6    in line 1001, "But she loves it."

7              Actually, in line 1,000 you said, "Only done it a

8    few times."   So was it one or more than one time that you did

9    this to your daughter?

10   A.    More than once.

11   Q.    Now, his response in line 1002 is, "Bet he loves it,

12   too."   What did you understand that to mean?

13   A.    I understood it to be that Aaron Dixon likes watching or

14   loves watching me do stuff to my daughter sexually.

15   Q.    And then in line 1004 defendant states, "So the question

16   is:   When are you going to have her suck on a cock?"   Can you

17   please explain to the members of the jury what the defendant

18   mean by that, if you understood?

19   A.    I understood it to be as if my daughter -- when I was

20   going to have someone watch her suck on someone's penis.

21   Q.    And your response to that was what in line 1005?

22   A.    "I don't do anything unless she wants it."

23   Q.    And then you also stated in line 1006, "Humm.   Well,

24   when it's right guy," and in 1007, "and right time."   What

25   did you mean by that?

1    A.    Meaning that I only allow my daughter -- I was only

2    going to allow them to -- Aaron Dixon as well as Jonathan

3    Adleta to perform in sexual activity with my daughter.

4    Q.    Those are the only people that you would consider?

5    A.    Uh-huh.

6    Q.    And in line 1009 in Bates stamp 180 you state, "He is

7    only one I consider besides you."  What did you mean by that?

8    A.    I meant that Aaron Dixon and Jonathan Adleta would be

9    the only ones in performing sexual activity with her.

10   Q.    And what was his response to that in line 1010?

11   A.    "I'd like to see that."

12   Q.    What did you understand that to mean?

13   A.    I understood it to be that he would like to see him,

14   referring to Aaron, see my daughter engaging in sexual

15   activity with him.

16   Q.    And, more specifically, oral sex?

17   A.    Yes, ma'am.

18   Q.    In line 1018, defendant states, "Well, if you do, you

19   got to record it."  If you do what?

20   A.    If my daughter was going to engage in sexual activity

21   with Aaron Dixon, he wanted me to video it.

22   Q.    And then in line 1020, you state, "Are you hoping to see

23   the kids by summer?"  And by that, which year are you

24   referring to?

25   A.    This year, 2013.

1    Q.    Okay.  And what was his response to that?

2    A.    Yes.

3    Q.    Okay.  Now I'm going to ask you to look at Exhibit 12

4    for identification.  Do you recognize it?

5    A.    I do.

6    Q.    How do you recognize it?

7    A.    It's my son on top of me.

8    Q.    Can you describe to the members of the jury what is he

9    doing?

10   A.    He's inserting a dildo into my vagina.

11   Q.    Okay.  Who took this picture?

12   A.    I did.

13   Q.    For what purpose?

14   A.    For Aaron Dixon.

15   Q.    Okay.

16         MS. RIVERA MIRANDA:  Now, Your Honor, we are

17   offering Government Exhibit 12 for identification, that it be

18   admitted into evidence as Government Exhibit 12.

19         THE COURT:  Mr. Bark.

20         MR. BARK:  I'm going to object as to relevance at

21   this point.

22         THE COURT:  Sustained.

23   BY MS. RIVERA MIRANDA:

24   Q.    Let me ask you, did you share information with defendant

25   regarding this incident, what you did with your son?

```
1    A.    Yes, I did.

2    Q.    Now, what was his response to that?

3    A.    He -- he liked the idea of it; and from my

4    understanding, he wanted a picture of it.

5    Q.    Okay.

6          MS. RIVERA MIRANDA:  Now, Your Honor, we resubmit,

7    based on her answers.

8          THE COURT:  Mr. Bark.

9          MR. BARK:  No objection.

10         THE COURT:  It'll be received.

11         MS. RIVERA MIRANDA:  May we publish it, Your Honor.

12         THE COURT:  Yes, you may.

13         MS. RIVERA MIRANDA:  That's Bates stamp 201.

14   BY MS. RIVERA MIRANDA:

15   Q.    Now, can you please tell the members of the jury who is

16   that child that's in between your legs?

17   A.    That is my son.

18   Q.    Okay.  And what is he doing as depicted in this

19   photograph?

20         MR. BARK:  Your Honor, I'm sorry.  Can I have a

21   moment?  I'm not sure what's being shown where.

22         THE COURT:  Nothing is up right now.  The picture

23   went up and came right down.  I think that was by design.

24         MR. BARK:  Thank you.

25   A.    He is inserting a dildo into my vagina.
```

1    Q.    Do you mean a sex toy?

2    A.    Yes, ma'am.

3    Q.    Did you have him do that?

4    A.    Yes.

5    Q.    How old was your son when this happened?

6    A.    He was one and a half to two years of age.

7    Q.    Now, I'm going to ask you to take a look at Government

8    Exhibit 16 for identification.

9           MR. BARK:  Your Honor, before we go into that, may

10   I approach to see the exhibit for a moment that we were just

11   referring to?

12          THE COURT:  Yes.

13          MR. BARK:  I'm sorry, but I need to approach for a

14   moment to discuss this exhibit.

15          THE COURT:  Okay.

16          (Bench conference as follows.)

17          MR. BARK:  I don't have an objection to the

18   photograph coming in as it was portrayed just to be a

19   photograph, but on top of the photograph is information that

20   was not discussed at the time it was being admitted.  So I

21   would seek to have that not admitted into evidence because

22   that's not what I was being told was admitted.  So I object

23   to the top part coming in at this point.

24          THE COURT:  Okay.  I don't know what's on the top

25   part.

1          Do you want to be heard?

2          MS. RIVERA MIRANDA:  Yes, Your Honor.  I will have

3     the expert testify exactly as to where this picture came

4     from.

5          THE COURT:  Okay.

6          Subject to it being tied up, I'm going to overrule

7     your objection.  If it's not tied up by the government in

8     terms of why this other extraneous information is relevant,

9     then I'll revisit it.

10         MR. BARK:  Thank you.

11         (In open court.)

12     BY MS. RIVERA MIRANDA:

13     Q.   Going back to Government Exhibit 12, let me ask you, do

14     you recall sending that picture to the defendant?

15     A.   Yes, I do.

16     Q.   Now, as to Government Exhibit 16, let me ask you, have

17     you seen the defendant naked?

18     A.   Yes, I have.

19     Q.   How many times?

20     A.   A lot.

21     Q.   Okay.  Now, let me ask you, do you recognize this

22     photograph?

23     A.   Yes, I do.

24     Q.   How do you recognize it?

25     A.   It is Jonathan Adleta, and I can tell because of his

1    freckles on his hand and I know what his penis looks like.

2    Q.   Okay.

3              MS. RIVERA MIRANDA:  Now, Your Honor, we're

4    offering Government Exhibit 16 for identification, that it be

5    admitted into evidence.

6              THE COURT:  Mr. Bark.

7              MR. BARK:  No objection.

8              THE COURT:  It'll be received.

9              MS. RIVERA MIRANDA:  May we publish it, Your Honor.

10             THE COURT:  Yes.

11             MS. RIVERA MIRANDA:  206.

12   BY MS. RIVERA MIRANDA:

13   Q.   Can you please describe to the members of the jury what

14   is depicted here?

15   A.   It's Jonathan's penis rubbing against a little girl.

16   Q.   Okay.  Now please turn to Government Exhibit for

17   Identification Number 17.  Do you recognize it?

18   A.   Yes, I do.

19   Q.   How do you recognize it?

20   A.   I recognize it because it's Jonathan's penis and I

21   recognize it by his freckles on his hand.

22             MS. RIVERA MIRANDA:  Your Honor, we now move that

23   Government Exhibit 17 for identification be admitted into

24   evidence.

25             THE COURT:  Mr. Bark.

```
1              MR. BARK:  No objection.

2              THE COURT:  It'll be received.

3              MS. RIVERA MIRANDA:  May we publish it, Your Honor.

4              THE COURT:  Yes.

5              MS. RIVERA MIRANDA:  207.

6   BY MS. RIVERA MIRANDA:

7   Q.   Can you please tell the members of the jury what is

8   depicted here?

9   A.   It's a picture of Jonathan's penis hard and it's --

10  Q.   Can you speak up?

11  A.   Sorry.  It's a picture of Jonathan's penis hard and it

12  looks like it's rubbing against that -- I can't tell if it's

13  a leg or what it is in the picture, but against a body.

14  Q.   Okay.  Now, these are Government Exhibit 16 and 17.  You

15  said -- you describe it was defendant's penis, and it appears

16  to be an erect penis; would that be correct?

17  A.   Yes, ma'am.

18             MS. RIVERA MIRANDA:  Your Honor, may I have a

19  second?

20             THE COURT:  Yes.

21             MS. RIVERA MIRANDA:  Your Honor, if we may approach

22  the witness.

23             THE COURT:  Yes.

24  BY MS. RIVERA MIRANDA:

25  Q.   Please examine Government Exhibit 1, the first page.
```

170

1    Let me ask you first whether you are familiar with

2    defendant's handwriting?

3    A.    Yes, I am.

4    Q.    How come?

5    A.    Because I saw him write several things and I've seen him

6    sign different documents.

7    Q.    Okay.   Now, do you recognize this, Government Exhibit

8    1 --

9    A.    No, I do not.

10   Q.    -- for identification?

11   A.    No, I do not.

12   Q.    And what I'm asking specifically, do you recognize the

13   handwriting --

14   A.    Yes.

15   Q.    -- in this first page of the exhibit?

16   A.    Yes.

17   Q.    Do you recognize it?

18   A.    Yes, I do.

19   Q.    How do you recognize it?

20   A.    It's Jonathan's --

21            MR. BARK:   Objection, Your Honor.   She's not --

22   lack of predicate.   She's not qualified to give this opinion.

23            THE COURT:   Overruled.

24   A.    I -- I recognize it because I've -- like I said, I've

25   seen him write different things, you know, such as signing a

171

1  check or at one point, you know, signing leasing documents

2  and that kind of thing.

3  Q.   Whose handwriting is that in Government Exhibit 1 for

4  identification?

5  A.   It is Jonathan Adleta's.

6         MS. RIVERA MIRANDA:  Your Honor, may we retrieve

7  it.

8         THE COURT:  Yes.

9         MS. RIVERA MIRANDA:  May we have a second.

10         THE COURT:  Yes.

11         MS. RIVERA MIRANDA:  Your Honor, no further

12  questions.

13         THE COURT:  Cross-examination?

14         MR. BARK:  Please, Your Honor.

15                        CROSS-EXAMINATION

16  BY MR. BARK:

17  Q.   Good afternoon.

18  A.   Good afternoon.

19  Q.   By name is Matthews Bark.  I'm going to ask you a couple

20  of questions, and that's a lawyer's definition of "a couple."

21  So it may be a few more than that.

22  A.   Okay.

23  Q.   But you went to Jonathan Adleta's house in Oklahoma,

24  correct?

25  A.   Yes, I did.

```
1   Q.    You did that at some time in late November, early

2   December?

3   A.    No.  I went the last week in December, at Christmastime.

4   Q.    Okay.  So you were there for Christmas?

5   A.    Yes, sir.

6         THE COURT:  Mr. Bark, would you pull the microphone

7   to you a little bit.

8         MR. BARK:  Yes, sir.  Sorry.

9   BY MR. BARK:

10  Q.    How long did you spend at Jonathan Adleta's house?

11  A.    Approximately 13 days.

12  Q.    So you're familiar with the layout of the house?

13  A.    Very familiar.

14  Q.    And you've mentioned an event when Samantha Bryant was

15  moaning, I believe you said?

16  A.    Yes.

17  Q.    And that was coming from the master bedroom; is that

18  correct?

19  A.    Correct.

20  Q.    Next to the master bedroom is the master bathroom; is

21  that correct?

22  A.    It's not next to it.  You walk in and there's the

23  bedroom with the windows, and then you walk a little bit and

24  there's a little path, like, to the left where the bathroom

25  was.
```

173

1   Q.   So is the bathroom essentially in the master bedroom?

2   A.   Technically speaking, no, but yes.

3   Q.   So it's connected by a wall?

4   A.   Correct.

5   Q.   To the master bedroom?

6   A.   Uh-huh.

7   Q.   And in that wall is a door; is that correct?

8   A.   Correct.

9   Q.   And when you said you heard Ms. Bryant moaning, you

10  concluded that Mr. Adleta and Ms. Bryant were having sex; is

11  that correct?

12  A.   Yes, I did.

13  Q.   But you didn't actually observe it; is that correct?

14  A.   That is correct.

15  Q.   Now, you say that there were children in the room; is

16  that correct?

17  A.   Yes.

18  Q.   But you didn't actually see the children in the master

19  bedroom; is that correct?

20  A.   That is correct.

21  Q.   Okay.  You don't know if they were actually in the

22  bathroom; is that correct?

23  A.   Correct.

24  Q.   Now, you requested in some way or another that Mr.

25  Adleta leave the bedroom; is that correct?

```
 1    A.   Yes, I did.

 2    Q.   And when he came out of the bedroom, he was actually

 3    clothed; is that correct?

 4    A.   That is correct.

 5    Q.   Okay.  So it's true that you don't really know whether

 6    Ms. Bryant and Mr. Adleta were having sex at that time; is

 7    that correct?

 8    A.   That is correct.

 9    Q.   Now, you've mentioned your divorce from Mr. Adleta?

10    A.   Uh-huh.

11    Q.   And there was many conversations between the two of you

12    in regards to your children; is that correct?

13    A.   Yes, sir.

14    Q.   In one of those conversations, if not many of those

15    conversations, Mr. Adleta threatened to call Child Protective

16    Services; is that correct?

17    A.   He -- he did not threaten several times.

18    Q.   Did he threaten at least one time?

19         MS. RIVERA MIRANDA:  Objection, Your Honor; it's

20    outside the scope and relevance.

21         THE COURT:  It's overruled.

22    A.   What are you referring to?

23    Q.   Well, there was many times where you discussed who the

24    children should spend their time with; is that correct?

25    A.   When -- I'm not understanding your question.
```

1    Q.    Okay.  Let me rephrase it.  In December you had a

2    conversation with Mr. Adleta and he was concerned about your

3    children; is that correct?

4    A.    I need a moment, please.

5    Q.    Sure.

6    A.    I -- I do not remember him threatening me with the Child

7    Protective Services.

8    Q.    Okay.  But he did make you aware that he was

9    concerned --

10   A.    No.

11   Q.    -- about -- not at all?

12   A.    Never.

13   Q.    Okay.

14   A.    To my knowledge, never.

15   Q.    You did have many conversations with him, though, about

16   who the children should spend their time with; is that

17   correct?

18   A.    Yes.

19   Q.    Can you describe for me the freckles that you were

20   referring to in the picture?

