1    IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF FLORIDA
2              ORLANDO DIVISION

3         Case no.:  6:13-cr-94-Orl-37GJK

4  UNITED STATES OF AMERICA,        )    Orlando, Florida
                                    )    September 12, 2013
5              Plaintiff,           )    8:28 a.m.
                                    )
6                  v.               )
                                    )
7  JONATHAN DANIEL ADLETA,          )
                                    )
8              Defendant.           )
   _____)

9

10

11

12          Transcript of the jury trial (day three)

13          before the Honorable Roy B. Dalton, Jr.

14             United States District Court Judge

15

16

   Appearances:
17
   Counsel for Plaintiff:  Karen Gable
18                          Ilyanis Rivera Miranda

19
   Counsel for Defendant:  Matthews Bark
20

21  Court Reporter:        Diane C. Peede, RMR, CRR
                           United States Courthouse
22                         401 West Central Blvd., #4600
                           Orlando, Florida  32801
23                         (407) 615-0305

24
   Proceedings recorded by mechanical stenography, transcript
25  produced by computer.

1                        Index of Transcript

2                                                        Page

3       Jury charge conference                            3

4

        Plaintiff and defense rest                        27

5

6       Closing arguments
        By Ms. Gable                                    28, 54

7       By Mr. Bark                                        43

8

        Jury charged by the Court                         57

9

10      Verdict                                           76

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **P R O C E E D I N G S**

2              (Jury not present.)

3              THE COURT:  Good morning.  My clerk is handing you

4     a copy of the proposed Court's instructions as well as a set

5     that is streamlined with all the headers stripped off of it.

6     If after we talk about it this morning we need to make any

7     changes, I can always do that; but these are in final form,

8     subject to you all having the last opportunity to persuade me

9     that I am making an error of some sort.

10              So we're back on the record in United States versus

11    Jonathan Adleta, case number 6:13-94.

12              I want to just summarize where I think we are.  Mr.

13    Bark, with respect to your requests, we did not talk last

14    evening about -- you had submitted a requested instruction

15    for a 404(b) instruction.  I don't know whether you continue

16    to want a 404(b) instruction.

17              MR. BARK:  I do, Your Honor.

18              THE COURT:  My view, subject to hearing from the

19    government, is that the 404(b) instruction -- I don't know

20    whether you want it or not, Ms. Gable.  In light of my ruling

21    on the previously submitted motion in limine by the

22    defendant, I mean, my view is that the uncharged conduct is

23    conduct that would be admissible under 413 and 414, and so

24    404 (b) is likely to be, in my judgment, confusing, telling

25    the jury that they can consider these prior acts for --

1    ordinarily, as you all both know, ordinarily prior bad

2    conduct is not admissible to show the propensity of the

3    defendant to commit the act that's charged in the Indictment.

4         However, the effect of 413 and 414 is to do exactly

5    the opposite and that is to make prior bad acts admissible

6    for purposes of showing that the defendant has a propensity

7    to do -- to commit the crimes and consequently that that

8    propensity may be considered in connection with the crime as

9    charged in the Indictment.

10        So it's my view that a 404(b) instruction doesn't

11   make sense, but I'm willing to be persuaded that I'm wrong if

12   the government wants to -- I don't know if you want it, Ms.

13   Gable.   I don't know if you want it or not.

14        MS. GABLE:   Your Honor, the government agrees with

15   the Court in this case, because, as I go through in my mind

16   and our motion, that all of the uncharged conduct, all of

17   that evidence that was introduced in this case was admissible

18   under 413 and 414, that there's nothing that was admissible

19   solely under 404(b), that I agree that it would confuse the

20   jury to tell them that they can only consider this evidence

21   for limited purposes since that is not the law under the

22   federal rules.   So I would ask the Court not to give that

23   instruction.

24        THE COURT:   All right.   That's how I see it.

25        Mr. Bark, I'm certainly willing to hear from you if

1    you want to argue why my assessment of 404(b) is wrong.

2            MR. BARK:  Your Honor, I'm just going to put this

3    on the record because I am conflicted with the point that the

4    Court makes, because I see the conflict between the two.

5            THE COURT:  I understand that you want to continue

6    to stand on your objection that you made in your motion in

7    limine that the evidence should not have come in in the first

8    place, and that's certainly preserved for the record; but in

9    view of the fact that I've ruled on that and the evidence has

10   come in, in my view, as I said -- I'm just repeating myself

11   now -- to instruct the jury with respect to 404(b) is likely

12   to cause problems that -- because I just don't think it's

13   applicable.

14           If we had a prior bad act that was not an act that

15   was admissible under the sexual misconduct involving minors

16   provisions of the evidence code, you know, so that -- for

17   instance, ordinarily drawing the inference that a defendant

18   has a propensity to commit criminal conduct which makes it

19   more likely that he or she committed the act charged in the

20   indictment is an impermissible inference.

21           However, under 413, 414 and 415, that is in fact

22   now a permissible inference, that an individual who has a

23   propensity to commit criminal conduct committed the acts that

24   are charged in the Indictment.

25           MR. BARK:  Your Honor, I think the issue is that

1    one of the elements that's required for the government to

2    prove is intent, and I believe 413 and 414 point to actual

3    conduct, that they have a propensity to commit the actual

4    conduct, not necessarily whether it proves the element of

5    intent, and that the 404(b) evidence is being used to satisfy

6    intent, which is one of the mimic requirements under 404(b).

7              THE COURT:  That's true when intent is in dispute,

8    which it is with a not-guilty verdict; but that's what makes

9    404(b) -- that's what makes prior similar conduct admissible

10   is that it's admissible on the question of intent, but you

11   have to instruct the jury that they're not to consider it

12   with respect to guilt.  That's not the case here.

13             They are entitled to consider that inference that

14   the defendant has a propensity to commit this conduct.  They

15   are indeed permitted to make that inference.  So I'm going to

16   not give the 404(b) instruction, over your objection.

17             The other thing that I took a look at last evening

18   was, Mr. Bark, your request that I give a more robust, for

19   lack of a better term, description of the term "illicit

20   sexual activity" or definition of "sexual act."

21             I think that the government's instructions with

22   respect to both the Florida law and the Oklahoma law

23   instructs the jury on all the essential elements of the state

24   law that the evidence would support the jury finding that the

25   defendant -- the evidence that has come in during the course

1    of the trial is all adequately covered in the government's

2    instructions on Oklahoma and Florida law.

3            Your request would have me instruct on all of the

4    elements of the -- not all of the elements -- all of the

5    various times of criminal conduct in Oklahoma and in Florida,

6    many of which there's been no evidence at all, and I don't

7    think that's appropriate.  I think it's likely to confuse the

8    jury.  If I give them instructions about Oklahoma law or

9    Florida law, that there's no evidence that implicates the

10   defendant in connection with that type of conduct.

11           So I think in order to avoid confusing the jury,

12   I'm going to give the government's requested instruction,

13   which I think is an accurate description of the law and I

14   think it covers all of the criminal conduct in both -- that's

15   unlawful in both Oklahoma and Florida, for which there is

16   evidence upon which the jury could find the defendant guilty

17   in this case.

18           So I'm going to overrule your requested instruction

19   that I include the entirety of the Oklahoma statute and the

20   Florida statute in the jury instructions.  I just wanted to

21   get that on the record and preserve your objection.

22           MR. BARK:  Your Honor, may I put one thing on the

23   record about the instruction as provided?

24           THE COURT:  Yes.

25           MR. BARK:  As to the third paragraph on proposed

jury instruction number eleven, it does say under Title 21,
Oklahoma statutes, it is a crime for a parent to sexually
abuse; and there's no definition of "sexually abuse" anywhere
for the jury to rely on.  So I would object to giving an
instruction without a definition of those terms.

THE COURT:  Okay.

MR. BARK:  As it also relates to that instruction,
the Florida component of it, there's no evidence -- this is
kind of -- I'm sorry to do this at this point -- a partial
motion for judgment of acquittal on that part of the crime
that's alleged, because there's no evidence that there was an
agreement between the parties to even send the child over to
Oklahoma at any point.  They were in discussions about it,
but there was never a finalized agreement.  So the Florida
law wouldn't apply to this case.

THE COURT:  Okay.  My view of the evidence is that
the government has sufficiently established an agreement
through the purchase of the airline ticket and the use of Mr.
Adleta's credit card to make those arrangements and the text
messages back and forth with respect to the transportation of
the minor child.  I'm going to deny your motion for judgment
of acquittal on that basis.

I previously denied your motion on the basis of
your argument which is similar to the argument that you make
with respect to the jury instruction, that sexual activity or

1    sexual abuse is insufficiently defined.

2         I think that takes care of all of the disputes that

3    we had over the instructions.  Let me take a quick look here

4    and see.

5         I think that's right.  So let's take a quick run

6    through what we have here and just make sure that there are

7    not any additional issues, Ms. Gable or Mr. Bark, that you

8    all want to raise or preserve for the record or talk to me

9    about.

10        The first instruction is the standard instruction

11   on duty to follow the instructions, presumption of innocence.

12   Any objection?

13        MS. GABLE:  None from the government, Your Honor.

14        MR. BARK:  No, Your Honor.

15        THE COURT:  Next is the definition of reasonable

16   doubt.  Any objection?

17        MS. GABLE:  None from the government.

18        MR. BARK:  No, Your Honor.

19        THE COURT:  Next is standard 4.3 on circumstantial

20   evidence and argument of counsel, consideration of the

21   evidence.  Any objection?

22        MS. GABLE:  No objection, Your Honor.

23        MR. BARK:  No objection.

24        THE COURT:  Next is standard instruction on

25   credibility of witnesses.  Any objection?

1          MS. GABLE:  No, Your Honor, not from the

2     government.

3          THE COURT:  Mr. Bark?

4          MR. BARK:  No, Your Honor.

5          THE COURT:  Next is -- I utilized 6.2.  I did take

6     a closer look at this.  I don't recall that we had any

7     impeachment by prior inconsistent statement; but in the

8     interest of completeness, I'll give this instruction, because

9     we did have two witnesses who testified who have felony

10    convictions, and I know that there was some cross-examination

11    with respect to the issue of whether or not there had been a

12    report or a threat to involve child protective services on

13    one of the witnesses.  So I think it's probably appropriate

14    to give this version of 6.2.

15         MS. GABLE:  No objection, Your Honor.

16         MR. BARK:  No objection.

17         THE COURT:  All right.  Next is standard

18    instruction on accomplice/co-defendant agreement.

19         MS. GABLE:  Can I have one moment, Your Honor?

20         THE COURT:  Yes.

21         I puzzled with this one myself.  I know that there

22    was some cross-examination of -- I guess it was Sarah Adleta

23    who had entered into a Plea Agreement.  I don't think there

24    was any testimony with respect to Sarah -- I'm drawing a

25    blank on her last name.

1          MS. GABLE:  Samantha Bryant.

2          THE COURT:  Bryant.  I don't think there was any

3     testimony elicited from Sarah (sic) Bryant that she had

4     entered a plea pursuant to a plea agreement.  I think she was

5     convicted on state charges in Oklahoma, if my memory is

6     correct.

7          MS. GABLE:  Yeah.  I guess from the government's

8     perspective, what I'm weighing here is that there was no --

9     there was no testimony whatsoever that she had a Plea

10    Agreement that provided for a more favorable or the

11    possibility of a more favorable sentence.