21   A.    Describe it in what way?

22   Q.    Can you tell me their location?

23   A.    They're on the hand, near the wrist area.

24   Q.    How many freckles?

25   A.    I don't know how many.

176

```
1    Q.    More than five?

2    A.    I'm not sure.

3    Q.    More than ten?

4    A.    I don't believe so.  Actually, can I say something off

5    of the hand?

6    Q.    There's no question pending.

7              THE COURT:  Just wait for a question, ma'am.

8              THE WITNESS:  Okay.

9              MR. BARK:  Thank you.

10             May I have a moment?

11             THE COURT:  Yes.

12   BY MR. BARK:

13   Q.    You knew Michael Dixon before you ever met Jonathan

14   Adleta; is that correct?

15   A.    Michael Dixon?

16   Q.    Yes.

17   A.    I did not know a Michael Dixon.

18   Q.    Excuse me.  Aaron Dixon?

19   A.    Yes.

20   Q.    Thank you.

21             MR. BARK:  No further questions, Your Honor.

22             THE COURT:  Any redirect?

23             MS. RIVERA MIRANDA:  Just one question.

24                    REDIRECT EXAMINATION

25   BY MS. RIVERA MIRANDA:
```

```
 1   Q.    When exactly was it you started sexually molesting your

 2   children?

 3   A.    Approximately March of 2012.

 4              MS. RIVERA MIRANDA:  Thank you.

 5              THE COURT:  You may step down.

 6              Call your next witness.

 7              MS. GABLE:  Samantha Bryant.

 8              THE COURT:  Is somebody retrieving Ms. Bryant?

 9              AGENT HYER:  Yes, sir.

10              MS. GABLE:  May I approach the witness stand?

11              THE COURT:  Yes.

12              MS. GABLE:  Thank you.

13              THE COURT:  Ms. Bryant, will you stand there by the

14   witness chair and raise your right hand please and be sworn.

15                        SAMANTHA BRYANT,

16   having been first duly sworn, was examined and testified as

17   follows:

18              THE COURT:  You can have a seat, and if you will,

19   pull that microphone close to you and speak directly into it,

20   please, ma'am.

21              THE COURTROOM DEPUTY:  Please state your name and

22   spell your last name.

23              THE WITNESS:  Samantha Bryant, B-r-y-a-n-t.

24              THE COURT:  You may inquire, Ms. Gable.

25                        DIRECT EXAMINATION
```

```
 1    BY MS. GABLE:

 2    Q.    Ms. Gable, how old are you today?

 3    A.    Twenty-three.

 4    Q.    And are you detained?

 5    A.    Yes.

 6    Q.    Are you currently detained?

 7    A.    Yes.

 8    Q.    And are you currently serving time in prison?

 9    A.    Yes.

10    Q.    What crimes are you serving time for?

11    A.    Sexual assault on a minor child and permitting sexual

12    assault on a minor child.

13    Q.    And what child did you sexually assault?

14    A.    M.

15    Q.    And who is M.?

16    A.    My daughter.

17    Q.    And what was the second count that you mentioned?

18    A.    Permitting sexual assault on a child.

19    Q.    I didn't hear the first word.

20    A.    Permitting sexual assault on a child.

21    Q.    And who was the child involved in that offense?

22    A.    M.

23    Q.    And who did you permit to sexually assault her?

24    A.    Jon.

25    Q.    Jon who?
```

```
 1   A.    Jon Adleta.

 2   Q.    Prior to your detention, did you attend college?

 3   A.    Some, yes.

 4   Q.    Where did you go to college?

 5   A.    Grayson County College and Paris Junior College.

 6   Q.    You mentioned you had a daughter.  How old is she?

 7   A.    She turned five in July.

 8   Q.    And when was her birth date?

 9   A.    XXXX.

10   Q.    You've mentioned that you have a son.  How old is he?

11   A.    Four.

12   Q.    And when is his birth date?

13   A.    XXXX.

14   Q.    You've mentioned Jon Adleta.  How do you know Jon

15   Adleta?

16   A.    He was my boyfriend.

17   Q.    Do you see him sitting in the courtroom today?

18   A.    Yes.

19   Q.    Can you describe what he's wearing and where he's

20   sitting?

21   A.    He's wearing a suit.  He's sitting over there.

22   Q.    What color is his suit?

23   A.    Black.

24   Q.    What is it?

25   A.    Black, I think.
```

1          MS. GABLE:  Your Honor, may the record reflect that

2     the witness that is identified Jon Adleta.

3          THE COURT:  Yes.

4     BY MS. GABLE:

5     Q.   When did you first meet the defendant, Jon Adleta?

6     A.   We started dating in April of 2012.

7     Q.   How did you meet him?

8     A.   Online.

9     Q.   And what website did you meet him on?

10    A.   Datehookup.com.

11    Q.   What is Datehookup.com?

12    A.   It's a dating website.

13    Q.   Do you create a profile on Datehookup.com?

14    A.   Yes.

15    Q.   And is that so others can see you to meet you?

16    A.   Yes.

17    Q.   Did you create a profile on Datehookup.com?

18    A.   Yes.

19    Q.   Did your profile include information about your

20    children?

21    A.   Yes.

22    Q.   What information did you include?

23    A.   Their names and their ages.

24    Q.   Did Mr. Adleta contact you on Datehookup.com?

25    A.   I don't remember who contacted who.

181

```
 1   Q.    Where were you first living when you met him on the

 2   website?

 3   A.    Commerce, Texas.

 4   Q.    And where was he living?

 5   A.    Richardson, Texas.

 6   Q.    Did you begin to date?

 7   A.    Yes.

 8   Q.    How long did you date?

 9   A.    I don't know.  I mean, since April.

10   Q.    At some point did you break up?

11   A.    Yeah.

12   Q.    When was that?

13   A.    Sometime during the summer.

14   Q.    Of what year?

15   A.    Of 2012.

16   Q.    Were you -- how did that happen?

17   A.    He sent me a text message saying that he didn't feel for

18   me what I felt for him.

19   Q.    Were you expecting that text message?

20   A.    No.

21   Q.    How did you feel when you received that text message?

22   A.    Hurt.

23   Q.    At some point did you get back together with him?

24   A.    Yeah.

25   Q.    When was that?
```

182

```
1    A.    About a month later.

2    Q.    So that would have been what?

3    A.    I can't -- it was sometime during the summer.  I don't

4    remember.

5    Q.    The summer of what year?

6    A.    2012.

7    Q.    When you broke up for that period of time, you said that

8    you were hurt.  Why were you hurt?

9    A.    Because he broke my heart.

10   Q.    Were you in love with him?

11   A.    Yes.

12   Q.    After you resumed your relationship with him in the

13   summer of 2012, did he make -- did he discuss with you any

14   plans for marriage?

15   A.    Yeah.  He -- well, he just said he wanted to marry me.

16   Q.    At this time where did the defendant live?

17   A.    Richardson.

18   Q.    What state?

19   A.    Texas.

20   Q.    And where did you live?

21   A.    Commerce, Texas.

22   Q.    How did you communicate with him?

23   A.    Text message, phone calls.

24   Q.    Did you Skype with him?

25   A.    Yeah.
```

1    Q.    At some point did the defendant talk to you about his

2    sexual interest in children?

3    A.    Yes.

4    Q.    What did he tell you?

5    A.    That he was into younger girls.

6    Q.    Did he tell you anything else?

7    A.    (No response.)

8    Q.    Did he tell you about any fantasies that he had?

9    A.    Yeah.

10   Q.    What did he tell you?

11   A.    He had a daddy-daughter fantasy.

12   Q.    Did he explain what that meant to you?

13   A.    No.   I mean, I kind of figured what it meant.

14   Q.    What did you understand that to mean?

15   A.    To mean that -- I don't know how to explain it.   I don't

16   know how to explain it.

17   Q.    Did Jonathan Adleta ever tell you that he was sexually

18   interested in your little girl?

19   A.    Yes.

20   Q.    When did he tell you this?

21   A.    Sometime after we got back together.

22   Q.    So sometime in the summer of 2012?

23   A.    Probably -- I think around the fall, I think.

24   Q.    Around the fall?

25   A.    (Witness nods head affirmatively.)

184

1    Q.    How old was your daughter at this time?

2    A.    She was four.

3    Q.    When you Skyped with the defendant, did he ever ask to

4    see your daughter?

5    A.    Yeah.

6    Q.    What did he ask you?

7    A.    Just to see her.

8    Q.    Did he ever ask you to see -- to display her naked?

9    A.    Yeah.

10   Q.    Did you do that?

11   A.    Yes.

12   Q.    Why did you do it?

13   A.    Because I loved him.

14   Q.    When you showed him your daughter naked over this Skype,

15   did you ever see him naked at the same time over Skype?

16   A.    Yes.

17   Q.    Did he ever do anything sexual?

18   A.    Yes.

19   Q.    What did he do?

20   A.    He masturbated.

21   Q.    How many times did this happen?

22   A.    I don't know.  A few.  I don't know.  I don't remember.

23   Q.    Did Jonathan Adleta ever tell you about the things that

24   he wanted to do to little girls?

25   A.    Yeah.

185

1   Q.   What did he tell you that he wanted to do?

2   A.   He just wanted to do stuff.  I mean --

3   Q.   Take a moment to collect yourself.

4            Let me ask you again, what did Mr. Adleta tell

5   you that he wanted to do to little girls?

6   A.   Sexual stuff.

7   Q.   Did he tell you the specific sexual things that he

8   wanted to do?

9   A.   Yeah.

10  Q.   What did he tell you?

11  A.   That -- that he wanted to masturbate on them.

12  Q.   What else?

13  A.   (No response.)

14  Q.   Ms. Bryant, did he ever tell you about wanting to have

15  oral sex with little girls?

16  A.   Yes.

17  Q.   Did the defendant every molest your daughter in your

18  presence?

19  A.   Yes.

20  Q.   How many times?

21  A.   A few.

22  Q.   Let me turn your attention to the fall of 2012.  Do you

23  recall Mr. Adleta coming to visit you at your home in Texas?

24  A.   Yes.

25  Q.   Was your daughter present?

1   A.   Yes.

2   Q.   What happened on that trip?

3   A.   He -- he played with himself looking at her and took

4   pictures.

5   Q.   Okay.  Ms. Bryant, where was your daughter?

6   A.   In her bed.

7   Q.   In her bedroom?

8   A.   Yes.

9   Q.   And what did the defendant do?

10  A.   He played with himself with her panties pulled down.

11  Q.   Did he put his penis next to her?  Did he put his penis

12  on her?

13  A.   Yes.

14  Q.   And what did you do while this was happening?

15  A.   I took pictures.

16  Q.   Why did you take the pictures?

17  A.   Just because.

18  Q.   Who asked you to take the pictures?

19  A.   Jon.

20  Q.   Ms. Bryant, I know this is tough.  You need to talk into

21  the microphone, okay?

22  A.   (No response.)

23  Q.   What did you use to take the pictures?

24  A.   A gray camera.

25  Q.   Whose camera was it?

1    A.    Jon gave it to me.

2              MS. GABLE:  May I approach, Your Honor?

3              THE COURT:  Yes.

4              MS. GABLE:  Thank you.

5    BY MS. GABLE:

6    Q.    I've shown you what's been admitted as Exhibit

7    Number 25.  Do you recognize Exhibit 25?

8    A.    Yes.

9    Q.    How do you recognize it?

10   A.    It's the camera Jon gave me.

11   Q.    Is that the camera that you used to take pictures of the

12   defendant --

13   A.    Yes.

14   Q.    -- molesting your girl?

15   A.    Yes.

16   Q.    Can you take a look at Government's Exhibit Numbers 16

17   and 17.

18              Before you take a look at those pictures, when

19   you took the pictures, what did you do with them?

20   A.    Uploaded them onto my computer.

21   Q.    Then what did you do with them?

22   A.    I e-mailed them.

23   Q.    Do you recall when you e-mailed them to him?

24   A.    I don't remember when.  I think October.

25   Q.    Okay.  And what was the e-mail account that you e-mailed

1    them to?

2    A.    JDAdleta@yahoo or @gmail, one of the two.

3    Q.    Were those Jonathan Adleta's e-mail accounts?

4    A.    Yes.

5    Q.    Can you look at Government Exhibit Number 16.  It's been

6    admitted.  What is Government Exhibit 16?

7    A.    A picture I took.

8    Q.    Who's in the picture?

9    A.    Jon and M.

10   Q.    And M. is your little girl?

11   A.    Yes.

12   Q.    Is that a picture that you took during the incident that

13   you just described in Texas in her bedroom?

14   A.    Yes.

15   Q.    There's some green in that picture.  What is that?

16   A.    Her sheets.

17   Q.    Of her bed?

18   A.    Yes.

19   Q.    Is your leg in that picture?

20   A.    Yes.

21   Q.    And why is your leg in that picture?  How were you next

22   to the child when that was happening?

23   A.    Because I had my knee on the bed so I could take a

24   picture.

25   Q.    Take a look at Government Exhibit Number 17, which has

1   been admitted into evidence.  Do you recognize Number 17?

2   A.   Yes.

3   Q.   And how do you recognize that?

4   A.   I took it.

5   Q.   And is that a picture that you took during the same

6   occasion when the defendant was molesting your daughter?

7   A.   Yes.

8   Q.   And, again, is she on her bed with green sheets?

9   A.   Yes.

10  Q.   What did you do with that picture?

11  A.   I uploaded it.

12  Q.   And then what did you do with it?

13  A.   And I e-mailed it.

14  Q.   Did the defendant ever ask you to perform sex acts on

15  your little girl?

16  A.   Yes.

17  Q.   Did you do that?

18  A.   Yes.

19  Q.   Why?

20  A.   Because he asked me to.

21  Q.   Where were you living at the time?

22  A.   Commerce.

23  Q.   In what state?

24  A.   Texas.

25  Q.   Did you take pictures of --

1    A.    Yes, I did.

2    Q.    Why did you take the pictures?

3    A.    To send them to him.

4    Q.    And did you send them to him?

5    A.    Yes.

6    Q.    How did you send them to him?

7    A.    E-mail.

8    Q.    Were you ever -- were you aware that the defendant had a

9    little girl?

10   A.    Yes.

11   Q.    Do you know what her name was?

12   A.    K.

13   Q.    Did he ever tell you about K. and his interest in K.?

14   A.    Yes.

15   Q.    What did he tell you?

16   A.    That he -- he had a daddy-daughter fantasy about her and

17   that he wanted to teach her things.

18   Q.    When did he tell you this?

19   A.    The fall of 2012.

20   Q.    When he told you that he wanted to teach her things,

21   what did you understand him to mean by that?

22   A.    Sexual things.

23   Q.    Did he mention any specific sexual things that he wanted

24   to teach her?

25   A.    I don't remember.

191

```
 1   Q.   Did he ever ask you to tell stories about K. and M.?

 2   A.   Yes.

 3   Q.   What kind of stories did he ask you to tell them?

 4   A.   Tell them sexual ones.

 5   Q.   What kind of sexual ones?

 6   A.   Like daddy-daughter ones.

 7   Q.   Did you do that?

 8   A.   Yes.

 9   Q.   Did you send him any of those stories?

10   A.   Yes.

11   Q.   If you will, take a look at what's been marked as

12   Government Exhibit Number 24.

13               I'm sorry.  I said the wrong exhibit number.

14   It's number 18.  Do you have that in front of you?

15   A.   Yes.

16   Q.   You do?

17   A.   Yes.

18   Q.   Okay.  If you'll look at Government Exhibit Number 18,

19   do you recognize Number 18?

20   A.   Yes.

21   Q.   How do you recognize Government Exhibit Number 18?

22   A.   Because I wrote it.

23   Q.   You wrote it?

24   A.   Yes.

25   Q.   And who did you send this to?
```

1    A.    Jon.

2    Q.    And what date did you send it to him?

3    A.    The 10th of November.

4    Q.    You'll have to repeat that.  I did not hear you.

5    A.    The 10th of November.

6    Q.    And is this an example of the kind of story that you

7    talked about with the two little girls?