12         THE COURT:  Well, she certainly was not cross-

13    examined on that.  I do recall on direct examination I think

14    she was asked whether or not she had entered into a Plea

15    Agreement and the Plea Agreement required her to cooperate.

16         MS. GABLE:  I agree.  So I think for that reason,

17    which is my -- since the government brought that up, that we

18    should give in instruction.

19         THE COURT:  I think so, too.  I don't know if you

20    have a view on it, Mr. Bark, one way or the other.  I did

21    spend a little time on this last night because I had the same

22    concerns.  Then, as I recalled the testimony, I think the

23    testimony from Sarah Adleta that she had pled guilty pursuant

24    to a plea agreement and had a cooperation clause in her plea

25    agreement probably makes the giving of this instruction

1   appropriate.  So I'll give it.

2           Next is the standard instruction on expert

3   witnesses.

4           MS. GABLE:  No objection.

5           MR. BARK:  No objection.

6           THE COURT:  Next, standard instruction on the

7   definition of "knowingly" and "willfully."

8           MS. GABLE:  No objection.

9           MR. BARK:  No objection.

10          THE COURT:  Next is the standard cautionary

11  instruction not to consider punishment.

12          MS. GABLE:  No objection, Your Honor.

13          MR. BARK:  No objection.

14          THE COURT:  Next is the introductory instruction

15  into the substantive counts, describes what's charged in

16  Count One.

17          MS. GABLE:  No objection.

18          MR. BARK:  May I have one moment?

19          THE COURT:  Yes, sir.

20          MR. BARK:  No objection.

21          THE COURT:  Next is the -- by the way, throughout

22  the course of the instructions, I reference "Indictment."  I

23  think we're actually on a Superseding Indictment.  I'll take

24  a minute and explain to the jury that the Superseding

25  Indictment is the Indictment.  I don't have a specific

1    instruction on that, but just so that there's no -- I don't

2    think they'll be confused by it, but I just wanted to point

3    that out to you all.

4              MS. GABLE:  Or you could just include -- refer to

5    it as a Superseding Indictment in the jury instructions.

6              THE COURT:  Well, I can.  It's not in the written

7    ones that I have printed out for them.

8              MS. GABLE:  That's fine.  Thank you.

9              THE COURT:  But I can do that.  I can make that

10   change between now and then if you feel strongly about it,

11   Ms. Gable, if you think it's likely to be a source of

12   confusion.  It's just a matter of printing out some more

13   paper.

14             MS. GABLE:  No, Your Honor.

15             THE COURT:  I'll spend a few minutes explaining it

16   to them in a very vanilla way, that it's a Superseding

17   Indictment.

18             MS. GABLE:  Okay.

19             THE COURT:  The next one is proposed instruction

20   eleven, the substantive offense on the conspiracy count.

21   Other than the objections that you've previously lodged, Mr.

22   Bark, do you have any objection to what the Court has

23   proposed?

24             MR. BARK:  I have no additional objections.

25             THE COURT:  How about you, Ms. Gable?

1    MS. GABLE:  Your Honor, I would simply ask the

2    Court, as I read through the statute this morning, on page

3    twelve of the jury instruction, when describing the Florida

4    statutes and it says -- the third line from the bottom of

5    that paragraph, where it says, "It is a crime to commit lewd

6    and lascivious offenses or sexual battery of a person less

7    than 16 years of age, including oral or vaginal penetration,

8    masturbation in the presence of a 16 year old -- of a child

9    under the age of 16," is what I would ask to be included.

10    THE COURT:  Is that what's in 794.011 or 800.04?

11    MS. GABLE:  It's in 800.04, and specifically. . .

12    yes, Your Honor.  I knew I saw this this morning.  I'm so

13    sorry.

14    THE COURT:  That's all right.

15    MS. GABLE:  Under 800.047, it is a crime for a

16    person to intentionally masturbate in the presence of a

17    victim who is less than 16 years of age.

18    THE COURT:  Okay.  I'm trying to get that portion

19    of the statute up on my screen here.

20    MR. BARK:  Your Honor, I'll agree that the statute

21    says what Ms. Gable. . .

22    THE COURT:  All right.  I'm trying to get to the

23    language.  So you would want -- this sentence should be

24    modified to say, "It is a crime to commit lewd and lascivious

25    offenses or sexual battery of a person less than 16 years of

 1    age, including oral or vaginal penetration --" shouldn't it

 2    say, "vaginal penetration, masturbation and exposure of

 3    genitals in a lewd or lascivious manner in the presence of a

 4    victim who is less than 16 years of age"?

 5              MS. GABLE:  That's correct, Your Honor.

 6              THE COURT:  All right.  So after "manner," add "in

 7    the presence of a victim who is less than 16 years of age;"

 8    does that do it?

 9              MS. GABLE:  Yes.

10              THE COURT:  All right.

11              Mr. Bark, any objection to that?

12              MR. BARK:  I don't have an objection to the

13    wording, if that's the instruction the Court is going to

14    give.  I'm concerned that my prior objection to the

15    instruction was not clear with the Florida law and that this

16    instruction is going to be very confusing to the jury, and I

17    would ask the Court to allow me to expand upon that at this

18    time.

19              THE COURT:  Okay.  I'll hear from you.

20              MR. BARK:  The -- the original Indictment that we

21    had was transporting from Florida to Oklahoma with the intent

22    for the sexual act, and the government agreed that Oklahoma

23    law should apply under that transportation issue.

24              The Superseding Indictment that charges conspiracy

25    now charges dates between November of 2012 and March of 2013.

1   It is my understanding from that allegation that the

2   agreement that is being contemplated for that conspiracy --

3   it could be several different ones.  It could be the initial

4   agreement to send the minor child to Oklahoma, but then the

5   ongoing discussion afterwards about custody takes place after

6   December -- the holidays in December of 2012 to March of

7   2013.

8           One, that agreement was never finalized, and that's

9   the portion that I believe the government -- that portion of

10  time should include the Florida law.

11          The reason I'm concerned it's going to create

12  confusion is that the agreement to send the child over to

13  Oklahoma during the November period does not involve an

14  interpretation of Florida law.  I mean, it's not even in the

15  substantive jury instruction or allegation, and now we're

16  bringing it in through the conspiracy.

17          So the acts that are alleged to have occurred in

18  November are going to affect the jury's interpretation of

19  this time period and how they should apply Florida law to

20  that time period, and it's not clear to them how they should

21  do that, the way this instruction is being given.  That's why

22  I object to it, because I ultimately think it's going to

23  confuse the jury.

24          THE COURT:  Do you want to be heard, Ms. Gable?

25          MS. GABLE:  Yes, Your Honor.  It's not a confusion

1    for the jury.  That's the theory of the government's case.

2    This is an ongoing conspiracy between these two individuals,

3    Jon Adleta and Sarah Adleta, to transport their child in

4    interstate commerce with intent to engage in sexual activity.

5    This is how they parented, the agreement they came to, and it

6    was throughout their entire conversations, both before and

7    after, about any time that child was with them and was

8    transported across state lines, the expectation, the

9    understanding was that she would be sexually abused.

10           So the defendant confuses the idea of a conspiracy

11   with actually having to complete the object of the

12   conspiracy.  In other words, the fact that she was not then

13   again transported across state lines after she returned to

14   Florida does not affect whether or not these two individuals

15   had an agreement to transport her across state lines with

16   intent to she engage in sexual activity.

17           Indeed, when Jon Adleta allowed Sarah Adleta to

18   walk out of the door and return to Florida, knowing that she

19   was going to abuse this child, there was, you know, that

20   agreement.  It shows that they had an understanding, a

21   purpose:  That when she went across state lines, it would be

22   with intent that she would be abused.

23           THE COURT:  I'm going to stand by my prior ruling,

24   Mr. Bark.

25           Other than objecting to my ruling on the issue that

18

1   you've just addressed, you have no objection to the inclusion

2   of the language "in the presence of a victim less than 16

3   years of age;" is that correct?

4             MR. BARK:  That's correct.

5             THE COURT:  Okay.  All right.  We'll make that

6   change.  And I guess in view of the fact that I'll need to

7   rerun the instructions once they're stripped of headers to

8   add this language in, I'll also add back in "Superseding

9   Indictment," just so that issue is addressed.

10            Okay, Ryan?  Did you get that?

11            Okay.  The next instruction is proposed instruction

12  number twelve, which is the substantive offense on

13  transporting the minor child across state lines for sexual

14  activity.  Any objection to that?

15            MS. GABLE:  No objection from the government.

16            MR. BARK:  No objection.

17            THE COURT:  Okay.

18            Next is the standard aiding and abetting

19  instruction, Court's instruction number 13.

20            MS. GABLE:  No objection.

21            MR. BARK:  No objection.

22            THE COURT:  The next instruction, Court's number 14

23  is the technology instruction, for lack of a better term,

24  social media.

25            MS. GABLE:  No objection.

1              MR. BARK:  No objection, Your Honor.

2              THE COURT:  Next is Court's 15, on the duty to

3    deliberate.

4              MS. GABLE:  No objection.

5              MR. BARK:  No objection.

6              THE COURT:  Next is Court's instruction 16,

7    explaining the Verdict Form.

8              MS. GABLE:  No objection, Your Honor.

9              MR. BARK:  No objection.

10             THE COURT:  And the Verdict Form itself.  You all

11   take a look at the Verdict Form.

12             MS. GABLE:  No objection from the government.

13             MR. BARK:  No objection.

14             THE COURT:  Okay.  What I'll do then is while you

15   all are doing your closing arguments, I'll have my clerk

16   rerun the instructions that are going to be submitted back to

17   the jurors, and I'm not going to give you a new set of

18   instructions with headers, unless you want them; but I'll

19   give you a new set of the instructions without the headers

20   that will go back to the jury that will include the change

21   that we discussed with respect to the conspiracy charge and

22   will also add the words "Superseding Indictment" as opposed

23   to just Indictment, okay?

24             All right.  We'll be in recess.  You all let me

25   know when our jurors are here and ready.

```
 1                    Ms. Flick reminds me to ask you all about
 2       forfeiture.  Do you want the jury to consider forfeiture?
 3                    MS. GABLE:  No.
 4                    THE COURT:  You are not seeking forfeiture?
 5                    MS. GABLE:  That's correct.
 6                    THE COURT:  Okay.  All right.  Thank you very much.
 7                    We'll be in recess.
 8                    (Recess taken from 8:56 until 9:10 a.m.)
 9                    (Jury not present.)
10                    THE COURT:  Ms. Gable, will you be closing for the
11       government?
12                    MS. GABLE:  Yes, Your Honor.
13                    THE COURT:  How much time do you think you'll need?
14                    MS. GABLE:  Your Honor, I'll ask the Court for 30
15       minutes.
16                    THE COURT:  How about you, Mr. Bark?
17                    MR. BARK:  I'm going to ask for 45 minutes, in an
18       abundance of caution.  I don't believe I'll take all that
19       time.
20                    THE COURT:  I'm going to give you equal time.  I
21       can't imagine that either of you will need more than 30
22       minutes, but I will give you 45 minutes if you need it, Ms.
23       Gable.
24                    And then I'll give you 45 as well, Mr. Bark,
25       although I don't think there's anything about the case that
```

1    requires 45 minutes.