8    A.    Yes.

9             MS. GABLE:  Your Honor, at this time I move for

10   admission of Government's Exhibit Number 18.

11            THE COURT:  Mr. Bark.

12            MR. BARK:  No objection.

13            THE COURT:  It'll be received.

14            MS. GABLE:  It's Government Number 18.

15            If we could, publish the exhibit, please.  Display

16   number 18.  If we could, just zero in on the very top,

17   please.

18            THE COURT:  Let me make sure.  Government's 18 is

19   the exhibit that was received?

20            MS. GABLE:  Yes.  Thank you, Your Honor.

21   BY MS. GABLE:

22   Q.    What is the subject?

23   A.    Story.

24   Q.    And it's from you?

25   A.    Yes.

193

1    Q.    And it's dated what?

2    A.    The 10th of November.

3    Q.    Of what year?

4    A.    2012.

5    Q.    And who is it sent to?

6    A.    Jonathan.

7    Q.    Just read the first line.

8    A.    (No response.)

9    Q.    Read the first line.

10   A.    "Baby, I want you to imagine M. in the bath with me, K.,

11   too.  We are rubbing soap all over each other."

12   Q.    Okay.

13              MS. GABLE:  You can take that down.

14   BY MS. GABLE:

15   Q.    How many stories did you write for the defendant like

16   this?

17   A.    I don't know.

18   Q.    And were these stories that he requested?

19   A.    Yes, some of them.

20              MR. BARK:  I'm sorry.  I couldn't hear that.

21   A.    Some of them.

22   Q.    Did the defendant ever comment to you about the sexual

23   attractiveness of your daughter and his daughter?

24   A.    Yes.

25   Q.    What did he tell you?

194

1    A.    He said that he was more attracted to M.

2    Q.    What else did he tell you?

3    A.    (No response.)

4    Q.    Did he use the word "attractive"?

5    A.    I don't remember what word he used.

6    Q.    All right.  I want to turn your attention to December of

7    2012, okay?  Did there come a time when you moved in with Jon

8    Adleta?

9    A.    Yes.

10   Q.    When was that?

11   A.    Around Christmas.

12   Q.    When -- where did you move -- where did he live at that

13   time?

14   A.    We just closed on a house in Glenpool.

15   Q.    Of what state?

16   A.    Oklahoma.

17   Q.    When did you close on the house?

18   A.    I think it was the 15th of December.

19   Q.    Of what year?

20   A.    2012.

21   Q.    When you moved into the home, did your children stay

22   with you at the home?

23   A.    Yes.

24   Q.    While at the home in Glenpool, Oklahoma, in -- I guess

25   it would have been after December 15th of 2012?

1    A.    (No response.)

2    Q.    Yes?

3    A.    Yes.

4    Q.    Let me just put a time frame on this.  Were you aware

5    that the defendant's children were coming to visit him in

6    December?

7    A.    Yes.

8    Q.    Did you know what date they were coming?

9    A.    I can't remember the exact date.

10    Q.    Was it before Christmas?

11    A.    Yes.

12    Q.    Okay.  Between that date and December 15th of 2012, did

13    you stay in the home with the defendant, Jonathan Adleta, and

14    your little girl?

15    A.    Yes.

16    Q.    Did there come a time during that stay that he molested

17    her?

18    A.    Yes.

19    Q.    What happened?

20    A.    He masturbated on her.

21    Q.    Where were you?

22    A.    In our bedroom.

23    Q.    And where was she?

24    A.    On our bed.

25    Q.    Where were you?

1    A.    I don't -- I think I was standing beside it.

2    Q.    And what did he do?

3    A.    He masturbated and ejaculated on her.

4    Q.    Did he ask you to do anything while that was happening?

5    A.    I recorded it.

6    Q.    Why did you record it?

7    A.    Because he asked me to.

8    Q.    What did you use to record that?

9    A.    I think it was his phone.

10   Q.    When he did that, did he rub his penis on her vagina?

11   A.    Yes.

12   Q.    Did the defendant ever ask you to role play with him

13   when you were having sex?

14   A.    Yes.

15   Q.    What did he ask you to do?

16   A.    I called him "Daddy."  He pretended I was one of the

17   kids or a baby-sitter or something.

18   Q.    Did he ask you to pretend like you were his little girl?

19   A.    Yes.

20   Q.    Did he ask you to pretend like you were your little

21   girl?

22   A.    Yes.

23   Q.    Did the activity that you engaged in, this role playing,

24   did it seem to intensify the days before his daughter

25   arrived?

1   A.   Yes.

2   Q.   In what way?

3   A.   We had sex a lot more.

4   Q.   And during this time did you role play?

5   A.   Some, yeah.

6   Q.   Role play that you were the kids?

7   A.   Yes.

8   Q.   I want to turn your attention now to December 23rd or

9   thereabouts of 2012.  Were you present at the home in

10  Glenpool, Oklahoma, when Sarah Adleta and her kids arrived?

11  A.   No.

12  Q.   Where were you?

13  A.   In Texas.

14  Q.   At some point did you go to the house in Glenpool?

15  A.   Yes.

16  Q.   When was that?

17  A.   Christmas day.

18  Q.   Of 2012?

19  A.   Yeah.

20  Q.   When you got there, when you went to the home, who was

21  there?

22  A.   I got there a few minutes before Sarah and Jon got back.

23  Q.   Did you have your children with you?

24  A.   Yes.

25  Q.   Both your little girl and your little boy?

1    A.    Yes.

2    Q.    So how many children were present in that house over the

3    Christmas holidays?

4    A.    Four.

5    Q.    Were they all under the age of five?

6    A.    Yes.

7    Q.    During the time that you were there, was there an

8    incident where Jon asked you to have sex while his little

9    girl was sleeping on the bed?

10   A.    Yes.

11   Q.    Can you tell the jury what happened?

12   A.    We had sex with K. laying on the bed.

13   Q.    And who else was in the room?

14   A.    M. and L.

15   Q.    And did Sarah Adleta say anything about that to you?

16   A.    Yes.  She got mad and came in and slammed the door.

17   Q.    After the kids left, did Jonathan Adleta tell you about

18   anything that he had done to K. while she was there?

19   A.    He said that K. put her mouth on his penis.

20   Q.    Did he say where this happened?

21   A.    In the shower.

22   Q.    And did he tell you what he did?

23   A.    That he ejaculated.

24   Q.    On her?

25   A.    I don't -- I don't know if it was -- I think, yes, on

1    her face.

2    Q.    While they were in the shower?

3    A.    Yes.

4    Q.    At this time when you were living in Glenpool, did the

5    defendant have a computer?

6    A.    Yes.

7    Q.    What kind of computer did he have?

8    A.    A laptop.

9    Q.    Did you ever see any pictures on his laptop computer?

10   A.    Yes.

11   Q.    Did you ever see any pictures of -- naked pictures of

12   his little girl on his computer?

13   A.    Yes.

14   Q.    Was she completely naked?

15   A.    Yes.

16   Q.    Did you observe after -- after Sarah Adleta left the

17   Glenpool home, did you observe Jonathan Adleta communicate

18   with Sarah Adleta?

19   A.    Yeah.  He Skyped with her and texted her some.

20   Q.    How often did you see that he spoke with her?

21   A.    He talked to her through text or phone every day.

22   Q.    I want to turn your attention to March of 2013.  Were

23   you present at the Glenpool home during the execution of a

24   federal search warrant?

25   A.    Yes.

1   Q.   What day was that?

2   A.   March 29th.

3   Q.   Of 2013?

4   A.   2013.

5   Q.   And at that time did you speak with agents?

6   A.   Yes.

7   Q.   And were you arrested at that time?

8   A.   Yes.

9   Q.   And were you arrested for the charges that you're in

10  custody on?

11  A.   Yes.

12  Q.   Did you plead guilty to those charges?

13  A.   Yes.

14  Q.   Were those charges in state court?

15  A.   Yes.

16  Q.   Prior to that incident, your arrest on March 29th of

17  2013, did you learn that Sarah Adleta had been arrested in

18  Florida?

19  A.   Yes.

20  Q.   How did you learn that?

21  A.   I -- D.C.F., I think is what it's called, called Jon and

22  let him know that she was arrested.

23  Q.   And were you present when that conversation happened?

24  A.   Yes.

25  Q.   Did the defendant talk to you about that?

```
1    A.    Yeah.

2    Q.    Did he ask you to do anything?

3    A.    No.

4    Q.    Did he ask you about pictures?

5    A.    Yes.

6    Q.    What did he ask you about that?

7    A.    If I had any pictures.

8    Q.    What kind of pictures did you understand him to mean?

9    A.    Like of the kids and stuff.

10   Q.    What kind of pictures of the kids and stuff?

11   A.    Sexual pictures of the kids.

12   Q.    And what did he ask you to do with those pictures, if

13   you had them?

14   A.    He just asked me if I had them and I said no.

15   Q.    Did you observe him -- after he learned that Sarah was

16   arrested, did you observe him deleting items off his

17   computer?

18   A.    Yes.

19   Q.    What did you see?

20   A.    He was trying to find out how to delete screen shots

21   and -- or something.

22   Q.    What did you see him do?

23   A.    He was looking online at how to delete them and then he

24   deleted some.

25   Q.    Did you see him do that?
```

1    A.    Yes.

2    Q.    Did he talk to you or did you have conversations about

3    destroying hard drives?

4    A.    Yes.

5    Q.    And in relation to what?

6    A.    To the pictures.

7    Q.    What pictures are you talking about?

8    A.    The sexual pictures of the kids.

9    Q.    When you say "the kids," who are you referring to?

10   A.    K. and M.

11   Q.    And this happened after D.C.F. notified him?

12   A.    Yes.

13           MS. GABLE:  I have nothing further, Your Honor.

14   Thank you.

15           THE COURT:  All right.  Ladies and gentlemen, we'll

16   take our afternoon break.  We'll be in recess until -- I

17   can't see that clock clearly.  It has a glare on it.  I can't

18   see it.

19           Let's come back at 25 after the hour and we'll pick

20   up with cross-examination of this witness.

21           (Jury not present at 3:10 p.m.)

22           THE COURT:  We'll be in recess until 3:25.

23           (Recess taken from 3:10 until 3:25 p.m.)

24           (Jury not present.)

25           THE COURT:  Are you ready to proceed, Mr. Bark?

```
 1              MR. BARK:  Yes, Your Honor.
 2              THE COURT:  All right.  Bring our jury back,
 3  please, Mr. Fiorenza.
 4              (Jury present at 3:27 a.m.)
 5              THE COURT:  Welcome back, ladies and gentlemen.
 6  Were y'all all able to follow my instructions not to begin
 7  discussing the case?
 8              (Affirmative responses.)
 9              THE COURT:  Thank you.
10              You may inquire, Mr. Bark.
11              MR. BARK:  Thank you, Your Honor.
12                        CROSS-EXAMINATION
13  BY MR. BARK:
14  Q.   Good afternoon.
15  A.   Good afternoon.
16  Q.   I know this is very difficult for you.  I'm going to try
17  to make it as quick as possible.
18  A.   Thank you.
19  Q.   You have seen Sarah Adleta use Jonathan Adleta's
20  computer in your presence; is that correct?
21  A.   Yes, I have.
22  Q.   And you and Mr. Adleta participated in many fantasies;
23  is that correct?
24  A.   Yes.
25  Q.   And there was times when you would ask him to call you
```

1   "Daddy" during sexual intercourse; is that correct?

2   A.   I didn't --

3   Q.   I'm sorry.  You would call him "Daddy" during sexual

4   intercourse?

5   A.   Yes.

6   Q.   And there were times when he asked you to stop doing

7   that; is that correct?

8   A.   Once or twice.

9   Q.   And he said, "I want the real Samantha;" is that

10  correct?

11  A.   Yes.

12  Q.   You guys broke up for a short period, correct?

13  A.   Yes.

14  Q.   During the breakup you started dating someone else; is

15  that correct?

16  A.   Yes.

17  Q.   Now, you actually enjoyed the fantasies; is that

18  correct?

19  A.   Yes.

20  Q.   And you've mentioned a time when Mr. Adleta's children

21  and your children were all in the bed while you were having

22  sexual intercourse, correct?

23  A.   No, not all of them were in the bed.  Just one.

24  Q.   Just one?

25  A.   K.

1    Q.    Just K.?

2    A.    Yes.

3    Q.    Okay.  Now, do you recall where the other children were?

4    A.    On the floor in the bedroom.

5    Q.    Okay.  Now, do you recall what time of day that was?

6    A.    It was, I know, after midnight.

7    Q.    After midnight.  Okay.  What time did the children

8    generally go to sleep?

9    A.    My kids normally went to bed -- I started laying them

10   down at 8:30.

11   Q.    8:30?

12   A.    Yes.

13   Q.    So this was well after 8:30; is that correct?

14   A.    Yes.

15   Q.    And you never observed Mr. Adleta ejaculate on K.; is

16   that correct?

17   A.    No.  I mean, yeah, that's correct.

18   Q.    It is correct?

19   A.    I'm sorry.

20   Q.    No problem.  Thank you.

21              MR. BARK:  May I have a moment?

22              THE COURT:  Yes.

23              MR. BARK:  Thank you.

24   BY MR. BARK:

25   Q.    Earlier you've mentioned something about Mr. Adleta

1    saying something to you about his penis being in K.'s mouth?

2    A.    Yes.

3    Q.    But you were really unclear as to whether you knew

4    exactly what he told you.  You don't recall today exactly

5    what he told you; is that correct?

6    A.    Not exactly, no.

7    Q.    Okay.  You're not sure if he said anything about

8    ejaculation at all?

9    A.    No.  He -- I remember him saying that he got off, is how

10   he put it.

11   Q.    Okay.  There was many things that you and he discussed

12   in fantasies that you did not do; is that correct?

13   A.    Yes.

14   Q.    And I don't have any further questions.

15              THE COURT:  Any redirect?

16                        REDIRECT EXAMINATION

17   BY MS. GABLE:

18   Q.    Ms. Bryant, how many times did you see Sarah Adleta at

19   Jonathan Adleta's home in Oklahoma?

20   A.    She was there for over a week.

21   Q.    And is that the trip in December?

22   A.    Yes.

23   Q.    Other than that, had you ever met her before?

24   A.    No.

25   Q.    Had you ever seen her before?

1   A.    No, not in person.

2   Q.    And had she ever been in Mr. Adleta's home, either in

3   Texas or Oklahoma, in your presence?

4   A.    No.

5   Q.    Thank you.

6           THE COURT:  You can step down, ma'am.

7           Call your next witness.

8           MS. RIVERA MIRANDA:  Diane Mathis, Your Honor.

9           Your Honor, may I approach the witness then just

10  to. . .

11          THE COURT:  Does Mr. Bark know what you have there?

12          Come on in, Ms. Mathis.  Come all the way down

13  front, please, and be sworn.  Come right over here, if you

14  would, please.

15          THE COURTROOM DEPUTY:  Please raise your right

16  hand.

17                        DIANE MATHIS,

18  having been first duly sworn, was examined and testified as

19  follows:

20          THE COURT:  Ms. Mathis, when you get settled in

21  there, if you will, pull that microphone close to you,

22  please, and speak directly into it.

23          THE COURTROOM DEPUTY:  Please state your name and

24  spell your last name.