2            MR. BARK:  Your Honor, if I may address the jury

3    instructions for one moment?

4            THE COURT:  Okay.

5            MR. BARK:  By adding "in the presence of," the

6    Florida law has a definition of "in the presence," that "in

7    the presence" means that the person in the presence of is

8    aware of the conduct.  So I would ask for -- I'm sorry that

9    I'm just getting to this, but I would ask that that

10   definition be included, and in fact I just thought of it just

11   now.

12           THE COURT:  I'm not following you.  I'm sorry.  I

13   apologize.

14           MR. BARK:  Sure.  On proposed jury instruction

15   number eleven, the third paragraph, the last sentence, after

16   "in a lewd or lascivious manner," we're including "in the

17   presence of."

18           THE COURT:  Okay.  I'm with you.

19           MR. BARK:  Under Florida law, there's a definition

20   of what "in the presence of" means.  So, for instance, if you

21   commit conduct and a person is asleep and doesn't know that

22   it's occurred, under Florida law, that's not in the presence

23   of.

24           THE COURT:  What portion of the Florida law are you

25   referring to that defines "in the presence of"?

1        MR. BARK:  May I use my iPad to pull up a statute?

2        THE COURT:  Yes.

3        MR. BARK:  I'm waiting for the iPad to get a

4   connection to the Internet.

5        THE COURT:  Do you have the Court's WiFi password?

6        MR. BARK:  I do not.  There is a network that it's

7   searching for that says it does not require one.

8        THE COURT:  I mean, we have WiFi, but you have to

9   have the password.  Ms. Flick may be able to get it for you.

10        MR. BARK:  Thank you.

11        THE COURT:  Are you contending "in the presence of"

12   is defined in this Florida statute that describes unlawful

13   sexual conduct with a minor?

14        MR. BARK:  It's not in the statute.  It's through

15   case law that it's been interpreted, and I don't have the

16   Florida standard jury instructions with the definition of

17   "presence" in it with me; but through case law, it's been

18   developed that "in the presence of" means that the person is

19   aware.  It's not just that they're physically present.  They

20   have to be mentally present as well.

21        THE COURT:  I guess what I'm curious about is "in

22   the presence of" is already in the instruction.  We're not

23   adding something that you shouldn't have been anticipating.

24   It says "in the presence of a child" is part of the -- for

25   instance, that's part of the Oklahoma statute, ejaculating

1    upon or in the presence of a child.

2            Under Florida statute, it's a crime to commit lewd

3    and lascivious offenses or sexual battery of a person less

4    than 16 years of age, in the presence of a victim less than

5    16 years of age.

6            So, I mean, I'm puzzled as to why this is just now

7    coming up.

8            MR. BARK:  Well, under the Florida section, the "in

9    the presence of" was not there until this morning.

10            I don't have a definition for -- under Oklahoma.  I

11   only know under Florida state law that that is an issue.  I

12   did not know until that was just brought up this morning that

13   that part of "presence" was going to be in this instruction.

14            And I can't tell the Court that that definition

15   under Florida is the same definition as Oklahoma, but I can

16   tell the Court that the definition of "presence" in Florida

17   through state court has been defined as a person being

18   mentally present as well.

19            MS. GABLE:  Your Honor, I don't have the cases, but

20   I don't see how this is relevant to this case, because there

21   is no evidence that these children, child, was not awake;

22   and, in any event, I just have to prove the defendant's

23   intent to commit these things.  I don't have to prove that

24   they necessarily occurred.

25            It's just that in the course of this case, the

1    evidence showed that this defendant had the plan and the

2    intent to perform numerous sexual acts in front of his little

3    girl and on his little girl, including this particular sexual

4    act, and that he did.  So I'm not really sure where -- how

5    this actually affects anything or what the relevancy of that

6    is to this instruction.

7              THE COURT:  What do you say to that, Mr. Bark?

8              MR. BARK:  If the jury makes a factual finding that

9    Mr. Adleta committed certain sexual activity in a bedroom

10   with a child physically present and is not left with an

11   instruction that the child has to be mentally present and

12   aware as well, then Mr. Adleta would be wrongfully convicted

13   under the Florida portion of the law, because that is not

14   what Florida's interpretation of that law is.

15             So I think we would be in error not to provide that

16   definition of "presence" under Florida law for the jury, and

17   there's no evidence to contradict that Mr. Adleta's intent

18   may have been to commit this act while the minor children

19   were sleeping, but that should result in a not-guilty verdict

20   under the portion of Florida law.

21             MS. GABLE:  Your Honor.

22             THE COURT:  Yes, ma'am.

23             MS. GABLE:  May I be heard?

24             THE COURT:  Yes.

25             MS. GABLE:  The sexual act he's referring to

1   occurred in Oklahoma.  So Florida law is irrelevant to this.

2   It occurred in Oklahoma.  The evidence is that the child was

3   awake, in any event; but there's no indication under Oklahoma

4   law this is the law that this child needs to be aware.  In

5   fact, I think the Oklahoma law reads "in the presence of or

6   upon a child."

7              THE COURT:  It does say, "upon or in the presence

8   of."

9              What is the evidence, Mr. Bark, that you think

10  would be -- that would require a definition of "presence"

11  insofar as it relates to Mr. Adleta's asserted conduct or

12  alleged conduct in Oklahoma?

13             MR. BARK:  I'm not certain how to answer the

14  question, because the way we're instructing on this charge is

15  we're including all the laws for them to consider.

16             THE COURT:  Well, we're including the charges.

17  We're including all the law because of the government's

18  theory of the case that it's a conspiracy that extends from

19  Oklahoma to Florida; but insofar as it relates to Mr.

20  Adleta's conduct and the argument that you're making about a

21  need for a more robust definition of the term "in the

22  presence of," what conduct occurred in Oklahoma on the

23  evidence that the jury has for its consideration that would

24  make that instruction necessary?

25             MR. BARK:  I will have to say that as the way we're

```
1    giving the instructions thus far, I don't believe there is
2    anything; but then that would just lead back into my prior
3    objection that I've raised many times.  So I'll leave it at
4    that.
5            THE COURT:  All right.  I'm going to go with what
6    we have then.  I think the instructions adequately charge the
7    jury, and I think for all the reasons I've previously
8    expressed in the record, I'm going to go with the proposal
9    that I submitted to you previously, with the addition of the
10   language "in the presence of a victim less than 16 years of
11   age."
12           Are you ready to proceed with closing?
13           MS. GABLE:  Yes, Your Honor.
14           THE COURT:  Mr. Bark, are you ready to go?
15           MR. BARK:  Yes.
16           THE COURT:  All right.  Let's bring our jury back,
17   please, Mr. Fiorenza.
18           (Jury present at 9:23 a.m.)
19           THE COURT:  Welcome back, ladies and gentlemen.
20   Were all of you able to follow my instructions not to begin
21   discussing the case either amongst yourselves or with anyone
22   else?
23           (Affirmative responses.)
24           THE COURT:  Were all of you able to avoid seeing,
25   reading, hearing anything about the case during your
```

 1    overnight stay?

 2                (Affirmative responses.)

 3                THE COURT:  I apologize for getting started a

 4    little late, but I have what I think will be some good news

 5    for you.  I think that we have concluded the presentation of

 6    the evidence portion of the case.  I'm going to check with

 7    the lawyers and ask them whether or not they have anything

 8    further or whether they want to announce that they rest.

 9                If things are as I expect they are, then we'll be

10    ready to proceed directly into closing arguments and then

11    I'll give you your instructions on the law and you'll be

12    ready to retire and deliberate.

13                Anything further from the United States, Ms. Gable?

14                MS. GABLE:  No, Your Honor.  At this time the

15    government rests.

16                THE COURT:  All right.

17                Mr. Bark, anything further from the defense?

18                MR. BARK:  The defense rests, Your Honor.

19                THE COURT:  Thank you, Mr. Bark.

20                Ladies and gentlemen, at this time the lawyers will

21    have an opportunity to make their closing arguments to you.

22    As I've mentioned to you a number of times, what the lawyers

23    said in their opening statements and what they're about to

24    say to you in their closing arguments is not evidence.  It's

25    not to be considered by you as evidence.  However, it is

1  intended to try to help you understand at least their view of

2  the evidence and how it relates to the charges that are

3  contained in the Indictment.  So I would ask that you give

4  them your close attention.

5          I will tell you that neither of these lawyers would

6  intentionally mislead you in any way; but if you have a

7  different recollection of the evidence other than -- that

8  differs from the recollection of either of the lawyers,

9  obviously, you rely upon your own recollection of the

10  evidence.

11          With that, Ms. Gable, if you're ready, the

12  government may proceed.

13          MS. GABLE:  Yes, Your Honor.  Thank you.

14          Your Honor, defense counsel.

15          Good morning, ladies and gentlemen of the jury.

16  Before I begin my closing remarks, I just want to thank you

17  for your service.  This has been a short trial, but it has

18  been an intense one.  The evidence has been disturbing.  It

19  has been horrific, and all of the parties in the case have

20  observed how you have been paying such close attention to the

21  testimony that was presented yesterday and to the exhibits

22  that were introduced and shown to you.

23          So, on behalf of the United States, I want to thank

24  you for your service and for paying such close attention to

25  all of the evidence in the case.

 1          What has the government proven in this case?  The

 2    defendant, Jon Adleta, he's a pedophile.  He is a man who was

 3    sexually interested in children, a man who had a daddy-

 4    daughter fantasy, a perverted daddy-daughter fantasy, a man

 5    who realized that fantasy and turned that fantasy into a

 6    reality in March of 2009 when his little girl, victim one in

 7    the Indictment, was born.

 8          The evidence has proven that the defendant, along

 9    with his partner in crime, Sarah Adleta, agreed and caused

10    the transportation of his little girl in interstate commerce

11    with the intent to sexually abuse her.

12          Now, the defendant for his conduct has been charged

13    in two counts in this Indictment.  The first count charges

14    him with a conspiracy, conspiring with Sarah Adleta to

15    transport minor victim one in interstate commerce with intent

16    to sexually abuse her.  So what is charged in Count One is

17    the conspiracy, the agreement to do that.

18          What is charged in Count Two is what we call a

19    substantive offense.  It is the actual act of causing the

20    transportation of this little girl in interstate commerce

21    with the intent to engage in sexual activity.

22          The Court will instruct you as to the elements of

23    the offense, but I'm going to go through with you the

24    elements and explain to you how all of the evidence that you

25    heard yesterday proves beyond a reasonable doubt each and

 1    every one of the elements of those crimes.  So we'll begin

 2    with Count Two, which is the actual causing of the

 3    transportation in interstate commerce.

 4         As the Court will instruct you, the first element

 5    of that offense is that this little girl was transported in

 6    interstate commerce, and there is no doubt as to that.  You

 7    heard the testimony of Sarah Adleta as well as Samantha

 8    Bryant and saw the pictures, which are Exhibits 10 and 11, of

 9    those children being in Oklahoma.

10         You heard from the bank custodian as well as the

11    custodian from American Airlines that in fact that child was

12    transported from Florida to Oklahoma and back in December of

13    2012, as charged in the Indictment.