25          THE WITNESS:  Diane Mathis, M-a-t-h-i-s.

 1          THE COURT:  You may inquire, Ms. Miranda.

 2          MS. RIVERA MIRANDA:  Thank you, Your Honor.  May I

 3  approach the witness?

 4          THE COURT:  Yes.

 5                    DIRECT EXAMINATION

 6  BY MS. RIVERA MIRANDA:

 7  Q.   Ma'am, can you please tell the Court where you work?

 8  A.   I work for U.S.A.A. Federal Savings Bank in San Antonio,

 9  Texas.

10  Q.   For how long have you worked with U.S.A.A.?

11  A.   Twenty-five years.

12  Q.   Okay.  And can you please tell the members of the jury

13  what is your title and your responsibility?

14  A.   Custodian of records specialist.  We process all

15  incoming information requests and subpoenas on behalf of the

16  bank.

17  Q.   For how long have you worked as a records custodian?

18  A.   For the past six years.

19  Q.   Can you please tell the members of the jury what are the

20  recordkeeping procedures or practices of U.S.A.A.?

21  A.   U.S.A.A. Federal Savings Bank maintains its records

22  electronically.

23  Q.   Okay.  Now, I'm going to ask you to please look at

24  Government Exhibit 7 for identification.  Do you recognize

25  it?

1    A.    Yes.

2    Q.    How do you recognize it?

3    A.    This is the cardholder information for Jonathan D.

4    Adleta.

5    Q.    Okay.  Is this a document that's created by U.S.A.A. in

6    the regular course of business?

7    A.    Yes.

8    Q.    And let me also ask you whether it is U.S.A.A.'s regular

9    practice to keep and maintain these records?

10   A.    Yes.

11   Q.    And was this record made at or near the time that this

12   debit account was generated?

13   A.    Yes.

14           MS. RIVERA MIRANDA:  Your Honor, we now move

15   Government Exhibit 7 for identification be admitted into

16   evidence.

17           MR. BARK:  No objection.

18           THE COURT:  It'll be received.  That's Number 7,

19   Government's 7?

20           MS. RIVERA MIRANDA:  Yes, Your Honor.  May we

21   publish it?

22           THE COURT:  Yes, you may.

23           MS. RIVERA MIRANDA:  That's Bates stamp 181.  Focus

24   on the top half.

25   BY MS. RIVERA MIRANDA:

1    Q.    Please describe to the members of the jury what

2    information is contained here.

3    A.    Yes.  It is the cardholder name, Jonathan D. Adleta; the

4    card number, which is the debit card number,

5    XXXXXXXXXXXX3558; the address on file, XXXX, Glenpool,

6    Oklahoma, 74033-3823.  It's an active card and it is a debit

7    card, and to the right of that is the customer's U.S.A.A.

8    member number.

9    Q.    And let me ask you whether this MasterCard, whether that

10   is linked to any account number?

11   A.    Yes.  The card is linked to checking account number

12   XXXX9040.

13   Q.    Okay.  Now, I'm going to ask you to take a look at

14   Government Exhibit 8.  Government Exhibit 8, do you recognize

15   it?

16   A.    Yes.

17   Q.    How do you recognize it?

18   A.    This is a monthly bank statement for U.S.A.A. Federal

19   Savings Bank account number XXXX9040, and the customer name

20   is Jonathan D. Adleta.

21   Q.    I'm sorry.  Go ahead.

22   A.    The statement is dated December 6, 2012.

23   Q.    And it's dated on December 12 (sic), 2012, you

24   indicated?

25   A.    December 6, 2012.

1    Q.    I'm sorry.  December 6.  And it pertains to transactions

2    that occur in which month?

3    A.    From the last month, from November 6, 2012, through

4    December 6, 2012.

5    Q.    Okay.  Is this document created by U.S.A.A. in the

6    regular course of business?

7    A.    Yes.

8    Q.    Okay.  Is this U.S.A.A.'s regular practice to keep

9    records like this one?

10   A.    Yes.

11   Q.    And was these document a record made at or near the time

12   that the transactions took place?

13   A.    Yes.

14           MS. RIVERA MIRANDA:  Your Honor, we move that

15   Government Exhibit 8 for identification be admitted into

16   evidence.

17           MR. BARK:  No objection.

18           THE COURT:  Government's 8 will be received.

19           MS. RIVERA MIRANDA:  May we publish it, Your Honor?

20           THE COURT:  Yes, you may.

21           MS. RIVERA MIRANDA:  And if we can go specifically

22   to Bates stamp 185.

23   BY MS. RIVERA MIRANDA:

24   Q.    Can you please tell the members of the jury what is

25   depicted here?

1    A.    Yes.  It is page four of the monthly statement, again,

2    for account number XXXX9040.  The customer is Jonathan D.

3    Adleta, and it's page four of the monthly statement dated

4    December 6, 2012.

5    Q.    Now, as to this area in the document, can you please

6    tell the members of the jury as to the first two lines, what

7    information is contained here?

8    A.    These are debits to the account.  The first line is

9    dated November 21st.  The transaction amount is $439.20.  It

10   is a debit card purchase dated November 17, 2012, to

11   American.

12   Q.    And the second line?

13   A.    It is a transaction dated November 21st in the amount of

14   $439.20.  It is a debit card purchase as of November 17,

15   2012, to American.

16   Q.    Okay.  And these dates that we see here, November 21st,

17   those are the dates the transaction is actually posted to the

18   account?

19   A.    That is correct.

20   Q.    Okay.  And November 17, 2012, what is that then?

21   A.    That is the date of the debit card purchase.

22   Q.    Okay.  In this case by whom?

23   A.    By the customer who -- Jonathan D. Adleta.

24   Q.    Thank you.

25            MS. RIVERA MIRANDA:  No further questions, Your

```
 1    Honor.

 2                THE COURT:  Cross-examination?

 3                MR. BARK:  No, Your Honor.

 4                THE COURT:  All right.  May this witness be

 5    excused?

 6                MS. RIVERA MIRANDA:  Yes, Your Honor.

 7                THE COURT:  All right.  Thank you, Ms. Mathis.  You

 8    can step down.  If you are under a subpoena, you are released

 9    from it.

10                THE WITNESS:  Thank you.

11                THE COURT:  Call your next witness.

12                MS. GABLE:  Sherry Wentz.

13                THE COURT:  Ms. Wentz, if you'll come all the way

14    to the front of the courtroom, my courtroom deputy will place

15    you under oath.

16                THE COURTROOM DEPUTY:  Please raise your right

17    hand.

18                         SHERRY WENTZ,

19    having been first duly sworn, was examined and testified as

20    follows:

21                THE COURTROOM DEPUTY:  Please take the witness

22    stand.

23                THE COURT:  Ms. Wentz, when you get settled in

24    there, if you will, pull the microphone up next to you and

25    speak directly into it.
```

```
 1              THE WITNESS:  Okay.

 2              THE COURTROOM DEPUTY:  Please state your name and

 3   spell your last name.

 4              THE WITNESS:  Sherry Wentz, W-e-n-t-z.

 5              THE COURT:  You may inquire, Ms. Gable.

 6              MS. GABLE:  Thank you, Your Honor.

 7                       DIRECT EXAMINATION

 8   BY MS. GABLE:

 9   Q.   Ms. Wentz, where do you work?

10   A.   American Airlines.

11   Q.   How long have you worked at American Airlines?

12   A.   Seventeen years.

13   Q.   What do you do there?

14   A.   I'm a compliance coordinator.

15   Q.   What do you do as a compliance coordinator?

16   A.   I do various internal audits with our policies and

17   procedures as well as deal with our external agencies such as

18   T.S.A., E.P.A., D.O.T.

19   Q.   Do you also serve as the airline's custodian of records?

20   A.   Yes.

21   Q.   Will you please take a look at Government Exhibit

22   Number 9.  It's in front of you.  Do you recognize Number 9?

23   A.   Yes.

24   Q.   How do you recognize this?

25   A.   In my day-to-day duties, when I do audits and things,
```

1    these are some of the different screen captions that I may

2    look at to be able to perform my audits and to find the

3    information that I'm looking for.

4    Q.    Are these records of American Airlines?

5    A.    Yes.

6    Q.    And what kind of records are these?

7    A.    On pages one and two, it's a screen caption of the

8    passenger's itinerary and what their ticket would appear as,

9    as far as the travel dates, fare bases and payment total; and

10   then the additional pages are copies of the entire

11   passenger's travel itinerary.

12   Q.    Are these records made in the ordinary course of

13   American Airlines' business?

14   A.    Yes.

15   Q.    Are they kept in the ordinary course of American

16   Airlines' business?

17   A.    Yes.

18   Q.    And are -- these records, do they reflect a regularly

19   business -- a regular business activity of American Airlines?

20   A.    Yes.

21   Q.    Were the records made at or near the events appearing on

22   them?

23   A.    Yes.

24           MS. GABLE:  At this time we move for the admission

25   of Government Exhibit Number 9.

1              MR. BARK:  No objection.

2              THE COURT:  Government's 9 will be received.

3              MS. GABLE:  189, please.

4    BY MS. GABLE:

5    Q.    Looking at 189, can you tell the members of the jury

6    were their tickets purchased for any individuals?

7    A.    On this particular page, there was a ticket for K.

8    Adleta.

9    Q.    Can you please tell the members of the grand jury (sic)

10   from where to where, the date of the destination and the

11   travel?

12   A.    Departing from Orlando, making a connection in Dallas to

13   Tulsa on the 23rd of December and then return travel from

14   Tulsa, connection in Dallas to Orlando on the 2nd of January.

15   Q.    What was the price of the tickets?

16   A.    $439.20.

17   Q.    And what date were the tickets purchased?

18   A.    The 17th of November, 2012.

19   Q.    Turning to 190, is there also a corresponding ticket for

20   Sarah Adleta?

21   A.    Yes.

22   Q.    Was it purchased on the same date?

23   A.    Yes.

24   Q.    And the travel is the same as you previously testified

25   for the other passenger?

1    A.    Yes.

2    Q.    Looking at the remaining records, Government Exhibit

3    Numbers 191 -- Government Exhibit Number 9, was the travel in

4    fact consummated in this case?

5    A.    Yes.

6    Q.    And how can you tell?

7    A.    On the page right in front of me, where it says, "Ticket

8    information," on lines four and five it shows that they had

9    checked bags and there's actually ticket transactions on

10   those two particular dates, the 23rd of December and the 2nd

11   of January.

12             Then, if you go to the next page, in the Remarks

13   information, it shows that they also checked baggage.

14   Q.    Thank you.

15             MS. GABLE:  I have no further questions.

16             THE COURT:  Cross-examination?

17             MR. BARK:  None, Your Honor.

18             THE COURT:  May this witness be excused?

19             MS. GABLE:  Yes, Your Honor.  Thank you.

20             THE COURT:  All right.

21             Thank you, Ms. Wentz.  You can step down.  If you

22   are under a subpoena, you are released from it.

23             THE WITNESS:  Thank you.

24             THE COURT:  Call your next witness.

25             MS. GABLE:  One moment, Your Honor.

```
 1              Your Honor, we'll call Ian Buchanan.

 2              THE COURT:  Mr. Buchanan, come all the way forward

 3   into the front of the courtroom, if you would, please, and my

 4   courtroom deputy standing, who is standing here to my right,

 5   will swear you in.

 6              THE COURTROOM DEPUTY:  Please raise your right

 7   hand.

 8                        IAN BUCHANAN,

 9   having been first duly sworn, was examined and testified as

10   follows:

11              THE COURTROOM DEPUTY:  Please state your name and

12   spell your last name.

13              THE WITNESS:  Ian Buchanan, B-u-c-h-a-n-a-n.

14              THE COURT:  You may inquire, Ms. Gable.

15              MS. GABLE:  Thank you, Your Honor.

16                    DIRECT EXAMINATION

17   BY MS. GABLE:

18   Q.   Agent Buchanan, where do you work?

19   A.   My primary employment is with the Broken Arrow Police

20   Department in Broken Arrow, Oklahoma.  It's a suburb of

21   Tulsa.

22   Q.   And where do you work?

23   A.   I'm assigned part time as a task force officer with the

24   F.B.I., also out of Tulsa.

25   Q.   How long have you been with the police department in
```

1    Oklahoma?

2    A.    I've been a police officer for 16 years.

3    Q.    And how long have you been assigned to the Innocent

4    Images Task Force?

5    A.    I've been assigned as a task force officer probably

6    around ten years.

7    Q.    What is the Innocent Images Task Force?

8    A.    The Innocent Images Task Force was created to combat the

9    online exploitation of children.

10   Q.    And what does the task force do?

11   A.    And we conduct online investigations.  We follow up on

12   leads sent by other agencies and other organizations relevant

13   to exploitation of children using the Internet, and we also

14   investigate trafficking of children for sex.

15   Q.    Have you received any training with respect to your role

16   as a task officer in the Innocent Images Task Force?

17   A.    Yes.

18   Q.    What kind of training have you had?

19   A.    As my primary assignment as a police officer with Broken

20   Arrow, I was assigned to the detective division where I

21   worked child crimes for a number of years and I received

22   training relevant to child abuse investigation, child sex

23   crimes investigations.  The F.B.I. has also sent me to a

24   number of schools across the nation as well as conferences

25   relevant to the online exploitation of children.

1    Q.    Have you participated in the execution of search

2    warrants as an F.B.I. Innocent Images officer?

3    A.    Yes.

4    Q.    And are you familiar with the way in which the F.B.I.

5    collects evidence and their collection procedures in general?

6    A.    Yes.

7    Q.    I want to turn your attention to March 29 of 2013.   Were

8    you working on that day?

9    A.    Yes.

10   Q.    What happened on that day?

11   A.    On that day a search warrant was executed at the

12   defendant's home in Glenpool, Oklahoma.

13   Q.    How did you become involved in that case?

14   A.    My counterpart, full-time F.B.I. agent, received a lead

15   that was shared with me from Orlando that indicated that

16   information had come in through Sarah Adleta that child

17   pornography had been produced at this residence in Glenpool,

18   Oklahoma.

19   Q.    And did you have a search warrant that a magistrate

20   signed to execute at the Glenpool home?

21   A.    Yes.

22   Q.    Did you also have an arrest warrant for Mr. Adleta?

23   A.    Yes.

24   Q.    And do you recall what the charge was in the arrest

25   warrant?

```
1    A.     I believe it was facilitating interstate travel with a

2    minor for sex.

3    Q.     Were you -- what was your role on this case?

4    A.     I was co-case agent on the case.

5    Q.     And as the co-case agent, is it your role to familiarize

6    yourself with all of the items that were seized from Mr.

7    Adleta's home?

8    A.     Yes.

9    Q.     Did you participate in the execution of the search

10   warrant on March 29, 2013?

11   A.     Yes.

12   Q.     I want to turn your attention to Government Exhibit

13   Number 21.

14            MS. GABLE:   But, Your Honor, I think I need a

15   moment to give those to the agent.

16            THE COURT:   Okay.

17   BY MS. GABLE:

18   Q.     Turning to Exhibit Number 21, do you have that in front

19   of you, sir?

20   A.     Yes.

21   Q.     Could you open it, please.

22            MS. GABLE:   Your Honor --

23   A.     I've got it.

24   Q.     Okay.  Do you recognize Government Exhibit Number 21?

25            MR. BARK:   Your Honor, can I just know what the
```

1    witness is looking at?