14         In addition, the evidence is that the defendant

15    caused that transportation, and we know that because he paid

16    for the plane ticket.  That's what he did.  He caused her

17    transportation by agreeing with Sarah Adleta, telling Sarah

18    Adleta that he wanted those children to come out to Oklahoma,

19    telling Sarah Adleta the reason why, which was to molest the

20    little girl, and by paying for the plane ticket.  We know

21    that he did because you saw the bank records and the

22    defendant actually did purchase those tickets, and we saw

23    that -- Sarah Adleta testified to that.  That was

24    corroborated through the bank records.

25         The Judge is going to instruct you on the law of

agency and that is that, you know, in order for a defendant

to be convicted of a crime, he doesn't need to do every

single act involved in the offense.  He just has to

participate in the crime.  He needs to willfully join in the

crime.

So if he directs another to do something which he

could do himself, then he is liable for those acts.  So in

this case, the defendant directed Sarah Adleta, caused her to

bring the children out to Oklahoma.  She didn't have the

means to pay for that.  But for him, this would have never

occurred.  She wouldn't have been able to get out there.

The most important element of this crime, the one

that I told you yesterday, ultimately this case comes down to

that, is:  What was the defendant's intent?  Because that

really is the crux of this crime.

Was his intent to engage in sexual activity with

minor victim one when he caused her transportation in

December of 2012?  And the answer to that is yes.  The

evidence is overwhelming that that was his intent, to engage

in criminal sexual activity with her.

The Judge will instruct you that the government

need not prove that anyone actually engaged in sexual

activity in order for this crime to have occurred.  In other

words, you don't need to find that the sexual activity

actually occurred.  You just need to find that he intended

1    for that activity to occur.

2            So how do we know that he intended to engage this

3    little girl in sexual activity when he caused her

4    transportation on December 23 of 2012?  I'm going to give you

5    nine pieces of evidence that you saw yesterday that proves

6    beyond a reasonable doubt that that was his intent.

7            First, we know that the defendant is sexually

8    interested in children.  He is -- more importantly, he's

9    interested in that daddy-daughter sex, that incest fantasy.

10   And how do we know that?  Well, we know from Sarah Adleta's

11   testimony that that was something that he had established

12   very early on in their relationship.  Way back in 2008, 2009

13   he told her that he was sexually interested in kids.  He told

14   her, as she testified, that he had that fantasy, that sick,

15   perverted fantasy.

16           We know in his own words that he had that sexual

17   interest in children.  If you will recall Exhibit Number 5 --

18   that's at 211 -- in his own words, he said, "I'm still into

19   young and dad-daughter stuff.  So I don't know."  So we know

20   this defendant was sexually interested in children.

21           He showed Sarah Adleta pictures of child

22   pornography way back before he ever went to Afghanistan,

23   pictures that she described as naked girls, and in fact we

24   saw a couple of those pictures, ladies and gentlemen.

25   Exhibits 14 and 15, two of those pictures that Deb Healy, the

agent who is the forensic examiner, recovered from his computer, if you will recall her testimony about those pictures -- and you can look at those pictures and the data is on there, but they were put onto his computer in 2008.  So that corroborates to Sarah Adleta that he was interested in children.  He had a daddy-daughter fantasy.

When the defendant and Sarah married in 2010, she testified how they negotiated -- this is reason number two -- that he negotiated with her, that she agreed to his plan and his rules for living as a family, rules that included the sexual abuse of their children.  She told you about that, and we know that to be true.  We know that that's what this defendant was all about, that his plan, his way of living, as disgusting as it is, was to sexually molest his children.  That was in his plan, in his cards; and we know her testimony to be true because we saw it in his diary, in his own words.  That was Exhibit 1.

Remember when Agent Buchanan read those passages and he in his own words talked about how Sarah was not okay with this, that they had a lot to talk about, but that she needed to know what he was about and needed to agree to what he was about before marrying her.  All those passages were in his diary about his desire to engage his little girl in hand jobs and blow jobs and feel her up, and how he talked about his little boy, who was not even born yet, and how he wanted

1  Sarah to do the same to his little boy, who was not even born

2  yet, because that's what this defendant is about.  He is

3  sexually interested in children; and for him, his plan, his

4  rules, his way of life with these two kids was to sexually

5  abuse them.  That's how he thought of them.

6         So that is another way that we know that that is

7  what his intent was when he saw his little girl and had her

8  travel across state lines, because from his diary, from all

9  that he said to Sarah before and during that time, you can

10  infer that any time he was going to see her, that's what he

11  was going to do, that that was his intent was to molest her.

12         Then we know, reason number three, that when he

13  came back from Afghanistan in 2011, during that year that he

14  lived with Sarah Adleta, he executed his plan.  He did what

15  he said he was going to do.

16         Sarah Adleta testified that he masturbated in front

17  of the children as if to teach his little girl how to become

18  used to seeing that type of activity, to groom her and to

19  prep her to be an object for him.

20         We know that he had her touch his penis again, as

21  if to teach this little child that this is what happens in a

22  family and this is what you should become used to.  So we

23  know that he did that during that time period, because Sarah

24  Adleta told you that, and that's corroborated by how he acted

25  after that.

1          Samantha Bryant told you that when he became

2    involved with her and her family, a new family for him, that

3    he did the same thing.  He masturbated in front of her little

4    girl.  He masturbated on top of her little girl.  So that's

5    how we know that his intent was to sexually molest his little

6    girl when he caused her transportation in December of 2012.

7          Then, after he and Sarah divorced and she moved

8    thousands of miles away from him with the kids, he still

9    continued to live along the lines that he said that he was

10   going to live with these children.  He still continued to

11   sexually abuse them.  He still continued to masturbate in

12   front of his child, only it was over Skype.

13         You can believe Sarah Adleta about that because

14   Samantha Bryant testified about the same thing; that, once

15   again, when he became involved with her child during that

16   same year, in 2012, he Skyped and asked to see Samantha

17   Bryant's little girl, just as he had done with Sarah and her

18   little girl, and asked to see that child naked and then

19   masturbated over Skype in front of that child.  The same

20   pattern.  The same person.  The same -- it is the exact same

21   conduct, because that is his intent.  That is what he plans

22   to do and that's what he does.

23         Reason number eight.  Even before K. traveled, even

24   as he was masturbating on Skype, he also was receiving

25   pictures, pictures of Sarah molesting their little boy at the

exact same time, in November of 2012, and we know that
because Agent Healy recovered that picture and that picture
was placed on his computer on November 10th of 2012.

        We know that it was his intent because Sarah Adleta
testified that the defendant told her, as they were making
preparation for their little girl to fly out there, that his
plan, what he wanted to do specifically was to, quote, "give
her a facial and to get a blow job," and he said he was going
to videotape it.

        We know his intent.  He told Sarah Adleta.  He said
it and Sarah Adleta agreed.  She agreed with him.  She was
his partner in crime and she told you she agreed, that he
could do these things, and that she would bring her child to
him, serve her up, serve her up to him to feed his sexual
appetite for her.

        Then you heard Sarah Adleta's account of what
happened when they were out there and Sarah Adleta told you
that he masturbated on the child when she was on the bed and
that she became upset and she cried, and that he told Sarah
that he had placed his penis in that child's mouth when they
were in the shower, and we know that happened because we have
his words.  He admitted to it.

        When they returned in January of 2013, they talked
about it through their text communications and their Skype
communications.  If you look at Exhibit 3 -- this is, I

1   believe, 209 -- look what he says to Sarah.  Those are his

2   words, his admission, that he did what he said he was going

3   to do, that he carried out his intent.

4           Again, Exhibit 4, during a text communication that

5   they had on February 12th of 2013, when he asks Sarah, "You

6   having someone c-u-m on her?"  And Sarah answers, "No.  I was

7   referring to her with you the last time.  Remember, she

8   freaked out," just as she had testified on the stand.

9           What does the defendant say?  "Yeah, she kind of

10  did.  Maybe you should get someone to c-u-m on her."

11          We know his intent was to sexually molest his

12  little girl when she traveled to Oklahoma because that's what

13  he told Sarah and that's what he did, and you know that it

14  happened.

15          How else do we know it was his intent?  Because he

16  did the same thing to Samantha Bryant's little girl just

17  weeks, just weeks before his little girl traveled to

18  Oklahoma.

19          Samantha Bryant told you how he came to her home in

20  Texas and how he molested her little girl, and, unbelievably,

21  she let it happen.

22          Then he used -- she took -- she took -- used a

23  camera and took pictures of it, and we know that to be true

24  because we found one of those pictures on his computer, a

25  picture that we know was taken November 17th, because Agent

Healy was able to recover the XF data from that picture.
Remember, that was the picture that Samantha took with the
defendant's Casio camera, and that picture, too, was on his
computer hard drive.

            We know that it was his intent because he would --
he showed Sarah Adleta stories, stories about daddies and
daughters having sex; and you can believe Sarah Adleta about
that, too, because Samantha Bryant testified to the same
thing.  In fact, she told you that she wrote stories for him.
And if we look at Exhibit Number 18, at 198, this is one of
the stories that she wrote, a story that she sent to him
November 10, 2012, just weeks, a story that was a fantasy
story about him and her having sex with their two little
girls.  That's how we know that that was his intent.  It's
because that's what he said, his actions, his words.  That's
how you know a person's intent, what they say and what they
do.  And what this defendant said and what this defendant did
was to molest his little girl.

            The final element of that offense, causing the
transportation of a child, is that if the sexual activity
occurred, he could have been charged with a criminal offense
under laws of Oklahoma, and the judge will instruct you what
that is; but in this case, he masturbated on her.  That was
his intent.  His intent was to get oral sex, which he did;
and those all are crimes under Oklahoma law, of course.

1    How do we know that he actually did engage this

2    child in oral sex in the shower?  Because Samantha Bryant

3    told you and Sarah Adleta told you.  He told them as if he

4    was proud that he had done that.  He told Sarah Adleta that

5    he had taken her little -- their little girl into the shower

6    and put his penis in her mouth, and he said the same thing to

7    Samantha Bryant and he told Samantha Bryant that he

8    ejaculated.

9          The first count of the Indictment is the

10   conspiracy, a conspiracy to transport the child.  So it's an

11   agreement and all it is is an agreement that these two

12   individuals had to transport this child in interstate

13   commerce.  Again, the government does not need to prove that

14   the transportation actually occurred, just that they actually

15   had an agreement; but in this case, the evidence of their

16   agreement is plain.

17         First, Sarah Adleta testified that they had an

18   agreement; that she agreed with him that when they

19   transported the child in interstate commerce, that he could

20   do these things.  But from the very beginning of their

21   relationship, ladies and gentlemen, this is how they acted.

22   From 2010, when she had those babies and he said to her the

23   way that he wanted to live and the sexual abuse that he

24   wanted to inflict upon them, she agreed to that.  She told

25   you that was a condition of their marriage which she agreed

1    to and his diary proves that out.

2         Those pages that Ian Buchanan read to you

3    yesterday, all of those pages show how he was persuading and

4    negotiating and making sure that she was on board and agreed

5    to what he wanted before he married her, and she did and they

6    got married; and the entire way that these two parented these

7    children was to sexually abuse them.  From the very

8    beginning, that's how they raised them.