2             THE COURT:  Sure.  I'm sorry.  I thought you knew

3    what Exhibit 21 was.

4             Do you want to let Mr. --

5             MR. BARK:  May I approach the witness?

6             THE COURT:  You may approach, yes.

7             MR. BARK:  All right.  Your Honor, I do have an

8    objection to the document that the witness is looking at

9    while he testifies.  It's not the exhibit.  It's something

10   else besides that.

11            THE COURT:  All right.  Let's see whether or not

12   the witness is looking at anything.  I don't think there's a

13   question pending with respect to that.

14            Let me see you at side bar.

15            Let me see counsel over here, please.

16            (Bench conference as follows.)

17            THE COURT:  I'm at a disadvantage.  I don't know

18   what you're talking about.

19            MR. BARK:  I know.  This is what he's referring to.

20   It's not the same exhibit that the government provided.  I've

21   never seen it before now.

22            THE COURT:  This wasn't produced in discovery?

23            MR. BARK:  I don't believe it was.

24            MS. GABLE:  Your Honor, this is just the chain of

25   custody with the item.

```
 1              THE COURT:  Okay.  He probably doesn't need it.
 2   Why don't you just take it back.
 3              MS. GABLE:  Okay.  That's fine.  And for your
 4   information --
 5              THE COURT:  If he does need it, then let me know
 6   and we'll let him look at it.
 7              MS. GABLE:  Okay.  And the items that he's doing,
 8   you have pictures of all of them in your notebook.  They were
 9   things that he had seen at the --
10              THE COURT:  All right.
11              (In open court.)
12   BY MS. GABLE:
13   Q.    Do you recognize Government Exhibit Number 21?
14   A.    Yes.
15   Q.    How do you recognize it?
16   A.    This is a removable -- it's a Western Digital removable
17   hard drive that was located in the master bedroom of the home
18   in Glenpool, Oklahoma.
19   Q.    Is the hard drive in the same or similar condition as
20   when it was seized?
21   A.    Yes.
22   Q.    After it was seized, what was done with the item?
23   A.    They were -- the items were collected in the home.  They
24   were logged by an agent and then transported to the Tulsa
25   office and ultimately they were sent to the Orlando office.
```

```
 1            MS. GABLE:  At this time we move for the admission
 2   of Government Exhibit Number 21.
 3            THE COURT:  Mr. Bark.
 4            MR. BARK:  No objection, Your Honor.
 5            THE COURT:  21 will be received.
 6   BY MS. GABLE:
 7   Q.   If you will, take a look at Government Exhibit Number
 8   22.
 9            MS. GABLE:  May I approach, Your Honor?
10            THE COURT:  Yes.
11   BY MS. GABLE:
12   Q.   Do you recognize Government Exhibit Number 22?
13   A.   Yes.
14   Q.   What is Government Exhibit Number 22?
15   A.   It's a Sony VAIO laptop that was located and recovered
16   in the master bedroom of the home where we conducted the
17   search warrant in Glenpool.
18            MS. GABLE:  Your Honor, at this time I move for the
19   admission of Government Exhibit Number 22.
20            MR. BARK:  No objection.
21            THE COURT:  22 will be received.
22   BY MS. GABLE:
23   Q.   Do you recognize Government Exhibit Number 23?
24   A.   Yes.
25   Q.   How do you recognize Government Exhibit Number 23?
```

1    A.    This is a 120-gigabyte removable hard drive that was

2    located in the master bedroom closet of the home in Glenpool,

3    Oklahoma.

4          MS. GABLE:  Move for the admission of Government

5    Exhibit Number 23.

6          THE COURT:  Mr. Bark.

7          MR. BARK:  No objection.

8          THE COURT:  23 will be received.

9    BY MS. GABLE:

10   Q.    Finally, if you will, look at Government Exhibit Number

11   25.

12   A.    Yes.

13   Q.    Do you recognize Government Exhibit Number 25?

14   A.    Yes.

15   Q.    How do you recognize 25?

16   A.    This is a Casio digital camera that was located in the

17   master bedroom closet in the residence in Glenpool where the

18   search warrant was executed.

19         MS. GABLE:  At this time we move for the admission

20   of Government Exhibit Number 25.

21         MR. BARK:  I think it's already in evidence.

22         MS. GABLE:  Thank you.

23   BY MS. GABLE:

24   Q.    If you will, take a look finally at Government Exhibit

25   Number 1.  Do you recognize Government Exhibit Number 1?

1    A.    Yes.

2    Q.    How do you recognize it?

3    A.    This is, I guess, a green diary that was located in the

4    attic in a duffel bag of the residence in Glenpool, Oklahoma,

5    where the search warrant was executed.

6              MS. GABLE:  At this time we move for the admission

7    of Government Exhibit Number 1.

8              MR. BARK:  I object to relevance.

9              THE COURT:  Response?

10             MS. GABLE:  Your Honor, the diary is that of

11   Jonathan Adleta's.  It's been previously identified in this

12   case, and it contains numerous admissions of Mr. Adleta

13   relevant -- related to his daughter and his son.

14             THE COURT:  The objection is overruled.

15   Government's 1 will be received.

16             MS. GABLE:  Thank you, Your Honor.

17             May I publish, Your Honor?

18             THE COURT:  Yes.

19             MS. GABLE:  Thank you.

20             If we could, turn to 0231.

21   BY MS. GABLE:

22   Q.    Do you see 0231?

23   A.    Yes.

24   Q.    Can you read for the members of the jury what that says?

25   A.    At the top of the page it says, "O.E.F."  It says,

1    "Afghanistan.  May 5th, 2010, by Jonathan D. Adleta to be

2    given to Sarah J. Adleta, Matthew C. Adleta."

3              MS. GABLE:  233, please.

4    BY MS. GABLE:

5    Q.   Another page in the diary, can you please read what's

6    highlighted in yellow?

7    A.   "Talked to Sarah this morning and this afternoon, trying

8    to talk about a lot of stuff before she marries me, make sure

9    she is ready for me.

10             "Told her I was thinking about becoming a nudist

11   in the privacy of our home.  She didn't have a problem with

12   that.  Her concern was not wanting our kids being forced to

13   do something, which I agree, but she didn't have a problem

14   with us being nudists at home with the kids.

15             "We talked very little about what happens when

16   she is in her teens with me.  She said something about being

17   upset at first and then very, very little about boundaries.

18             "Then we talked about how we wanted to educate

19   the kids.  We both want to teach them.  Talked very little

20   about showing them.  We still have lots to talk about."

21             MS. GABLE:  235, please.

22   BY MS. GABLE:

23   Q.   Agent Buchanan, what is the date of this entry?

24   A.   10/6 of 2012.

25   Q.   This is military?

1   A.    So I guess it would be June 10th of 2012.

2   Q.    Can you please read it?

3   A.    The corresponding number in the upper right-hand corner

4   is D plus 38.  It says, "I've talked to Sarah a lot since

5   last night.  Sarah wants to do 15, 16, says it would be a lot

6   of fun.  We've talked about how much we're going to do with

7   the kids -- how much we're going to do with the kids there

8   and boundaries.

9           "Right now she's said nothing with the kids and

10  stop stuff when three, four.

11          "I've told her right now I don't want any

12  boundaries.  I want to keep diary stuff -- I want to keep

13  daily stuff --"

14  Q.    Is that "doing"?

15  A.    "I want to keep doing stuff in front of them.  I want to

16  be completely open with them.  Sarah said she wasn't

17  concerned.  It's something we still need to talk about it a

18  lot."

19          MS. GABLE:  Turn to 236, please.

20  BY MS. GABLE:

21  Q.    Agent Buchanan, can you please read this entry?

22  A.    "I really want to talk to Sarah more about F.M.S. and

23  F.M.C.  I don't know if I'm fucked up, but I think it would

24  have been really cool when I was younger and old couple did

25  stuff with me.  Also to be involved -- "

1              MS. GABLE:   237.

2    A.    "-- with family.   Not my parents, because they've never

3    been that good looking, but to be able to see people do it

4    and/or be involved with it would have been awesome.   To have

5    someone I could have as -- have asked anything or have them

6    show me stuff to be completely open.

7              "So, yeah, as of right now I want to be able to

8    do anything with Sarah in front of my kids, be able to show

9    the kids and let them be involved; but the number one thing

10   is I don't want them to get hurt, make them do anything they

11   don't want to do -- make them do anything they don't want to

12   do or for us to get in trouble."

13             MS. GABLE:   238, please, and the bottom part of

14   238.

15   A.    "You know I only feel close to someone if we're having

16   sex or doing sexual things.   Maybe that's why I want to be

17   completely open with the kids, be able to have sex in front

18   of them, to be able to tell them whatever, to be able to have

19   them involved.   I want to be able to teach them.

20             "Am I really fucked up?   K. learning how to give

21   a hand job or blow job on me, Sarah giving our son a hand job

22   or blow job, Sarah must think I'm crazy."

23             MS. GABLE:   239.   Just the top, please.   Just the

24   top.

25   A.    "Want to see Sarah teach our kids.   I want to be close

1    with them.  I want. . ."

2    Q.   That's all.  Thank you.

3            MS. GABLE:  243.  243.

4    BY MS. GABLE:

5    Q.   Agent Buchanan, what does that say?

6    A.   "Would it be weird if K. was giving me a hand job?  Yes,

7    I want to be open with kids and share and show them

8    everything, but it is bad that it's exciting to think about."

9    Q.   Is that "but it is," or, "is it"?

10   A.   Oh, "but is it bad that it's exciting to think about?"

11           MS. GABLE:  244, please.

12   BY MS. GABLE:

13   Q.   Agent Buchanan, what is the date of this diary entry?

14   A.   June 10, 2012.  10/6/17.  June 17th of 2010.  I'm sorry.

15   Q.   Can you please read what it says for the jury?

16   A.   "Just got off two-hour phone convo with Sarah.

17   Apparently she didn't clearly know what I was about, however

18   you say it.  I told her clearly, though.  She knows about my

19   fantasy with a 15, 16 and her.  She is fine with it and wants

20   to do it.

21           "I told her to think about it more and think how

22   we would find someone.  But the thing we talked about the

23   most was stuff with the kids.  Sarah is fine with doing

24   everything in front of the kids.  I made it clear that I want

25   to do stuff with the kids, like, K. giving me a hand job or

1    blow job and me and our son doing that.  I even told her

2    maybe even have sex with her.

3              "We're gonna talk about it more, but she knows

4    exactly where -- she knows exactly where I stand and she

5    seems to be fine with really wanting to marry me."

6              MS. GABLE:  245.  Starting just with the "we."  Do

7    you see the first "we," three lines down?  And the rest of

8    it.

9    BY MS. GABLE:

10   Q.   Agent Buchanan, can you read that for the jury?

11   A.   "We hashed out the whole kids being involved.  We're not

12   gonna encourage it until they get older; but if they happen

13   to talk about it or they -- or try to do something, we're not

14   gonna stop it.

15             "Sarah did say she doesn't want oral from him.

16   Sarah said she doesn't mind telling stories every now and

17   then about it."

18             MS. GABLE:  I need a moment, Your Honor.

19             THE COURT:  Okay.

20             MS. GABLE:  240, please, and if we could go to the

21   very top.

22   BY MS. GABLE:

23   Q.   Agent Buchanan, what is the date of this entry?

24   A.   June 15th, 2010.

25             MS. GABLE:  If we could, go to the bottom of the

1    page, please.

2    BY MS. GABLE:

3    Q.    Agent Buchanan, can you please read this for the jury?

4    A.    "Just talked to Sarah briefly.  I'm so excited.  I found

5    out what we're having.  She is two" -- or, "21 weeks."

6            MS. GABLE:  241, please.

7    A.    "Due on October 21st.  It gonna be a boy.  A boy."

8            MS. GABLE:  And the rest of the entry, please.

9    BY MS. GABLE:

10   Q.    Can you read this for the jury, Agent Buchanan?

11   A.    "I'm so excited to have a boy.  Sarah said tonight she

12   wants to do the nudism.  She still wants to be able to dress

13   K. up.

14            "I was, like, 'Yeah.  I hope you do.'  It's not

15   like we're going outside naked.

16            "Sarah also said she doesn't mind me showing our

17   boy techniques and stuff.  Also, she wants to be open and

18   still do stuff in front of the kids.  Didn't want to talk

19   about K.  We'll do that when I actually get the phone, but

20   she knows what I want and where I stand.

21            "I'm real excited.  We're getting married next

22   week.  I'm really happy about that.  I can't wait to be with

23   her.  It's extremely exciting to be able to share with the

24   kids."

25            MS. GABLE:  Back to 240, please.  Can we read the

 1    top of that, please.

 2    BY MS. GABLE:

 3    Q.    Can you read that, Agent Buchanan?

 4    A.    "Sarah should be finding out what the baby is today.

 5    That's exciting.   I don't get phone for another two days.

 6    Sarah and I need to talk.

 7                "Would it be weird if later on in life if the

 8    family was in the living room, all of us naked, watching a

 9    movie?   I got Sarah and K. snuggled up to me and our son

10    snuggled up to Sarah.   Sarah, shortly joined by K., start

11    playing with my dick.   The son starts playing with -- the son

12    starts playing with Sarah, and I'm feeling up K.   Then K.

13    goes down and starts sucking on me and Sarah starts on our

14    son.   We get their faces together and I jack our son off onto

15    their faces while the girls get me off on them.   I'm addicted

16    to sex."

17                MS. GABLE:   And, if we can, turn to page 248.

18    BY MS. GABLE:

19    Q.    What is the date of this entry?

20    A.    June 23rd, 2010.

21    Q.    Can you please read what is highlighted in yellow for

22    the members of the jury?

23    A.    "I might be getting married right now.   I'm pretty

24    excited about getting married.   I believe me and Sarah are on

25    the same page about things.   She's fine with doing stuff in

```
 1    front and with the kids."
 2              MS. GABLE:   Page 250.
 3    BY MS. GABLE:
 4    Q.    What is the date of this diary entry?
 5    A.    August 1st of 2010.
 6    Q.    Would you please read what's highlighted in yellow?
 7    A.    "What if I want to be K.'s first and if I want to give
 8    her a facial?"
 9              MS. GABLE:   Page 251.
10    BY MS. GABLE:
11    Q.    What is the date of this diary entry?
12    A.    August 2, 2010.
13    Q.    Please just read what's in yellow.
14    A.    "Me and Sarah still have lots to talk about.  She told a
15    story of when K. was ten and we hung out in the bath with --
16    hung out in the bath with us and then we get in bed and Sarah
17    showed her how to give a B.J.  It's really exciting thinking
18    about doing stuff with Sarah and the kids."
19    Q.    Thank you, Agent Buchanan.
20              MS. GABLE:   I have no further questions of this
21    witness.
22              THE COURT:   Cross-examination?
23              MS. GABLE:   One moment, Your Honor.
24                        CROSS-EXAMINATION
25    BY MR. BARK:
```

1   Q.    You've read the highlighted part.  What does the next

2   sentence say?

3   A.    "Am I really crazy?"

4   Q.    Thank you.

5          MR. BARK:  Then could you turn to page 232, please.

6   BY MR. BARK:

7   Q.    And starting at about the tenth line, the full sentence

8   there, could you start reading there?