9         So.  When Sarah Adleta transported that child, she

10   agreed with him that he could sexually abuse these kids, and

11   that agreement was an ongoing agreement.  Look at the way

12   they parented these kids.  They consulted each other about

13   everything.

14        If you will recall, she asked the defendant in

15   those exhibits, 2, 3, 4, 5, 6 -- those are the chats and

16   texts they had -- she consulted with him about using a dildo

17   on his child.  After they returned from Oklahoma, after he

18   had already sexually abused this little girl, returned her

19   back to Florida, back across state lines and while in

20   Florida, the two of them talked about continued plans for

21   transporting this child in interstate commerce and continuing

22   plans to sexually abuse her.

23        So, if you recall, when they first got back from

24   Oklahoma, they have conversation immediately.  Jon Adleta,

25   who has not seen this -- who only saw this child in Oklahoma

one time, one time, because, remember, the two of them had
only been divorced for a year and Sarah lived here in Florida
and Jon lived in Oklahoma and Texas, so as soon as he had
Sarah or had his little girl and had engaged in those sex
acts, he wanted more.

So, when they got back, immediately he started
negotiating with Sarah about plans to have both of those
children at his home for longer periods of time.  Recall how
they were talking about having the children spend two weeks
with him, three weeks out of five weeks, and they were
talking about and they were planning that; and at the same
time with all those texts and communications, they're
planning the continued sexual abuse of little -- of their
little girl.

So recall when she's telling him that she wants to
get a dildo for this child, a three-year-old, and what he
thought about that.  He was fine.

Recall when she talked about using sounding rods on
a three-year-old and she talked about giving this three-year-
old an orgasm, a three-year-old, and his reaction was, "Oh,
sounds like it hurts."

Recall how he's talking about ejaculating on her
and how she became scared by that, and his acknowledgment and
his solution was to serve her up to other men so that they
could do the same thing to him -- to her.  That was his

solution, because these two had this agreement that this is how they would raise these children, his little girl in particular, and that it was their understanding that any time this child traveled across state lines, any time either one of them would see her, it would be with the intent that they engage in sexual activity.  That's how they operated.  Those are their words.

Finally, finally at the very end of the communication, in March of 2013, recall that Sarah was arrested.  The defendant was arrested in March of 2013.  So that last communication that we have, that the government was able to seize from Sarah Adleta's media devices, was a conversation where Sarah Adleta tells him, tells the defendant, that she is going to take their child to that monster, Aaron Dixon, for that person to sexually abuse her, and the defendant's reaction:  "Well, you gotta record it," because that was the plan.  That was the understanding that these two people had, the defendant and Sarah Adleta.  Their understanding was that this little girl would be abused, and any time she traveled across state lines, that would occur.

When she returned back to Florida, there were many sex acts perpetrated on that child.  Sarah Adleta told you about those sex acts:  The defendant Skyping with her, masturbating through the Skype while the child was present, all the sex acts that Sarah Adleta inflicted upon this child,

1  because that was their understanding, that any time she

2  traveled, it would be with the intent to engage in sexual

3  activity.  That's what would happen.  That's how they

4  operated.

5          196.

6          The defendant, you know, he had a daddy-daughter

7  fantasy and it became his reality.  That was his reality,

8  ladies and gentlemen.  Unfortunately, tragically, it was

9  their reality, too.

10          No one can undo the cruelty and abuse that the

11  defendant has inflicted upon his little girl; but what you

12  can do, what the evidence calls for in this case is for you

13  to consider the evidence, look at the evidence, and then come

14  out and say, "Mr. Adleta, we find you guilty of the crimes in

15  this Indictment."  Thank you.

16          THE COURT:  Thank you, Ms. Gable.

17          Mr. Bark.

18          MR. BARK:  Thank you, Your Honor.

19          Good morning, ladies and gentlemen.  I know it's

20  hard for you to sit here and probably listen to what I even

21  have to say at this moment, and I thank you for giving me the

22  courtesy of doing so.

23          When we began the trial, when we started with voir

24  dire and jury selection, we made great efforts to see if you

25  were the proper jurors to sit here, to make sure that you

1   could look at very disturbing evidence and still make a

2   determination of whether Mr. Adleta is guilty or not guilty

3   of the charges in the Superseding Indictment.  Judge Dalton

4   went over that with you at great length.  It took a full day.

5   So I ask you to fulfill that commitment and to do that.

6        The government has presented their argument and

7   there are some things I'm going to ask you to look for in

8   making your determination.  And I agree with the government.

9   The thing you have to do is determine whether on this date at

10  this time, whether Mr. Adleta's intent in transporting his

11  children during the Christmas holiday was for the purpose of

12  sexually -- performing sexual activity with his daughter.

13       Now, it is certainly reasonable to believe that

14  there were other reasons for him to want his daughter to come

15  to Oklahoma during Christmas.  So we start with that.

16       Two, the government relies tremendously upon Sarah

17  Adleta's testimony as to the event that they allege occurred

18  in Oklahoma.  Now, why should we have issue with Sarah

19  Adleta's testimony?

20       We should have tremendous issues with Ms. Adleta's

21  testimony.  One, let's begin with the fact that she met Aaron

22  Dixon in 2005.  She had no idea at this time who Jonathan

23  Adleta was and she was already engaged in a relationship with

24  a man known as Aaron Dixon.

25       She does not meet Mr. Adleta until much later.  She

has children with him and she makes an exchange. She says

she makes a deal with Mr. Adleta that to marry him, they have

to live a certain lifestyle. So she's willing to do that

because she loves him. So she's already expressed to you the

type of person that she is.

Then she comes into this courtroom and tells you,

"I entered into a plea deal and that my resolution is going

to be better" --

MS. GABLE: Objection.

THE COURT: Sustained.

MR. BARK: That in order for her to get the benefit

of the plea deal, she had to cooperate with the government.

Everything Sarah Adleta does is for Sarah Adleta.

Now, Mr. Adleta also confronted her about the

children, about custody of the children, who should have the

children, and whether anything should be done about the way

the children were being raised.

If you recall, she had to think for several minutes

about what I was talking to her about; and I would suggest to

you that the only things that she could testify to were

things that she thought would benefit her, based on her

demeanor and reaction to those questions.

Now, some of the testimony that the government has

just discussed with you is that the Adletas' daughter would

touch Mr. Adleta's penis or -- excuse me -- the way that was

1  presented to you by the government was that Mr. Adleta would

2  have the daughter touch his penis.

3         Now, that is not the way I recall Ms. Adleta's

4  testimony.  In fact, I recall her saying that their daughter

5  would just walk up and touch it.  Now, that is going to be up

6  to you to rely on your own recollection as to the way you

7  heard that testimony, but that it is different than what the

8  government has said to you.

9         Now, the reason I bring that up is not because we

10 need to test our memories or not.  It's because we have seen

11 a tremendous amount of disturbing photographs, images,

12 communication, but how do we interpret it all?

13        We have to interpret it as the date of the intent

14 of the transportation.  Now, the reason I say that is there

15 is no communication in writing, on Skype or in any text

16 messages prior to the transportation that this was the intent

17 of the transportation.

18        If you go back and look at the exhibits, it is

19 after the transportation that there's a discussion about

20 ejaculation, that there's a discussion about masturbation,

21 that there's a discussion about blow jobs between Sarah

22 Adleta and Jonathan Adleta.  None of that occurs prior to the

23 transportation.

24        Now, you may be saying to yourself, "Why do we

25 care?  The things we have seen are tremendously disturbing."

1   But we live in a country of laws.  We live in a country where

2   you, the jurors, your responsibility is not to find the

3   person guilty of anything that they could possibly be found

4   guilty of, but what the charges are in the Indictment and

5   what they are being alleged to have done.

6          That burden is on the government, and I ask you not

7   to carry that burden for them, but that for you to make your

8   own determination as to whether the defendant is guilty of

9   the conduct alleged in the Indictment.

10          So then you may ask, how do you explain the

11   journal?

12          When we discussed in opening statement the

13   difference between fantasy and reality, and you have been

14   presented a journal highlighted as to the particular points

15   that the government would like you just to rely on.

16          You will be given the journal to take back with you

17   and to review, and it is quite extensive, of Mr. Adleta's

18   time in Afghanistan; and as you review the entire journal you

19   will see a man who is conflicted between a thought, between a

20   fantasy and what to do about that.  You will see a man who's

21   tremendously conflicted.

22          I can't stand before you and tell you that this is

23   a perfect man that we should honor, and I don't say that; but

24   I ask you to look deeply into that journal and to find out if

25   that was his intent at the time of transportation.  Was that

his intent at the time he bought those plane tickets or was it just to see his daughter during Christmas?

One of the other things I want to point out is the Skype communication with Samantha Bryant and Sarah Adleta. Now, one of the things that we've heard is that Sarah Adleta said that Mr. Adleta would masturbate on Skype, on the video conference, and that the children would be there.

We do not have a clear indication of what the children being there means. Were they just in the house or in the room? Were they watching something on TV? Were they playing a video game on an iPad or anything like that?

You're going to be given an instruction on activities in the presence of, but you're not going to be given a definition of "in the presence of." I would submit to you that "in the presence of" does not just mean physically present, but also mentally present and aware, and that relates to this circumstance with the Skype video account, because I'm not sure what Sarah Adleta meant by "present."

In fact, this may be difficult to understand, but based on Sarah Adleta's demeanor and consistent portrayal of herself in this proceeding, that she defines "masturbating" the same way everyone else does, and she has not provided to you what that definition means.

Now, perhaps she knows exactly what we're talking

1    about, but does she say that it's even on the video, that we

2    could see it going on in the video?

3           She says that he would masturbate in front of the

4    children, I believe, like, under a blanket or something of

5    that sort, and then when asked, she said, "Well, you know,

6    touching himself."  Perhaps that's all she means by

7    "masturbating."  Perhaps it's, for lack of a better

8    explanation, an Al Bundy-type of conduct.  I don't know, but

9    neither do you.

10          Now, you're being asked to do something that's

11   incredibly difficult, which is to look at certain evidence of

12   prior conduct and to incorporate that in your decision

13   making, and I ask you just to exercise great caution in the

14   way you do that.

15          Now, one of the items of proof the government says

16   that you should rely on is a photograph taken -- that they

17   say was taken on November 17th on the camera, and I just want

18   to remind you that the government's own expert said that we

19   can't be sure of the exact date.  The dates can be

20   manipulated on the camera, on the computer.

21          Now, they said when they got the camera, it was set

22   fine, to the right date, but that doesn't mean that it was

23   set fine throughout the duration of the time period that

24   we're discussing throughout this trial.

25          Now, I found it also very interesting that the

government didn't mention Aaron Dixon until the very end of
their argument, and the reason I find that very interesting
is because the relationship between Aaron Dixon and Sarah
Adleta is probably one of the most important things for us to
look at here today.

Now, you heard some testimony about Mr. Adleta's
concern with the children.  You heard some testimony about
that he wanted to see his children over certain periods of
time after they're divorced, a custody dispute; and the
government puts so much weight into the fact that he says,
"If you take her there, make sure you record it," because
it's for his purposes.

Well, it may be for his purposes, his purpose of
getting custody of his children because of the conduct of his
ex-wife with a person she met --

MS. GABLE:  Your Honor, objection.

THE COURT:  Overruled.