9   A.    From the date line or from the dialogue?

10  Q.    From the time, ten down from there.

11  A.    Okay.

12  Q.    Starting from the top of what's there.

13  A.    "To turn back, they had intel about complex ambushes.  I

14  had the P.H. hold security and start clearing" maybe "road to

15  north.  I went up with one Marine and A.N.A. to check

16  S.I.M.I.  The brights (sic) were on the other side clearing

17  up.  So I was working with the A.N.A.  The Brits and the

18  Danish, NATO Commander Adleta.  Ha.

19          "Found out P.M. of Britain is coming to Afghan

20  today.  We did company V.C.P.s.  Of course, red was Q.R.F. on

21  Andy Hill.  Everyone saw combat but us."

22  Q.    Thank you.

23          MR. BARK:  I have no further questions.

24          THE COURT:  Any redirect?

25          MS. GABLE:  No, Your Honor.

```
 1              THE COURT:  All right.  Can the officer be excused?

 2              MS. GABLE:  Yes, Your Honor.

 3              THE COURT:  All right.

 4              You can step down, Officer Buchanan.  Thank you.

 5    If you're under a subpoena, you are released from it.

 6              I don't know if you're going to need these

 7    exhibits, Ms. Gable, for your next witness; but if you're

 8    not -- well, as long as they're out of the way over there.

 9              MS. GABLE:  That's fine.  It's the examiner.  So --

10              THE COURT:  Okay.  Call your next witness.

11              MS. GABLE:  Deb Healy.

12              THE COURT:  Ma'am, if you will, come over here and

13    be sworn, please.

14              THE COURTROOM DEPUTY:  Please raise your right

15    hand.

16                        DEBRA HEALY,

17    having been first duly sworn, was examined and testified as

18    follows:

19              THE COURTROOM DEPUTY:  Please take the witness

20    stand.  Please state your name and spell your last name.

21              THE WITNESS:  Debra Healy, H-e-a-l-y.

22              THE COURT:  You may inquire, Ms. Gable.

23              MS. GABLE:  Thank you.

24    BY MS. GABLE:

25    Q.   Agent Healy, please state your full name.
```

1    A.    Debra Healy.

2    Q.    Where do you work?

3    A.    I'm an investigator with the Seminole County Sheriff's

4    Office, currently assigned full time to the F.B.I. Innocent

5    Images Task Force.

6    Q.    How long have you worked at the Seminole County

7    Sheriff's Office?

8    A.    Since 2001.

9    Q.    And what is your official title there?

10   A.    I'm a computer forensic examiner.

11   Q.    What are your duties and responsibilities as a computer

12   forensic examiner?

13   A.    I examine all items of digital media for information or

14   data.

15   Q.    Can you give some examples of what digital media is?

16   A.    Digital media is anything that contains data:  Hard

17   drives, phones, tablets, thumb drives, CDs, DVDs.

18   Q.    You've mentioned a hard drive.  What is a hard drive?

19   A.    A hard drive is that item that's located inside of a

20   computer that holds data or information.

21   Q.    How long have you worked as a forensic computer

22   examiner?

23   A.    Since 2006.

24   Q.    You've mentioned had that you are currently assigned to

25   the F.B.I. task force.  What task force are you assigned to?

1    A.    The Innocent Images Task Force.

2    Q.    Is that here in Orlando?

3    A.    Yes, it is.

4    Q.    How long have you been assigned to that task force?

5    A.    Since 2010.

6    Q.    What is your role on the task force?

7    A.    I do all of the computer forensics digital analysis.

8    Q.    And what kind of investigations does the Innocent Images

9    Task Force handle?

10   A.    The exploitation of children, child pornography.

11   Q.    Have you had any special training in the area of child

12   exploitation investigations?

13   A.    Yes, I have.

14   Q.    What kind of training have you had?

15   A.    I've been to numerous trainings that allow me to

16   identify the presence of graphics of prepubescent children.

17   Q.    And why have you received that training?  How does that

18   impact your job?

19   A.    It allows me to go through and identify graphics or

20   movies of children that are believed to be under age,

21   prepubescent.

22   Q.    And that constitute child pornography?

23   A.    Yes.

24   Q.    Have you received any training as a computer forensic

25   examiner?

1    A.    Yes, I have.

2    Q.    What kind of training have you received?

3    A.    I've received numerous classes in beginning,

4    intermediate and advanced level classes.  I'm certified

5    through IACIS, which is an international association that's

6    accredited, that certifies most of the computer forensic

7    examiners that work in the field.

8    Q.    And what did you have to do to get your certification?

9    A.    The initial certification starts with a two-week class

10   and is then followed by a twelve-month period, in excess of a

11   thousand hours of both classroom, practical and written

12   examination to certify you in order to proceed from there to

13   go into the software certifications.

14   Q.    Have you -- well, how many forensic examinations have

15   you done?

16   A.    I've done in excess -- I'm sorry.  In excess of 320

17   individual examinations, which constitute over 1500 pieces of

18   media.

19   Q.    Have you testified as an expert in computer forensic

20   examination before?

21   A.    Yes, I have.

22   Q.    And have you testified in federal court?

23   A.    Yes, I have.

24          MS. GABLE:  At this time we move to qualify the

25   witness as an expert in computer forensic examination.

```
1              THE COURT:  Do you wish to voir dire, Mr. Bark?

2              MR. BARK:  No, Your Honor.

3              THE COURT:  All right.  The witness will be

4    permitted to offer opinion testimony in her area of

5    expertise.

6              MS. GABLE:  Thank you.

7    BY MS. GABLE:

8    Q.   Agent Healy, as part of your duties in this case, did

9    you examine any items?

10   A.   Yes, I did.

11   Q.   What items did you examine?

12   A.   I examined several pieces of items from Sarah Adleta's

13   residence as well as Jonathan Adleta's residence.

14             MS. GABLE:  One moment, Your Honor.

15             THE COURT:  Yes, ma'am.

16             MS. GABLE:  May I approach?

17             THE COURT:  Yes, you may.

18   BY MS. GABLE:

19   Q.   If you can, take a look at Government Exhibit Number

20   9 -- 19.  I'm sorry.  Number 19.  Do you recognize 19?

21   A.   Yes, I do.

22   Q.   How do you recognize it?

23   A.   It is the laptop from Sarah Adleta's residence.

24   Q.   Did you examine this item?

25   A.   Yes, I did.
```

241

1   Q.   Take a look at Government Exhibit Number 20.

2   A.   I'm sorry.  Where is 20?

3   Q.   It should be in front of you.

4            Do you recognize 20?

5   A.   Yes, I do.

6   Q.   And what is that?

7   A.   It's an iPhone, cellular telephone.

8   Q.   Did you conduct an examination of Exhibit 20?

9   A.   Yes, I did.

10  Q.   And Exhibit Number 21?

11  A.   Yes, I do.

12  Q.   Do you recognize -- how do you recognize 21?

13  A.   It was an exhibit that I examined.

14  Q.   What is it?

15  A.   It's a Western Digital Passport hard drive.

16  Q.   And how about Exhibit Number 22?

17  A.   Yes, I do.

18  Q.   How do you recognize 22?

19  A.   It was an exhibit that I examined.

20  Q.   What is it?

21  A.   It's a Sony VAIO laptop.

22  Q.   And Exhibit Number 23?

23  A.   Yes, I do.

24  Q.   What is Exhibit 23?

25  A.   It's an external hard drive with a SimpleTech case.

1   Q.    And did you examine it?

2   A.    Yes, I did.

3   Q.    Exhibits 21, 22 and 23 that you just looked at, the

4   Western Digital hard drive, the Sony VAIO laptop computer and

5   the Western Digital hard drive and the SimpleTech case, where

6   did you obtain those items?

7   A.    Those items were provided to me by Agent Hyer.

8   Q.    And do you know where they came from?

9   A.    Yes.  They were from Oklahoma, from the residence of

10  Jonathan Adleta.

11  Q.    Agent Healy, you've mentioned that you conducted

12  examinations of 19, 21, 22, 23 and 23.  What was the initial

13  step of your investigation of these items?

14  A.    The initial step is to verify chain of custody.

15  Q.    So then what did you do?

16  A.    Then digitally photograph all the items.

17  Q.    And after you did that, what did you do?

18  A.    After they're digitally photographed, then they are

19  removed and attached to a write-blocking device so that no

20  changes or alterations can be made to the original media.

21  Q.    What is a write-blocking device?

22  A.    It is a physical device that you attach to digital media

23  so that it cannot be written to, nothing can be added or

24  taken away from it.

25  Q.    After you attach them to the write-blocker, what did you

1    do?

2    A.    Then forensic software is then used to create a bit-by-

3    bit image or a copy of the digital media.

4    Q.    And why is it that you don't work on the original piece

5    of media?

6    A.    We never work on the original media because we don't

7    want to make any changes to it.  We want it to be in the same

8    state after that it was before.

9    Q.    When you make the copy of each piece of media, how do

10   you verify that you have an exact copy of the original?

11   A.    We use what's called a hash analysis or it's a

12   mathematical algorithm that is used to computate a hash value

13   for each piece of digital media.  That hash value is computed

14   before we make our image and then it's computed again after

15   we make the image to make sure that it's an exact copy.

16   Q.    And did you obtain the hash values for each of Exhibit

17   Numbers 19, 21, 22 and 23?

18   A.    Yes, I did.

19   Q.    So you verified that they were exact copies?

20   A.    Yes, I did.

21   Q.    After you copied the evidence, did you conduct an

22   examination of the items?

23   A.    Yes, I did.

24   Q.    How did you do that?

25   A.    We used forensic software, in this case EnCase.

1    Q.    And what is EnCase?

2    A.    EnCase is forensic software that allows us to go in and

3    look at the media.

4    Q.    Does EnCase in any way add data or information?

5    A.    No, it does not.

6    Q.    What does EnCase do?

7    A.    It allows us to look at, bookmark, and then export

8    certain pieces of information or data from a given exhibit.

9    Q.    Does it organize information that's on a hard drive?

10   A.    Yes.

11   Q.    And are you able to generate reports of the information

12   that's on the hard drive?

13   A.    Yes, we are.

14   Q.    Is EnCase used by other forensic examiners?

15   A.    Yes.

16   Q.    Are you aware of whether other state -- of whether other

17   state and federal agencies use EnCase?

18   A.    Yes.  It is one of the most prevalent pieces of software

19   that's been used.

20   Q.    Has EnCase been tested for its reliability and accuracy?

21        MR. BARK:  I object for lack of predicate of how

22   she would know this.

23        THE COURT:  The objection is overruled.

24   A.    Yes.

25   Q.    I want to talk about Exhibit Number 19, which is the

1    Toshiba laptop computer.

2    A.    Yes, ma'am.

3    Q.    Did you examine Exhibit Number 19, the Toshiba?

4    A.    Yes, I did.

5    Q.    Are you familiar with Skype?

6    A.    Yes, I am.

7    Q.    What is it?

8    A.    It is a video chat program.

9    Q.    And were you able to recover Skype communications off of

10   that computer?

11   A.    Yes, I was.

12   Q.    Looking at Exhibit Number 2, it's 170 -- it'll come up

13   on your computer?

14   A.    I'm sorry.

15   Q.    Is this one of the communications that you recovered?

16   A.    Yes, it is.

17   Q.    Looking at Government Exhibit Number 5, that's 211,

18   please.

19   A.    Yes, it is.

20           MS. GABLE:  Can we publish 212 of that exhibit.  If

21   you could, highlight line 747.

22           Can we make it bigger, please.  Thanks.

23   BY MS. GABLE:

24   Q.    Do you see this communication?

25   A.    Yes, I do.

1   Q.   And what is the date of it?

2   A.   On February 13th of 2013.

3   Q.   And is it the speaker Jon Adleta?

4   A.   Yes, it is.

5   Q.   Can you read for the jury what Mr. Adleta said there?

6   A.   "All you have to do is go to Tools, Options then

7   Privacy, and delete History."

8   Q.   Now, I notice that you didn't read the in quote and

9   quote.  Can you tell the members of the jury what that is?

10  A.   That is -- usually those are used with symbols.  When

11  you have something in -- an apostrophe, quotation marks,

12  it'll come up as a different symbol when it's logging the

13  chats.

14  Q.   Okay.

15          MS. GABLE:  Thank you.

16          Then Exhibit Number 6.  It's 178.

17  BY MS. GABLE:

18  Q.   Do you recognize Exhibit Number 6?

19  A.   Yes, I do.

20  Q.   And how do you recognize it?

21  A.   It's one of the chats.

22  Q.   And, again, if you could tell the members of the grand

23  (sic) jury how the chat comes out when you print it from the

24  computer.

25          THE COURT:  You said, "grand jury."

1          MS. GABLE:  I know.  I'm in grand jury today.

2    BY MS. GABLE:

3    Q.    On the left side of the column, do you see there's a

4    date?

5    A.    Yes.

6    Q.    What is that date?

7    A.    March 5, 2013.

8    Q.    And is that the date that the chat occurred?

9    A.    Yes.

10   Q.    And then the next column over, what is that?

11   A.    That would be the parties that are communicating.

12   Q.    So when it says, "Sarah Adleta," is that the speaker?

13   A.    Yes.

14   Q.    And when it says, "Jon Adleta," is that the speaker?

15   A.    Yes.

16   Q.    Thank you.

17          I want to turn to your examination of Exhibit

18   Number 23, the Western Digital SimpleTech case.

19   A.    Okay.

20   Q.    Did you recover any child pornography on that computer?

21   A.    Yes.

22   Q.    How many images of child pornography did you recover on

23   that -- I guess it's a hard drive?

24   A.    Seventy-seven.

25   Q.    Did I ask you to bring some of those representative

```
1    samples here today?

2    A.    Yes.

3    Q.    Do you have Exhibit Number 14 and 15 in front of you?

4              MS. GABLE:   May I approach, Your Honor?

5              THE COURT:   Yes.

6    A.    I don't believe so.

7    Q.    Agent Healy, I'm going to move on to another question.

8    A.    Okay.

9    Q.    Staying with Exhibit Number 23, the Western Digital hard

10   drive, if you will, take a look at Exhibit Numbers 14 and 15.

11             Do you recognize 14 and 15?

12   A.    Yes, I do.

13   Q.    How do you recognize those?

14   A.    They were graphics that were located on the hard drive.

15   Q.    Okay.

16             MS. GABLE:   At this time we move for the admission

17   of Government Exhibit Number 14 and 15.

18             THE COURT:   Mr. Bark.

19             MR. BARK:   Can I just get some clarity on which

20   hard drive she's referring to?

21             THE COURT:   The Western Digital hard drive, I think

22   is what she said.

23             MR. BARK:   I think there's two of them.

24             MS. GABLE:   Exhibit Number 23.

25             MR. BARK:   Okay.   No objection.
```

```
 1              THE COURT:  Those will be received, 14 and 15 for
 2   the government.
 3              MS. GABLE:  Thank you, Your Honor.  May we publish?
 4              THE COURT:  Yes.
 5              MS. GABLE:  204.
 6              Okay.
 7   BY MS. GABLE:
 8   Q.    Is Exhibit 14 an image that you recovered?
 9   A.    Yes, it is.
10   Q.    And is that representative of the images that you
11   recovered off of the hard drive?
12   A.    Yes, it is.
13   Q.    Do you have any indication who used that hard drive?
14   A.    The graphics is located inside of a folder.  No.  I'm
15   sorry.  That particular hard drive had, in addition to
16   graphics --
17              MR. BARK:  Objection; non-responsive to the
18   question.
19              THE COURT:  Start over again, Ms. Gable, and ask a
20   new question, please.
21              MS. GABLE:  Sure.
22   BY MS. RIVERA MIRANDA:
23   Q.    Exhibit Number 23 the Western Digital SimpleTech case
24   hard drive, during your examination of that hard drive, were
25   you able to ascertain who used that hard drive?
```

1    A.   Yes.

2    Q.   Who used it?

3    A.   Jonathan Adleta.

4    Q.   And how are you able to make that determination?

5    A.   There were numerous documents located on that hard drive

6    that were attributable to him.