MR. BARK:  -- because of the conduct of someone she
met before she ever even knew Jonathan Adleta.

Now, you're going to be instructed on what a
reasonable doubt is.  You're going to be instructed on the
burden of proof and the presumption of innocence, and there
are alternative reasons for the conduct of a very troubled
man, and that the events that occur in 2013, after the
transportation occurred, cannot define the intent of Mr.

Adleta at that time, especially since there's a custody
dispute going on throughout this proceeding.

Now, the government then says, "Okay.  Fine.
Perhaps we can't prove that.  We also charge him with a
conspiracy and an agreement to conduct these activities."

We don't know if this is an agreement.  In fact,
there never, ever has been a time where they agreed that he
would see the children two weeks out of the month, three
weeks out of the month.  There is an agreement that he would
see the children at some point, but she said, "I haven't even
received the child support yet; and basically until I do
that, we'll then resolve when you can see them."

There's no agreement here for continuing, ongoing
acts whatsoever.  There is a dispute here.  There is a sick
woman here who is taking her child to another man.

Now, what's interesting about that is that the only
person that has testified to you today that Jonathan Adleta
masturbated in front of his daughter, that he ejaculated on
his daughter is the same woman who he was in that custody
dispute with.  This is the only person.

Now, I'm concerned that you may look to the fact
that Samantha Bryant said that they had sex and Mr. Adleta's
daughter was in the bed with them, and that perhaps you rely
on that to coming to a finding of guilt; but, once again, I
stress to you that there is no definition in these jury

1    instructions of what "in the presence means."  And "in the

2    presence" is not just physical presence, but that the child,

3    I would submit, must be mentally aware of what was going on

4    as well.  I'd ask you to consider that in your finding.

5           I think your job is incredibly difficult here today

6    because the things you have seen are horrific.  They're

7    disgusting.  There's no way to hide that, but your job is not

8    to find -- there's no line that says that, "We, the jury,

9    find the defendant horrific."  It says, "We, the jury, find

10   the defendant" either "guilty" or "not guilty" of the charges

11   in the Indictment, and I submit to you that the government

12   has failed to do that here today.

13          In Exhibit 3, line 2000 -- no -- line 209, the

14   government referred to that in their argument, and the quote

15   is, "You like seeing me come on her?"  And they rely on that

16   as corroboration, as support for Sarah Adleta's testimony

17   that Mr. Adleta did this act.

18          Once again, this is an interesting discussion, a

19   fantasy, a conflicted mind of stories of fantasy.  I mean, we

20   see the stories.  We see the fantasy.  We have a witness,

21   Samantha Bryant, who freely admitted to you how much he

22   enjoyed the fantasy.  And we don't know the difference

23   between fantasy and reality throughout this proceeding, and

24   that is scary, but that is also reasonable doubt, because we

25   don't know what is real and what is not.

1     We don't know during this custody dispute in 2013,

2   after the children were in Oklahoma, that that statement, is

3   that a setup so that Mr. Adleta can preserve evidence against

4   Sarah Adleta?

5           So we have to weigh all of this.  We have to look

6   at all of this.  Is this -- it could be dubious on his behalf

7   to set up his ex-wife so he could have custody of his

8   children.  We just don't know.

9           Mr. Adleta is not the one who talked about sounding

10  rods.  Mr. Adleta is not the man who took his child to see, I

11  believe -- I'm not sure which adjective the government

12  used -- to see the monster, Aaron Dixon.

13          There's another thing I want to point out.  Sarah

14  Adleta has pled to -- well, no.  Let me make sure I say this

15  correctly.  She has admitted to performing oral sex on her

16  daughter and she has told you with her own mouth that

17  Jonathan Adleta never witnessed that, that he never observed

18  that, that this was done for Aaron Dixon.

19          Misery loves company.  It doesn't always deserve

20  it.

21          We discussed how difficult the job is that you have

22  before you.  We discussed how disgusting the evidence is and

23  how difficult it is to disseminate between it, but I submit

24  to you that Mr. Adleta is not guilty of the charges that are

25  in the Superseding Indictment that is before you.  Not only

1   do I submit that, but I submit to you, as the Judge told you

2   when we began this, about the jury process and the

3   Constitution, that for over 260 years we have valued a jury

4   and the reason we have a jury is for a situation just like

5   this.  We are bogged down.  We are busy and we are trying --

6   everyone is trying their best to present to you the things

7   that should be presented to you and the way they should be;

8   but in this particular case, these particular charges are the

9   wrong charges.

10          Mr. Adleta is not guilty of the offenses in the

11   Superseding Indictment.  He may well be guilty of other

12   things, but you're not here to decide that today.  You're

13   here to decide whether we are making strides towards a more

14   perfect union and how much we value that, and your

15   determination, your verdict will show that.  Thank you.

16          THE COURT:  Thank you, Mr. Bark.

17          Ms. Gable.

18          MS. GABLE:  Thank you, Your Honor.

19          None of the facts you just heard are in evidence

20   before this jury.

21          How do we know what the defendant's intent was in

22   this case?  It's all of the evidence in the case.  Every

23   single piece of evidence, from his diary, his possession of

24   child pornography, his molestation of children, his

25   molestation of his little girl, his admissions that he did

1   that, that's how we know what his intent is.

2          Defense counsel told you that it had to be the

3   purpose, that the reason why she was transported was for that

4   reason, but that's not what the law is.  That's not what the

5   statute says.  It does not say that he transported her for

6   the purpose.  He transported her with intent to engage her in

7   sexual activity.

8          Sarah's testimony, everything that she said was

9   corroborated by the evidence in this case.  She talked to

10  you -- I mean, everything that she said was corroborated.

11  She told you about child pornography and stories on the

12  Internet, and Samantha Bryant corroborated the stories.  You

13  saw a story that was written about his father-daughter

14  fantasy.  The child pornography was found on his computer.

15  He molested Samantha Bryant's little girl.  All of that shows

16  what his intent was, and everything that Sarah testified to

17  was corroborated by all of the evidence in the case.

18         Regarding the touching of the penis, recall the

19  testimony of Sarah Adleta.  His penis was erect when the

20  little girl touched it and he was naked.

21         The journal that's in evidence shows what his

22  intent was.  His intent was to sexually assault his children.

23         With the Skype, whether the children were present,

24  knew what was going on or not, his intent was to masturbate

25  in front of them, to perform a sex act in front of them.  And

1   why was he doing that?  Because he was grooming them,

2   grooming them to become familiar with that, grooming them to

3   become accepting of that conduct.

4          The most disturbing thing that was said to you

5   during defense counsel's closing was to suggest to you that

6   this defendant allowed Sarah Adleta to take her child to be

7   sexually molested and that he wanted to record it for a

8   custody dispute.

9          There's no evidence at all in this case that there

10  was a custody dispute; but for him to suggest that this

11  father would allow the child to be sexually molested so that

12  he could get a recording for a custody dispute, no.  Ladies

13  and gentlemen, he wanted a recording of that, if it occurred,

14  to satisfy his own lustful desires.

15         This case is about a defendant who was sexually

16  interested in his children.  The defendant's intent was that

17  that child be sexually abused when she was transported with

18  interstate commerce.  We ask you to review all of the

19  evidence and to please return guilty verdicts.  Thank you.

20         THE COURT:  Thank you, Ms. Gable.

21         All right.  Ladies and gentlemen, I'm going to give

22  you your instructions on the law now.  If you need to stretch

23  for a minute, stand up and stretch.  You might do that.  This

24  will take probably ten, fifteen minutes for me to get through

25  it.

1          Are you all comfortable?  Do you want to stand and

2    stretch for a minute?

3          Members of the jury, it is now my duty to instruct

4    you on the rules of law that you must follow and apply in

5    deciding this case.  After I have completed these

6    instructions, you will go to the jury room and begin your

7    discussions, what we call your deliberations.  It will be

8    your duty to decide whether the government has proved beyond

9    reasonable doubt the specific facts necessary to find the

10   defendant guilty of the crime charged in the Superseding

11   Indictment.

12         You must make your decision only on the basis of

13   the testimony and other evidence presented here during the

14   trial, and you must not be influenced in any way by either

15   sympathy or prejudice for or against the defendant or the

16   government.

17         You must also follow the law as I explain it to

18   you, whether you agree with that law or not, and you must

19   follow all of my instructions as a whole.  You may not single

20   out or disregard any of the Court's instructions on the law.

21         The Superseding Indictment or formal charge against

22   any defendant is not evidence of guilt.  Indeed, every

23   defendant is presumed by the law to be innocent.  The law

24   does not require a defendant to prove innocence or to produce

25   any evidence at all; and if a defendant elects not to

1   testify, you cannot consider that in any way during your

2   deliberations.  The government has the burden of proving a

3   defendant guilty beyond a reasonable doubt; and if it fails

4   to do so, you must find that defendant not guilty.

5           Thus, while the government's burden of proof is a

6   strict or heavy burden, it is not necessary that a

7   defendant's guilt be proved beyond all possible doubt.  It is

8   only required that the government's proof exclude any

9   reasonable doubt concerning the defendant's guilt.

10          A "reasonable doubt" is a real doubt, based upon

11  reason and common sense after careful and impartial

12  consideration of all of the evidence in the case.

13          Proof beyond a reasonable doubt, therefore, is

14  proof of such a convincing character that you would be

15  willing to rely and act upon it without hesitation in the

16  most important of your own affairs.  If you are convinced

17  that the defendant has been proved guilty beyond a reasonable

18  doubt, say so.  If you are not convinced, say so.

19          As I said earlier, you must consider only the

20  evidence that I have admitted in the case.  The term

21  "evidence" includes the testimony of the witnesses and the

22  exhibits admitted in the record.  Remember that anything the

23  lawyers say is not evidence in the case.  It is your own

24  recollection and interpretation of the evidence that

25  controls.  What the lawyers say is not binding upon you.

1            Also, you should not assume from anything that I

2    may have said that I have any opinion concerning any of the

3    issues in this case.  Except for my instructions to you on

4    the law, you should disregard anything I may have said during

5    the trial in arriving at your own decision concerning the

6    facts.

7            In considering the evidence, you may make

8    deductions and reach conclusions which reason and common

9    sense lead you to make, and you should not be concerned about

10   whether the evidence is direct or circumstantial.

11           "Direct evidence" is the testimony of one who

12   asserts actual knowledge of a fact, such as an eyewitness.

13   "Circumstantial evidence" is proof of a chain of facts and

14   circumstances tending to prove or disprove any fact in

15   dispute.  The law makes no distinction between the weight

16   that you may give either to direct or circumstantial

17   evidence.

18           Now, in saying that you must consider all of the

19   evidence, I do not mean that you must accept all of the

20   evidence as true or accurate.  You should decide whether you

21   believe what each witness had to say and how important that

22   testimony was.  In making that decision, you may believe or

23   disbelieve any witness in whole or in part.  Also, the number

24   of witnesses testifying concerning any particular dispute is

25   not controlling.