7    Q.   Looking at Government Exhibit Number 14, are you able to

8    determine where that file resided on his hard drive?

9    A.   Yes.

10   Q.   Where?

11   A.   It was located within the Lost Files folder.

12   Q.   What is "Lost Files"?

13   A.   Lost files are basically files that have had the title

14   deleted.

15   Q.   And how about Exhibit Number 15?

16   A.   I believe it was located in the same location.

17   Q.   And, again, what is "Lost Files"?

18   A.   Lost Files are files that have had the title removed but

19   are recoverable.

20   Q.   And when you say "removed," what do you mean by that?

21   A.   Deleted.

22   Q.   And deletion, is that something that the user does?

23   A.   Yes.

24   Q.   Looking at Government Exhibit Number 14, there is some

25   information printed at the top of the exhibit.  What is that

```
 1   information?

 2   A.    Which information are you referring to?

 3   Q.    The written information.

 4   A.    September 16th of 2008.

 5   Q.    Exhibit 14?  Are you at 14?

 6             No, no, no.  Look at the exhibit itself.

 7   A.    Okay.

 8   Q.    Do you see where it says, "Name file created"?

 9   A.    Yes.

10   Q.    What is that?

11   A.    That would be the name that would be attributed to the

12   file, and the created time would be when it was created on

13   that piece of media, and the written time would be the last

14   time any modifications had been made to that file.

15   Q.    And then what is the full path?

16   A.    The full path, after the part -- up until the part where

17   it says C is the title that I've given it to identify what

18   piece of media it is, and then after C would be the path that

19   it was located at on the hard drive.

20   Q.    How is that report information generated?

21   A.    The report -- EnCase reports that information and pulls

22   it directly from the hard drive.

23   Q.    What was the full path of Exhibit Number 14?

24   A.    It was located in Lost Files, badULnotsogoodABCD and

25   then the number 7.jpeg.
```

252

1    Q.    Who puts the file path onto the picture?

2    A.    The file path is user identified.

3    Q.    Okay.  Exhibit Number 21, the Western Digital hard drive

4    that was recovered from Mr. Adleta's home, did you recover

5    any child pornography from this hard drive?

6    A.    Number 21?

7    Q.    Yes.

8    A.    Yes, I did.

9    Q.    What did you recover from this hard drive?

10   A.    There was a graphic on the hard drive of Sarah and J.

11         MS. GABLE:  Your Honor, may I approach, please?

12         THE COURT:  Yes.

13   BY MS. GABLE:

14   Q.    Do you recognize Government Exhibit Number 12?

15   A.    Yes, I do.

16   Q.    What is that?

17   A.    It's a picture of a prepubescent boy and an adult

18   female.

19   Q.    Do you recognize the female?

20   A.    I don't recognize it from the picture.  I'm sorry.

21   Q.    Exhibit 12 has already been admitted, but looking at

22   Exhibit Number 12, do you see that there's some writing on

23   this picture?

24   A.    Yes.

25   Q.    Did you print this picture out?

1    A.    Yes, I did.

2    Q.    What is the writing on the top of the picture?

3    A.    The name is the name that was given to it.  It's on the

4    computer.  The access created in written times, the modified

5    time, and then the path of where the picture was located at.

6    Q.    And when was this image first placed on the piece of

7    media?

8    A.    It was first placed on the media on November 10th of

9    2012.

10    Q.    And is there a file name associated with the image?

11    A.    Yes.

12    Q.    What is the file name?

13    A.    It's V_89D9.jpeg.

14    Q.    Take a look at Exhibit Number 22.  Exhibit Number 22 is

15    the Sony laptop.

16    A.    Okay.

17    Q.    Before we get to Exhibit Number 22, the Western Digital

18    hard drive that was Exhibit Number 21, during your

19    examination of that hard drive, did you have any -- were you

20    able to ascertain who used that hard drive?

21    A.    Yes.

22    Q.    And how are you able to do that?

23    A.    Again, there was documents located on it that had --

24    that indicated Jonathan Adleta.

25    Q.    Looking at Exhibit Number 22, the Sony laptop --

1    A.    Yes.

2    Q.    -- where was that found?

3    A.    Jonathan Adleta's residence.

4    Q.    During your examination were you able to find any

5    indication of who owned or used that laptop?

6    A.    Yes.

7    Q.    What was that?

8    A.    Again, there was indications of Jonathan Adleta using

9    it.

10   Q.    How are you able to ascertain that?

11   A.    There was documents and programs.

12   Q.    Did you find any child pornography on the laptop?

13   A.    Yes.

14   Q.    What did you find?

15   A.    I found a graphic of a prepubescent female and an adult

16   male.

17          MS. GABLE:  May I approach, Your Honor?

18          THE COURT:  Yes.

19   BY MS. GABLE:

20   Q.    Do you have Exhibit Number 13?

21   A.    I don't believe I do, ma'am.

22          MS. GABLE:  One moment, Your Honor.

23          May I approach?

24          THE COURT:  Yes.

25   BY MS. GABLE:

1    Q.    (Hands to witness.)

2    A.    Thank you.

3    Q.    Do you recognize Government Exhibit Number 13?

4    A.    Yes.

5    Q.    How do you recognize it?

6    A.    That's the graphic that was recovered from the hard

7    drive out of the computer.

8              MS. GABLE:  At this time we move for the admission

9    of Government Exhibit Number 13.

10             THE COURT:  Any objection, Mr. Bark?

11             MR. BARK:  No.

12             THE COURT:  13 will be received.

13             MS. GABLE:  May we publish, Your Honor?

14             THE COURT:  Yes.

15             MS. GABLE:  I believe it's 0202.

16             Okay.  You can take it off.

17   BY MS. GABLE:

18   Q.    Looking at Government Exhibit Number 13, did you create

19   a report associated with that picture?

20   A.    Yes.

21   Q.    And what is the report?

22   A.    It's a graphic report.

23   Q.    And when was -- what is the name of that file?

24   A.    Unallocated Clusters.

25   Q.    When was -- do you have any file creation date

1   information associated with that?

2   A.    There's no file created in association, but there was XF

3   data associated with the file.

4   Q.    You've mentioned that it was unallocated space?

5   A.    Correct.

6   Q.    What do you mean by "unallocated space"?

7   A.    "Unallocated space" is that area of a hard drive where

8   deleted data is contained.

9   Q.    How does data end up in unallocated space?

10  A.    If the file or folder has been deleted.

11  Q.    Are you able to recover videos that have been deleted?

12  A.    On occasion, yes.

13  Q.    Is it more difficult to obtain videos that were deleted?

14  A.    Yes.

15  Q.    Why is that?

16  A.    Because of the way the operating system writes to the

17  hard drive, video may be located throughout numerous areas of

18  a hard drive where a graphic would be located in one

19  location.

20  Q.    So what does that mean?

21  A.    It just means that it's much more difficult, a video

22  would span a much larger area, and we would have to have

23  indicators of where the different parts of the video was

24  stored.

25  Q.    Looking at this laptop, did you find anything unusual

```
1    about it during your examination?

2    A.    Yes, I did.

3    Q.    What did you find?

4    A.    The operating system had been re-installed on March 21st

5    of 2013.

6    Q.    What effect does the installation of the operating

7    system have on the existing files and folders contained on

8    the hard drive?

9    A.    It erases them.  It deletes them.

10   Q.    If the files and folders are deleted, does that mean

11   pictures and videos are deleted?

12   A.    Yes.

13   Q.    When was the operating system installed on the laptop?

14   A.    March 21st of 2013.

15   Q.    Do you know what date Sarah Adleta was arrested?

16   A.    I don't know the exact date.  I'm sorry.

17   Q.    Do you know if it was before March 21st of 2013?

18   A.    Yes, it was.

19   Q.    How do you know that?

20   A.    Because the evidence was received after she was

21   arrested.

22   Q.    And were you present when she was arrested?

23   A.    Yes, I was.

24   Q.    You've mentioned XF data.  Were you able to determine

25   what camera was used to take the picture?
```

1    A.    Yes.

2    Q.    How are you able to determine that?

3    A.    Because XF data is contained within the graphic itself;

4    and even if a graphic is deleted, it would still be

5    maintained within the graphic.

6    Q.    What is XF data?

7    A.    "XF data" is metadata that's written into the photograph

8    itself by the camera that's taking the picture.

9    Q.    If you will, take a look at Government Exhibit Number

10   13.  Did you print a report of the XF data associated with

11   that picture?

12   A.    Yes, I did.

13             MS. GABLE:  At this time we move for the admission

14   of the second page of Government Exhibit Number 13.

15             THE COURT:  Mr. Bark.

16             MR. BARK:  May I approach to see what it is?

17             That's what we don't have, right?

18             MS. GABLE:  You probably don't.

19             MR. BARK:  Can I approach to take a look at it?

20             THE COURT:  Yes.

21             MR. BARK:  Thank you.

22             No objection, Your Honor.

23             THE COURT:  13 will be received.

24             MS. GABLE:  Could we publish 0203, please.

25   BY MS. GABLE:

1    Q.    Is this a report of the XF data that was contained

2    within the picture?

3    A.    Yes, it is.

4    Q.    What date was this picture taken?

5    A.    The date is November 17th of 2012.

6    Q.    And what was used to take the picture?

7    A.    A Casio camera, model number EXZ750.

8    Q.    Do you see Exhibit Number 25 in front of you?

9    A.    Yes, I do.

10   Q.    Is the XF data consistent with that Casio camera?

11   A.    Yes, it is.

12   Q.    Was there -- during your examination of the various

13   pieces of digital media that you looked at, did you have any

14   indication of who owned that camera?

15   A.    Yes, I did.

16   Q.    What was your indication?

17   A.    The camera had been used throughout a period of time to

18   take graphics of Jonathan Adleta, Sarah Adleta and the

19   children.

20   Q.    If you look at Government Exhibit Number 20, it was the

21   Apple iPhone actually, did you examine the Apple iPhone?

22   A.    Yes, I did.

23   Q.    Can you describe the process?

24   A.    The process is we utilize a software and hardware

25   program by Cellebrite called a physical analyzer, which we

```
 1   connect to the iPhone, which then downloads all of the data

 2   contained in the iPhone and publishes it to a report.

 3   Q.    What does the Cellebrite actually extract?

 4   A.    It extracts all the files and folders that's on the

 5   phone itself.

 6   Q.    Does it extract text messages?

 7   A.    Yes, it does.

 8   Q.    In this case, were you able to extract text messages

 9   between Jonathan Adleta and Sarah Adleta off of the Apple

10   iPhone?

11   A.    Yes.

12   Q.    If you'll take a look at Government Exhibit Number 3,

13   it's 208, do you recognize that Exhibit Number 3?

14   A.    Yes, I do.

15   Q.    How do you recognize that?

16   A.    It's chats or text that was recovered.

17   Q.    Off of the Apple iPhone?

18   A.    Yes.

19   Q.    And Exhibit Number 4, 173, please, did you recover this

20   text message off of the Apple iPhone as well?

21   A.    Yes, I did.

22   Q.    Thank you.  I have no further questions.

23             THE COURT:  Cross-examination?

24                     CROSS-EXAMINATION

25   BY MR. BARK:
```

1    Q.    Good afternoon.

2    A.    Good afternoon.

3    Q.    So the date on the last -- Exhibit 13 that we were

4    looking at with the Casio camera --

5    A.    Yes.

6    Q.    -- the second page of that computer data, where does

7    that date come from?

8    A.    It comes from the camera itself.

9    Q.    Okay.  Now, the camera has to be set to a date; is that

10   correct?

11   A.    That is correct.

12   Q.    So whatever date the camera is set to is what will show

13   up on your information?

14   A.    That's correct.

15   Q.    So that's subject to whoever uses the camera and

16   manipulates the date?

17   A.    Yes, sir.

18   Q.    Operating systems on computers are formatted all the

19   time when people get viruses and are having trouble with

20   their computer; is that correct?

21   A.    That's correct.

22   Q.    So when a computer is running slowly or you're getting

23   pop-ups, that many people will reformat their operating

24   system; is that correct?

25   A.    They can, yes, sir.

1    Q.    Are you familiar with programs such as Go to My PC?

2    A.    Yes.

3    Q.    And that is a software program where you can access

4    someone else's computer from a distance; is that correct?

5    A.    That's correct.

6    Q.    Okay.  There's no way you could tell this jury whether

7    Aaron Dixon ever did that with these two computers; is that

8    correct?

9    A.    No, sir.

10   Q.    So you can't tell them one way or the other; is that

11   correct?

12   A.    No, sir.

13   Q.    You were referencing a Skype conversation at one point

14   and you said it was between Sarah Adleta and Jonathan Adleta;

15   is that correct?

16   A.    That's correct.

17   Q.    And the only way that you were able to make that

18   determination is by the names that were in the Skype

19   conversation; is that correct?

20   A.    That's correct.

21   Q.    You never went to Skype, the company, to see who

22   registered for those names; is that correct?

23   A.    No, sir, I did not.

24   Q.    And on most of the images that you were just shown,

25   you're unable to tell who actually put those on the computer;

1    is that correct?

2    A.    In regards to which images, sir?

3    Q.    Well, you said you came to the conclusion that Jonathan

4    Adleta, that was his computer based on documents, correct?

5    A.    Correct.

6    Q.    But you don't know for sure, just because there's

7    documents on the computer, that he then put everything else

8    on that computer?

9    A.    No, sir, I don't.

10   Q.    And that's because other users could use that computer;

11   is that correct?

12   A.    That's correct.

13   Q.    The computer wasn't even password protected, was it?

14   A.    I don't know at this time.

15   Q.    Now, there was a conversation about videos being

16   difficult to recover, correct?

17   A.    Correct.

18   Q.    But if a person has an iPhone with a video on it, you

19   would be able to recover that quite easily; is that correct?

20   A.    Not if it's been deleted.

21   Q.    Okay.  But if it's on the iPhone, you would be able to

22   do that; is that correct?

23   A.    Correct.

24   Q.    And the Skype conversation that you recovered, you

25   recovered that from the computer found at Sarah Adleta's

264

```
 1    house; is that correct?
 2    A.    That's correct.
 3    Q.    You did not find that in Jonathan Adleta's -- anything
 4    that came from Jonathan Adleta's home; is that correct?
 5    A.    Correct.
 6    Q.    In fact, you're unable to tell us who deleted the
 7    operating system; is that correct?
 8    A.    That's correct.
 9              MR. BARK:  May I have a moment?
10              THE COURT:  Yes.
11              MR. BARK:  Thank you.
12              I have no further questions.
13              THE COURT:  Redirect?
14                      REDIRECT EXAMINATION
15    BY MS. GABLE:
16    Q.    Agent Healy, did you conduct an examination of the Casio
17    camera?
18    A.    Yes.
19    Q.    Did you verify the time and date of the camera when you
20    received it?
21    A.    Yes.
22    Q.    And was it accurate?
23    A.    Yes.
24    Q.    Was it set properly?
25    A.    Yes.
```

1    Q.    Thank you.

2              THE COURT:  All right.  May this witness be

3    excused?