 1          In deciding whether you believe or do not believe
 2   any witness I suggest you ask yourself a few questions:
 3          Did the witness impress you as one who was telling
 4   the truth?
 5          Did the witness have any particular reason not to
 6   tell the truth?
 7          Did the witness have a personal interest in the
 8   outcome of the case?
 9          Did the witness seem to have a good memory?
10          Did the witness have the opportunity and ability to
11   observe accurately the things he or she testified about?
12          Did the witness appear to understand the questions
13   clearly and answer them directly?
14          Did the witness's testimony differ from other
15   testimony or other evidence?
16          You should also ask yourself whether there was
17   evidence tending to prove that a witness testified falsely
18   concerning some important fact or whether there was evidence
19   that at some other time a witness said or did something or
20   failed to say or do something which was different from the
21   testimony the witness gave before you during the trial.
22          The fact that a witness has been convicted of a
23   felony offense is another factor you may consider in deciding
24   whether you believe that witness.
25          You should keep in mind, of course, that a simple

1    mistake by a witness does not necessarily mean that the

2    witness was not telling the truth as he or she remembers it,

3    because people naturally tend to forget some things or

4    remember other things inaccurately.

5            So, if a witness has made a misstatement, you need

6    to consider whether it was simply an innocent lapse of memory

7    or an intentional falsehood; and the significance of that may

8    depend on whether it has to do with an important fact or only

9    an unimportant detail.

10           The testimony of some witnesses must be considered

11   with more caution than the testimony of other witnesses.

12           In this case, the government called as one of its

13   witnesses a person with whom the government has entered into

14   a plea agreement providing for the possibility of a lesser

15   sentence than the witness would otherwise be exposed to.

16   Such plea bargaining, as it has been called, has been

17   approved as lawful and proper and is expressly provided for

18   in the rules of this court.

19           However, a witness who hopes to gain more favorable

20   treatment may have a reason to make a false statement because

21   the witness wants to strike a good bargain with the

22   government.  So, while a witness of that kind may be entirely

23   truthful when testifying, you should consider such testimony

24   with more caution than the testimony of other witnesses.

25           And, of course, the fact that a witness has pled

1   guilty to the crime charged in the Superseding Indictment is

2   not evidence in and of itself of the guilt of any other

3   person.

4          When knowledge of a technical subject matter might

5   be helpful to the jury, a person having special training or

6   experience in that technical field is permitted to state an

7   opinion concerning those technical matters.

8          Merely because a witness has expressed an opinion,

9   however, does not mean that you must accept that opinion.

10  The same as with any other witness, it is up to you to decide

11  whether to rely upon it.

12         You will note that the Superseding Indictment

13  charges that the offense was committed on or about a certain

14  date.  The government does not have to prove with certainty

15  the exact date of the alleged offense.  It is sufficient if

16  the government proves beyond a reasonable doubt that the

17  offense was committed on a date reasonably near the date

18  alleged.

19         The word "knowingly," as that term is used in the

20  Superseding Indictment or in these instructions, means that

21  the act was done voluntarily and intentionally and not

22  because of mistake or accident.

23         The word "willfully," as that term is used in the

24  Superseding Indictment or in these instructions, means that

25  the act was committed voluntarily and purposely, with the

specific intent to do something the law forbids, that is, with bad purpose, either to disobey or disregard the law.

A separate crime or offense is charged in each count of the Superseding Indictment.  Each charge and the evidence to it -- pertaining to it should be considered separately.  The fact that that you may find the defendant guilty or not guilty as to one of the offenses charged should not affect your verdict as to any other offense charged.

I caution you, members of the jury, that you are here to determine from the evidence in this case whether the defendant is guilty or not guilty.  The defendant is on trial only for those specific offenses alleged in the Superseding Indictment.

Also, the question of punishment should never be considered by the jury in any way in deciding this case.  If the defendant is convicted, the matter of punishment is for the Judge alone to determine later.

At this time I will explain the Superseding Indictment which charges two separate offenses that are called "counts."  I will not read it to you at length because you will be given a copy of the Superseding Indictment for reference during your deliberations.

In summary, Count One charges that the defendant knowingly conspired to transport a minor in interstate commerce with intent that the minor engage in sexual activity

for which any person can be charged with a criminal offense.

Count Two charges the commission of what is referred to as a substantive offense, namely that the defendant caused a minor to be transported in interstate commerce with the intent that the minor engage in sexual activity for which any person can be charged with a criminal offense.  I will explain the law governing that substantive offense in a moment.

First, however, as to Count One, you will note that the defendant is not charged in that count with committing a substantive offense.  Rather, he is charged with having conspired to do so.

Title 18 of the United States Code, Section 2423(e), makes it a federal crime for anyone to conspire or agree with someone else to do something which, if actually carried out, would be a violation of Title 18, United States Code, Section 2423(a).

Title 18, United States Code, Section 2423(a), makes it a federal crime to knowingly transport an individual under 18 years old in interstate or foreign commerce with the intent that the individual engage in sexual activity for which any person can be charged with a criminal offense.

Under Title 21, Oklahoma Statutes, Section 843.5 and 1123, it is a crime for a parent to sexually abuse a child under 18 years of age or to commit lewd and lascivious

acts upon a child under 16 years of age, including committing fellatio upon a child or ejaculating upon or in the presence of a child.

Under Florida Statutes, Section 794.011 and 800.04, it is a crime to commit lewd and lascivious offenses or sexually battery of a person less than 16 years of age, including oral or vaginal penetration, masturbation and exposure of the genitals in a lewd or lascivious manner in the presence of a victim who is less than 16 years of age.

Under the law, a "conspiracy" is an agreement of any kind -- an agreement or a kind of partnership in criminal purposes in which each member becomes the agent or partner of every other member.

In order to establish a conspiracy offense, it is not necessary for the government to prove that the members of the plan had entered into any formal type of agreement. Also, because the essence of a conspiracy offense is the making of the agreement itself, it is not necessary for the government to prove that the conspirators actually succeeded in accomplishing their unlawful plan.

The defendant can be found guilty of this crime only if all of the following facts are proved beyond a reasonable doubt:

First, that two or more persons in some way or manner came to a mutual understanding to try to accomplish a

1   common and unlawful plan to violate Title 18, United States

2   Code, Section 2423(a), as charged in the Superseding

3   Indictment; and,

4         Second, that the defendant, knowing the unlawful

5   purpose of the plan, willfully joined in it.

6         A person may become a member of a conspiracy

7   without full knowledge of all of the details of the unlawful

8   plan or the names and identities of all of the other alleged

9   conspirators.  So, if a defendant has a general understanding

10  of the unlawful purpose of the plan and knowingly joins in

11  that plan on one occasion, that is sufficient to convict that

12  defendant for conspiracy even though the defendant did not

13  participate before and even though the defendant played only

14  a minor role.

15        Of course, mere presence at the scene of a

16  transaction or event or the mere fact that certain persons

17  may have associated with each other and may have assembled

18  together and discussed common aims and interests does not,

19  standing alone, establish proof of conspiracy.

20        Also, a person who has no knowledge of a

21  conspiracy, but who happens to act in a way which advances

22  some purpose of one, does not thereby become a conspirator.

23        As to Count Two, it is a federal crime to transport

24  or cause to be transported an individual under 18 years of

25  age in interstate or foreign commerce with the intent that

the individual engage in sexual activity for which any person can be charged with a criminal offense.

        The defendant can be found guilty of this crime only if all of the following facts are proved beyond a reasonable doubt:

        First, the defendant knowingly transported or caused the transportation of Minor A in interstate commerce;

        Second, at the time of the transportation, Minor A was less than 18 years old; and,

        Third, at the time of the transportation, defendant intended that Minor A would engage in unlawful sexual activity.

        It is not necessary for the government to prove that anyone actually engaged in illegal sexual activity after being transported across state lines.  The government must prove beyond a reasonable doubt that the defendant knowingly transported or caused the transportation of a person under 18 years old across state lines and that the defendant intended at the time for the person under 18 to engage in illegal sexual activity.

        The government must prove that if the intended sexual activity had occurred, the defendant could have been charged with a criminal offense under the laws of Oklahoma.

        As I previously stated, under Title 21, Oklahoma Statutes, Section 1123, it is a crime to commit lewd and

lascivious acts upon a child under 16 years of age, including

committing fellatio upon a child or ejaculating upon or in

the presence of a child.

It is also a crime under Title 21, Oklahoma

Statutes, Section 843.5, for a parent to sexually abuse a

child under 18 years of age.

To "transport in interstate commerce" means to move

or carry someone or cause someone to be moved or carried from

one state to another.  The term "state" includes a state of

the United States, the District of Columbia and any

commonwealth, territory or possession of the United States.

It is not necessary to show that the defendant knew that

state lines were being crossed, but the government must prove

that state lines were crossed.

The guilt of a defendant in a criminal case may be

proved without evidence that the defendant personally did

every act involved in the commission of the crime charged.

The law recognizes that ordinarily anything a person can do

for one's self may also be accomplished through direction of

another person as an agent or by acting together with or

under the direction of another person or persons in a joint

effort.

So, if the acts or conduct of an agent, employee or

other associate of the defendant are willfully directed and

authorized by the defendant or if the defendant aids and

abets another person by willfully joining together with that person in the commission of a crime, then the law holds the defendant responsible for the conduct of that other person just as though the defendant had personally engaged in such conduct.

However, before any defendant can be held criminally responsible for the conduct of others, it is necessary that the defendant willfully associate in some way with the crime and willfully participate in it.  Mere presence at the scene of a crime and even knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime. You must find beyond a reasonable doubt that the defendant was a willful participant and not merely a knowing spectator.

During your deliberations, you must not communication with or provide any information to anyone by any means about this case.  You may not use any electronic device or media, such as the telephone, a cell phone, Smartphone, iPhone, BlackBerry, computer, the Internet, any Internet service, any text or instant messaging service, any Internet chat room, blog or website such as Facebook, MySpace, LinkedIn, YouTube or Twitter or any such other device, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

1          In other words, you cannot talk to anyone on the

2     phone, correspond with anyone or electronically communicate

3     with anyone about this case.  You can only discuss the case

4     in the jury room with your fellow jurors during

5     deliberations.  I expect you to inform me should you become

6     aware of another juror's violation of these instructions.

7          You may not use these electronic means to

8     investigate or communicate about the case because it is

9     important that you decide this case based solely on the

10    evidence presented in this courtroom.  Information on the

11    Internet or available through social media might be wrong,

12    incomplete or inaccurate.

13         You are only permitted to discuss the case with

14    your fellow jurors during deliberations because they have

15    seen and heard the same evidence you have.

16         In our judicial system, it is important that you

17    are not influenced by anything or anyone outside the

18    courtroom.  Otherwise, your decision may be based on

19    information known only by you and not your fellow jurors or

20    the parties in this case.  This would unfairly and adversely

21    impact the judicial process.

22         Any verdict you reach in the jury room, whether

23    guilty or not guilty, must be unanimous.  In other words, to

24    return a verdict, you must all agree.  Your deliberations

25    will be secret and you will never have to explain your

1    verdict to anyone.

2          It is your duty as jurors to discuss this case with

3    one another in an effort to reach agreement if you can do so.

4    Each of you must decide the case for yourself, but only after

5    full consideration of the evidence with the other members of

6    the jury.

7          While you are discussing the case, do not hesitate

8    to re-examine your own opinion and change your mind if you

9    become convinced that you were wrong; but do not give up your

10   honest beliefs solely because the others think differently or

11   merely to get the case over with.