4              MS. GABLE:  Yes, Your Honor.

5              THE COURT:  All right.

6              Thank you, Agent.  You can step down.  If you're

7    under a subpoena, you are released from it.

8              Ladies and gentlemen, we are at a good stopping

9    point, I think, for the day.  It's been a long, full day, and

10   I appreciate your time and attention.

11             I'm going to remind you of what I have told you a

12   number of times.  I'm sure you're tired of hearing it, but

13   I'd be remiss if I didn't remind you every time you leave the

14   courtroom, at least as best I can recall to do it, and that

15   is you're not to discuss the case amongst yourselves or with

16   anyone else.

17             As I said before, I don't know whether there's any

18   media coverage about this.  I have seen some media folks in

19   and out of the courtroom while we've been in session.  So

20   it's possible that there may be.  So be vigilant about that.

21             I would encourage you not to look at the newspaper,

22   not to watch the news.  If you accidentally come across it,

23   immediately turn it off or look away from it.  I'm going to

24   ask you in the morning whether or not you've been able to

25   abide by my instructions, and I'm confident and hopeful that

1    you'll answer in the affirmative.

2              With that, I wish you a good evening and I look

3    forward to seeing you back here in the morning at 9:00.

4              (Jury not present at 5:00 p.m.)

5              THE COURT:  Y'all can be seated.

6              Ms. Miranda or Ms. Gable, what does your schedule

7    look like for tomorrow?

8              MS. GABLE:  We're resting, Your Honor.  We're

9    finished.

10             THE COURT:  Okay.  I'll give you the opportunity to

11   announce rest in the presence of the jury tomorrow morning

12   when they come in.

13             Mr. Bark, have you and your client discussed

14   whether or not he wishes to testify?

15             MR. BARK:  May I have a moment with him?  I may be

16   able to answer that very quickly.

17             THE COURT:  You don't have to tell me this moment.

18   You can tell me in the morning after you've had plenty of

19   time to talk with him about it.

20             If you want me to inquire after you've had an

21   opportunity to discuss it with him, I will.  I mean, if you

22   want to tell me now, if you're prepared to tell me now, we

23   can do it now.

24             MR. BARK:  If you can give me 45 seconds, I think I

25   can tell you.

1      THE COURT:  I'm happy to give you more than that if

2    you need it.  I was willing to give you overnight if you

3    wanted it.

4      MR. BARK:  I want to see if I can.

5      THE COURT:  Okay.

6      (Discussion off the record between Mr. Bark and the

7    defendant.)

8      MR. BARK:  Your Honor, we will not be putting on a

9    case at all.

10      THE COURT:  Okay.

11      What I would like to do is have you all come in in

12    the morning at -- well, maybe we can do it now.

13      What about jury instructions?  Would you like to do

14    that in the morning or are you prepared to do it now?

15      Mr. Bark, do you have a preference?

16      I guess my concern is I want to make sure that we

17    get them together so that we can immediately go into closings

18    in the morning and I'll have the jury instructions and you'll

19    know -- so that you can put your closing arguments together,

20    you'll know what the instructions are going to be.

21      I didn't think we had a lot of disagreement about

22    them.  The only thing that I can remember was that there was

23    at least a little disparity between whether or not we were

24    going to instruct on Oklahoma law or Florida law in terms of

25    the underlying criminal offense, and I know that -- at least

1    it struck me that -- I can't remember now which of you went

2    which way.

3         Does the government have a view on that?  Do you

4    remember, Ms. Gable, what you submitted?

5         MS. GABLE:  Your Honor, I think under Count One,

6    because it's a conspiracy between the two, that they should

7    be instructed on both states; and that then as to Count Two,

8    which is just the transportation to Oklahoma, they ought to

9    be instructed on Oklahoma law.

10        THE COURT:  Isn't the conspiracy to transport from

11   Florida to Oklahoma?

12        MS. GABLE:  And back again.  It's a continuing

13   conspiracy.

14        THE COURT:  I understand that part, but I'm

15   concerned about the underlying offense.  The underlying

16   offense, it seems to me -- I'm prepared to be persuaded

17   otherwise, but it seems to me the conspiracy that's been

18   established by the government, at least that the government

19   has offered proof on, is that the defendant entered into an

20   agreement with another individual to transport a minor child

21   from Florida to Oklahoma for the purpose of performing an

22   unlawful act, an act that would be unlawful in Oklahoma.

23        MS. GABLE:  That's correct, Your Honor.

24        THE COURT:  I'm not confident there's evidence, but

25   you can refresh my recollection, that the transportation of

1    the minor back from Oklahoma to Florida was with the intent

2    that an unlawful act be committed in Florida.

3              MS. GABLE:  Your Honor, the evidence is actually in

4    the chats and the Skypes and the way and the understanding

5    that these two individuals had with respect to this child and

6    that is that, you know, the expectation was that she was a

7    child to be molested by either of them and that her

8    transportation back and forth between Oklahoma and Florida

9    was -- there was intent that she would be molested.  This was

10   just a continuing conspiracy between the two of them.

11             THE COURT:  All right.  I'm with you.

12             Mr. Bark.

13             MR. BARK:  There's two things I want to bring up.

14   One is I would like to make a motion for judgment of

15   acquittal.

16             THE COURT:  Surely.

17             MR. BARK:  I can do that right now.

18             THE COURT:  Okay.  I'd be happy to hear you on

19   that.

20             MR. BARK:  And that leads into the jury

21   instructions as well, and the reason I say that is the way

22   the Indictment reads -- I can get it, but I'm going to try my

23   best to do it from memory -- is that there was an agreement

24   to transport minor victim one in interstate commerce for

25   sexual activity that is punishable by any criminal act, and

1    then the government cites to Oklahoma and Florida law after

2    that.

3              My concern is the vagueness of the Indictment and

4    the words "sexual activity" as to, one, there's been no

5    direction at this point from how we define "sexual activity."

6    And the federal system has defined sexual activity in one

7    way, and I will suggest it's not even defined well because

8    there's sexual acts, sexual conduct, and it's not clear

9    whether that all falls under sexual activity or only parts of

10   it fall under sexual activity.

11             So I would argue to the Court that due to the -- I

12   apologize, madam court reporter.

13             May I stand at the podium?

14             THE COURT:  Yes, please.

15             MR. BARK:  The Indictment -- it's not just the

16   Indictment.  It's the law itself is vague, and perhaps

17   constitutionally vague, in that there's nowhere that we are

18   informed of what is defined by "sexual activity."

19             Now, the impetus of that is highlighted in the fact

20   that the federal government seems to define it one way.

21   Oklahoma seems to define it another way, and Florida seems to

22   define it even another way.  So we have three different

23   definitions of what "sexual activity" is.

24             In my proposed jury instructions, I believe I

25   provided the definition of sexual acts from Chapter 109.

1    Actually, I also provided the definition of sexual acts for

2    the State of Florida.

3            I did not find one for the State of Oklahoma.  That

4    does not mean it does not exist.  I have limited access to

5    Oklahoma law, but I could not find one.

6            So I'm concerned that we aren't sure what the law

7    is and it's because of the vague nature; and based on that,

8    the government has not established what that definition is

9    for them to have even provided sufficient evidence to have

10   met that definition, and that is my -- that's the motion for

11   judgment of acquittal.

12           I'll then discuss the jury instructions.

13           THE COURT:  All right.  I'm going to deny your

14   motion for judgment of acquittal based on your argument that

15   the definition of "sexual activity" is not sufficiently well

16   defined in order to constitute an offense.

17           Do you want to talk about the jury instruction?

18           MR. BARK:  Yes.  For both substantive offenses, the

19   conspiracy and the -- the conspiracy to transport and the

20   transporting or the intent to transport, I have requested

21   that we define "sexual activity" under Chapter 109 of the

22   federal system.

23           If I can have a moment.

24           (High-pitched noise coming from sound system.)

25           MR. BARK:  All of a sudden I'm radio active.

1           That's found in Chapter 18, U.S.C.A. (sic), Section

2    2246, is the definition of sexual act through the federal

3    statutes.

4           I have not found the definition of "sexual

5    activity" in Oklahoma to provide to the Court, but I have

6    provided a very lengthy jury instruction that details all of

7    the definitions and allegations set forth, and would ask that

8    those be given.

9           THE COURT:  Do you want to be heard, Ms. Gable?

10          MS. RIVERA MIRANDA:  Your Honor, if I may, it would

11   appear that defendant's --

12          THE COURT:  I'm sorry.  Ms. Miranda.

13          MS. RIVERA MIRANDA:  That's fine.  That defendant's

14   motion for acquittal, I mean, is related again to his

15   argument that he's making now for this jury instruction,

16   basically limiting the scope of the applicability of 18,

17   U.S.C., Section 2423A.

18          When we read the statute, it is clear that Congress

19   meant it to be expansive by using the term "any sexual

20   activity for which any person can be charged with a criminal

21   offense."  Congress did not say, "A criminal offense in a

22   court of the United States."

23          And we know from other statutes, like, 18, U.S.C.,

24   Section 924(c), that require specifically that a crime of

25   violence that occur -- that could be proven in a court of the

1    United States.  That's not the case with this provision.

2           And there is case law, and not specifically

3    addressing this provision of the law, but the same identical

4    language in 18, U.S.C., Section 2422(a) and (b), identical

5    language, the enticement of a minor to commit any sexual

6    activity for which any person can be charged with a criminal

7    offense, that was interpreted in the case of U.S. versus

8    Panfil, and the citation is 338 F.3d 1299.  It's an Eleventh

9    Circuit case, the year 2003.  The court said those terms are

10   to be given their plain and ordinary meaning.

11          It was a similar allegation like the one that the

12   defense is making today that the statute is vague, and the

13   court said that these words are to be analyzed in the context

14   of their plain and ordinary meaning.

15          We know that the word "any" has an expansive

16   meaning.  The Supreme Court of the United States has already

17   said so.

18          So defendant's intent to basically limit the scope

19   of the definition in this case is completely unwarranted.

20   He's basically taking a provision as to what "sex act" is,

21   and that is defined in another section of the statute.

22   There's no cross-reference to that section of the statute,

23   and it's no -- there's no reason for that.  He has not

24   provided a legal basis for that.

25          There are other cases, from the First Circuit --

1    and we can provide the citations to the court -- the Ninth

2    Circuit, the Eighth Circuit that state the same, that in this

3    case the provision -- any sexual activity for which any

4    person can be charged with a criminal offense can be

5    interpreted to mean both state law and federal law.

6              THE COURT:  All right.

7              I'm going to take a look at this over the evening.

8    I would tell you, Mr. Bark, I'm not inclined to deviate from

9    the Eleventh Circuit's standard with respect to sexual

10   activity, which I think is less specific than you would like

11   for me to give; but I'm inclined to go with the Eleventh

12   Circuit's pattern instruction.

13             Also, in light of the government's theory of the

14   case that the conspiracy includes overt acts that occurred

15   both in Oklahoma and in Florida, I think the government's

16   position with respect to instructing on criminal activity in

17   both Florida and Oklahoma is likely the correct one.

18             I'm going to look at your proposed instructions

19   again just to make sure that once I read through them all and

20   do a little work this evening, that I'm still of that mind;

21   but I wanted to at least share my thinking with you in the

22   morning.

23             If we get together a little early in the morning,

24   before 9:00, I'll let you know if I'm otherwise inclined; but

25   assuming that I don't change my mind between now and then,

1    I'll have a set of instructions for you both that I would be

2    prepared to give, consistent with what I've just articulated

3    from the bench.

4              Anything you want to take up before we recess?

5              MS. GABLE:  No, Your Honor.  But I would request

6    the Court to just voir dire the defendant about his decision

7    not to testify.

8              THE COURT:  I'm not sure we're at that point, but,

9    yes, ma'am, I will do that.  Thank you.

10             MS. GABLE:  Thank you.

11             MR. BARK:  Your Honor, if I may point out one thing

12   about the jury instructions.

13             THE COURT:  Sure.

14             MR. BARK:  I give a detail -- (moved to the

15   microphone) I'll get better at that one day -- a detailed

16   recitation of what those laws are.

17             THE COURT:  I have this in front of me.  I'm

18   looking at it.  Thank you.

19             What do you want to do with respect to testifying?

20   Do you want to take the evening and talk with Mr. Adleta or

21   are you prepared to talk about it now?

22             MR. BARK:  If the Court wants to inquire now, I

23   have no issue with that.

24             THE COURT:  You haven't told me -- you did tell me

25   that the defense plans to put on no case.

```
 1              MR. BARK:  Yes.
 2              THE COURT:  My apologies.
 3              Mr. Adleta, would you stand, please, sir.
 4              THE DEFENDANT:  Yes, Your Honor.
 5              THE COURT:  Have you had an opportunity to talk
 6    with your lawyer about the pros and cons of testifying in
 7    connection with your case?
 8              THE DEFENDANT:  I have, Your Honor.
 9              THE COURT:  Have you reached a decision as to
10    whether or not you wish to testify?
11              THE DEFENDANT:  Yes, Your Honor.
12              THE COURT:  Do you wish to testify?
13              THE DEFENDANT:  No, Your Honor.
14              THE COURT:  Is that decision made of your own free
15    will?
16              THE DEFENDANT:  Yes, Your Honor.
17              THE COURT:  Have you had all the time that you need
18    to talk with Mr. Bark about the pluses and minuses of making
19    that decision?
20              THE DEFENDANT:  Yes, Your Honor.
21              THE COURT:  All right.
22              Does the government wish me to make any further
23    inquiry?
24              MS. GABLE:  No, Your Honor.
25              THE COURT:  All right.
```

1          Mr. Bark, are you satisfied with the inquiry?

2          MR. BARK:  Yes, Your Honor.

3          THE COURT:  All right.

4          Thank you, Mr. Adleta.

5          We'll be in recess then and I'll see you all

6     back -- I don't want you to get here too early, but if we

7     come -- how about this.  Let's get back together at 8:30 in

8     the morning.  We'll go through the jury instructions.  You

9     all -- it's always nice to have another set of eyes on them,

10    even after I've done them, just to make sure that there's not

11    something that you missed tonight that I missed in the

12    preparation of them, and then you all will be here and we'll

13    have that settled.

14         We'll bring the jury back in, tell them where we

15    are, give you an opportunity to rest in their presence, give

16    you an opportunity to rest in their presence, and we'll go

17    directly to closing arguments.  All right?

18         MS. GABLE:  Thank you, Your Honor.

19         THE COURT:  Thank you.  See you in the morning.

20         (Proceedings adjourned at 5:13 p.m.)

21         - - - - - - - -

22         Reporter's Certification
      I certify that the foregoing is a correct transcript from the
23    record of proceedings in the above-entitled matter.
                              s/Diane Peede, RMR, CRR
24                            Official Court Reporter
                              United States District Court
25    Date:  April 15, 2014    Middle District of Florida

                                        Diane Peede, RMR, CRR (407) 615-0305