12         Remember that in a very real way, you are judges,

13   judges of the facts.  Your only interest is to seek the truth

14   from the evidence in the case.

15         When you go to the jury room, you should first

16   select one of your members to act as your foreperson.  The

17   foreperson will preside over your deliberations and will

18   speak for you here in court.

19         A form of Verdict has been prepared for your

20   convenience.

21         I'm going to just review it with you briefly.  It's

22   a single page.  At the top of the page is the style of the

23   case and the case number.  It says, "Verdict Form.

24         "Count One.  As to the offense of conspiracy to

25   transport a minor with intent to engage in criminal sexual

1   activity, in violation of 18, U.S.C., 2423(e), we, the jury,

2   find the defendant, Jonathan Daniel Adleta," and then there's

3   a place here to indicate "Guilty" or "Not guilty."

4            "Question two.

5            "Count Two of the Superseding Indictment.

6            "As to the offense of causing the transportation of

7   a minor with intent to engage in criminal sexual activity, in

8   violation of Title 18, United States Code, Section 2423(a),

9   we, the jury, find the defendant, Jonathan Daniel Adleta,"

10  and then there's a place for you to indicate your finding,

11  "Guilty" or "Not guilty.

12           "So say we all, this" blank "day of September,

13  2013," and a signature line for your foreperson.

14           You will take the Verdict Form with you to the jury

15  room and when you have reached unanimous agreement, you will

16  have your foreperson fill in the Verdict Form, date it, sign

17  it and return it to the courtroom.

18           Should you desire to communicate with me at any

19  time, please write down your message or question and pass the

20  note to the court security officer, who will bring it to my

21  attention.  I will then respond as promptly as possible,

22  either in writing or by having you return to the courtroom so

23  that I can address you orally.

24           I want to caution you, however, that should you

25  send me any type of message or question, that you not

 1   indicate on the message or question any numerical division

 2   that you might have at the time that you submit the question.

 3          Now, you will have with you back in the jury room

 4   two copies of these instructions which I've just read to you.

 5   So you will have them for reference.

 6          You will also have a copy of the Superseding

 7   Indictment as well as the Verdict Form that I've just

 8   mentioned.

 9          In just a few minutes, after I send you back to

10   begin your deliberations, I'm going to have my courtroom

11   deputy deliver all of the exhibits after the lawyers have had

12   a chance to look through them and make sure that they are

13   intact and that everything you are supposed to have is there

14   and that you get everything that you are supposed to have.

15          So, with the exception of Mr. Dockery, who I am

16   going to ask to pull out and stand to the side for just a

17   moment, the rest of you are released now to begin your

18   deliberations.  You can take your pads back with you.

19          Mr. Dockery, if you will come over here and just

20   hover there for a minute, I'll get back with you in just a

21   second.

22          (Jury not present at 10:35 a.m.)

23          THE COURT:  Counsel, any objection to the

24   instructions as delivered other than previously indicated in

25   the record?

1          MS. GABLE:  No, Your Honor.

2          MR. BARK:  No, Your Honor.

3          THE COURT:  Mr. Dockery, as you may have figured

4   out, you are our alternate juror; and I am not going to

5   discharge you at the moment because it happens from time to

6   time that one of our jurors gets sick or incapacitated in the

7   course of their deliberations, and it's necessary for me to

8   call you back into service.

9          So I am going to ask that you continue to be under

10   my admonition not to discuss the case, not read anything,

11   don't look at anything about it.  You are free to wait if you

12   want to wait.  You're not required to wait.  If you would

13   like to leave, if you will just give Ms. Flick some contact

14   information; but if you decide that you want to go, you're

15   free to go.  Just let Ms. Flick know how to get ahold of you.

16   In the unlikely event we have some sort of an incident that

17   requires you to be back in service, I need to get ahold of

18   you and get you back here.

19          So thank you very much for your service.

20          Counsel, I would like for you all to come to the

21   bench, please, and go carefully through the evidence and make

22   sure that everything that Ms. Flick needs that has been

23   admitted into evidence is in its proper order and that

24   there's not anything extraneous that goes back to the jury

25   that they shouldn't be seeing.  So I'll count on you all to

1   let her know when you have looked at the evidence and you're

2   satisfied that it's all in order.

3           Otherwise, we'll stand adjourned until further word

4   from the jury.

5           MS. GABLE:  Your Honor, may I take care of a few

6   administrative matters while I have the Court?

7           THE COURT:  Yes.

8           MS. GABLE:  One is that I moved to seal certain

9   exhibits.  In this case it would be Numbers 12, 13, 14, 15,

10  16 and 17, which are the child pornography that was

11  introduced in this case.

12          THE COURT:  Yes, ma'am.

13          MS. GABLE:  And, further, I would move to

14  substitute at the conclusion of the deliberations photographs

15  for Government's Exhibit Numbers 19, 20, 21, 22, 23 and 25.

16          THE COURT:  All right.

17          Mr. Bark, any objection?

18          MR. BARK:  No.

19          THE COURT:  All right.  The government's motion to

20  seal will be granted.  The exhibits that were iterated into

21  the record and substitution of photographs for the physical

22  evidence described will also be granted.  We'll tend to those

23  matters after the discharge of the jury.

24          We'll be in recess.

25          (Recess taken at 10:38 a.m., pending word from the

 1   jury.)

 2              (Jury not present at 11:23 a.m.)

 3              THE COURT:  I've been advised by Mr. Fiorenza that

 4   we have a verdict.

 5              Is that correct?

 6              THE COURTROOM SECURITY OFFICER:  Yes, sir.

 7              THE COURT:  Bring our jury back, please, sir.

 8              (Jury present at 11:24 a.m.)

 9              THE COURT:  Welcome back, ladies and gentlemen.

10              I see, Mr. Jaynes, that you have the paperwork.

11   Does that mean that you are the foreperson?

12              THE PROSPECTIVE JUROR:  Yes.

13              THE COURT:  Has the jury reached a verdict?

14              THE PROSPECTIVE JUROR:  Yes, we have.

15              THE COURT:  Would you hand the Verdict Form to Mr.

16   Fiorenza, please.

17              Mr. Adleta, would you and your counsel stand,

18   please.

19              Ms. Flick, would you publish the verdict.

20              THE COURTROOM DEPUTY:  Yes, sir.

21              "Case number 3 (sic) :13-cr- 94, United States of

22   America versus Jonathan Daniel Adleta.

23              "Count One of the Superseding Indictment.

24              "As to the offense of conspiracy to transport a

25   minor with intent to engage in criminal sexual activity, in

1  violation of 18, U.S. Code, Section 2423(e), we, the jury,

2  find the defendant, Jonathan Daniel Adleta, guilty.

3  "Count Two of the Superseding Indictment.

4  "As to the offense of causing the transportation of

5  a minor with intent to engage in criminal sexual activity, in

6  violation of 18, U.S. Code, Section 2423(a), we, the jury,

7  find the defendant, Jonathan Daniel Adleta, guilty.

8  "So say we all, this 12th day of September, 2013."

9  And it's signed by the foreperson.

10  THE COURT:  All right.

11  Counsel, would you like the jury polled?

12  MR. BARK:  Please, Your Honor.

13  THE COURT:  All right.  Y'all can be seated.

14  Ladies and gentlemen, we've received your verdict.

15  I'm going to ask each of you now individually to confirm for

16  me that that is your verdict, if in fact it is.

17  Let me start with you, Shari Schmitt.  Is that your

18  verdict?

19  THE JUROR:  Yes, sir.

20  THE COURT:  Deborah McLaughlin, is that your

21  verdict?

22  THE JUROR:  Yes, sir.

23  THE COURT:  Karen Pizette, is that your verdict?

24  THE JUROR:  Yes, sir.

25  THE COURT:  Donald Rapovich, is that your verdict?

```
1              THE JUROR:  Yes, sir.

2              THE COURT:  Shauna Wadsworth, is that your verdict?

3              THE JUROR:  Yes, sir.

4              THE COURT:  Ward Sparks, is that your verdict?

5              THE JUROR:  Yes, sir.

6              THE COURT:  Jean Warriner, is that your verdict?

7              THE JUROR:  Yes, sir.

8              THE COURT:  Patricia Windorf, is that your verdict?

9              THE JUROR:  Yes, sir.

10             THE COURT:  Gary Baugh, is that your verdict?

11             THE JUROR:  Yes, Your Honor.

12             THE COURT:  Paul Jaynes, is that your verdict?

13             THE JUROR:  Yes, Your Honor.

14             THE COURT:  Kamaal Hutchinson, is that your

15    verdict?

16             THE JUROR:  Yes, Your Honor.

17             THE COURT:  Cynthia Angell, is that your verdict?

18             THE JUROR:  Yes, Your Honor.

19             THE COURT:  Thank you all very much.

20             I want to take a minute and talk to you about just

21    briefly some distinct privileges that you all enjoy as jurors

22    here in the Middle District of Florida.  Our local rules do

23    not provide for or allow for any of the parties or the

24    parties' representatives or anyone associated with the

25    parties to contact you or to inquire about your deliberations
```

1    in any way.

2           I've told you throughout the course of the

3    proceedings about not talking about the case amongst

4    yourselves or with anyone else until you began to deliberate.

5    You're obviously now free from that instruction, but with

6    this proviso, that we live in a country where we honor and

7    value free speech, and certainly you all enjoy free speech

8    with respect to your participation in this case and your

9    deliberations.

10          However, you also have the right to keep your views

11   and your deliberations and the deliberations of your fellow

12   jurors private.  Nobody can force you to talk about those

13   things absent some order from me, which they would be

14   unlikely to receive.

15          So I would point out to you that oftentimes people

16   who seek to approach you and discuss your verdict with you

17   have some ulterior motive or are seeking to undermine your

18   verdict in some respect.  So while you are free to discuss

19   the case and your deliberations if you wish to, my advice to

20   you is that the better course is to keep your deliberations

21   private.  Just remember that if you choose to talk about your

22   deliberations, you are of necessity making a decision for one

23   of your fellow jurors that they might not share.

24          So, as I said, it is your right to do as you will;

25   but my advice to you is that the more prudent course is to

```
1    keep your deliberations private.  But nonetheless, I'm going

2    to discharge you now with the thanks of the Court, with one

3    additional request for you.  If you would give me just a few

4    minutes to that care of a couple matters here with the

5    lawyers, I'd like to come back and thank you myself for your

6    service and I won't be long.

7              (Jury not present at 11:28 a.m.)

8              THE COURT:  Jonathan Adleta, you and Mr. Bark

9    please come into the well of the courtroom.

10             Jonathan Adleta, having been convicted by a jury of

11   violations of Title 18, United States Code, Section 2423(e),

12   and Title 18, United States Code, Section 2423(a) and 2, you

13   are hereby remanded to the custody of the United States

14   Marshal to await sentencing.

15             Your sentencing is scheduled for Monday, December

16   the 9th at 10:15 in the morning.

17             We are adjourned.

18             (Proceedings concluded at 11:30 a.m.)

19                      - - - - - - - -

20                   Reporter's Certification

21   I certify that the foregoing is a correct transcript from the

22   record of proceedings in the above-entitled matter.

23                             s/Diane Peede, RMR, CRR
                              Official Court Reporter
24                            United States District Court
     Date:  April 17, 2014    Middle District of Florida
25
```